Stephen E. Hessler, P.C.
Marc Kieselstein, P.C.
Cristine Pirro Schwarzman
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet, P.C. (*pro hac vice* pending)
Brad Weiland (*pro hac vice* pending)
John R. Luze (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| WINDSTREAM HOLDINGS, INC., *et al.,*[1] | ) | Case No. 19-22312 (RDD) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**DEBTORS' AMENDED[2] MOTION FOR ENTRY OF INTERIM**
**AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,**
**AND 507 (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED**
**SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING**
**LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,**
**(III) AUTHORIZING USE OF CASH COLLATERAL, (IV) GRANTING**
**ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY,**
**(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

---

[1]   The last four digits of Debtor Windstream Holdings, Inc.'s tax identification number are 7717.  Due to the large number of debtor entities in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://www.kccllc.net/windstream.  The location of the Debtors' service address for purposes of these chapter 11 cases is:  4001 North Rodney Parham Road, Little Rock, Arkansas 72112.

[2]   This amended motion reflects certain changes to conform the text of the Motion (as defined herein) to that of the proposed form of order, which proposed form of order currently remains as negotiated by the Debtors and other parties and as filed with the original motion at Docket No. 3.

Windstream Services, LLC ("Windstream" or the "Borrower")[3] and the other above-captioned debtors and debtors-in-possession (collectively, the "Debtors,"), respectfully state the following in support of this motion (this "Motion"):

## Preliminary Statement[4]

1.      In a true testament to the strength of Windstream's business operations and reorganizational prospects, Windstream has been able secure $1,000,000,000 in debtor-in-possession financing on market terms over the course of a mere business week.  The Debtors commenced these chapter 11 cases to both obtain the benefit of the automatic stay and to secure the financing needed to continue operating their businesses.  After an unexpected adverse ruling in the Southern District of New York, Windstream suffered events of default under its funded debt documents, discussed more fully below and in the First Day Declaration, resulting in a constriction of liquidity under their revolving credit facility and an acceleration of their remaining $5.6 billion capital structure.  Faced with a sudden liquidity crisis but a strong business model, Windstream turned to the market to provide a solution.

2.      The Debtors received multiple proposals from lenders within and outside the capital structure for both out-of-court and in-court financing.  Together with their advisors, the Debtors and their advisors moved as quickly as possible to provide the necessary due diligence and

---

[3]    Capitalized terms used but not defined in their respective sections have the meanings ascribed to such terms further below in this Motion, the DIP Documents, or the Interim Order, as applicable, as such terms are defined herein.

[4]    In support of this Motion, the Debtors respectfully submit the (a) *Declaration of Nicholas Leone in Support of the Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay,(VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 38] (the "Leone Declaration"), and (b) *Declaration of Tony Thomas, Chief Executive Officer and President of Windstream Holdings, Inc., (I) in Support of Debtors' Chapter 11 Petitions and First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* [Docket No. 27] (the "First Day Declaration").

2

undertake the negotiations necessary to secure the DIP Financing proposal that is now before the Court. This process was ultimately successful, culminating in the proposed $500 million DIP Revolving Facility and $500 million DIP Term Loan Facility. The DIP Facilities allow the DIP Loan Parties to immediately access up to $100 million under the DIP Revolving Facility and $300 million under the DIP Term Loan Facility upon entry of the Interim DIP Order so they can continue to pay their operating expenses and signal to their customers, vendors, employees, and lenders that operations will continue in the ordinary course. The DIP Facilities will provide sufficient liquidity to ensure the Debtors are able to pay their debts as they come due, notwithstanding their inability to access the revolving credit facility under their Prepetition Revolving Credit Facility.

3.       The DIP Facilities were the product of a marketing process and good faith arms'-length negotiation with various potential providers of postpetition financing. As discussed herein and in the Leone Declaration, the DIP Facilities were preceded by a competitive marketing process designed to secure postpetition financing on the best available terms. As part of this process, PJT Partners LLC ("PJT"), the Debtors' proposed investment banker, solicited proposals for debtor-in-possession financing from a variety of potential lenders. While certain parties did offer alternative financing proposals, as explained below and in the Leone Declaration in the Debtors' business judgment, the DIP Facilities provide the best available comprehensive postpetition financing.

4.       In short, the availability under the DIP Facilities will provide sufficient liquidity to fund these chapter 11 cases and the Debtors' general corporate operations. Accordingly, the Debtors firmly believe that approval of the DIP Facilities will maximize value for the Debtors'

stakeholders and is a sound exercise of the Debtors' business judgment.  As a result, the Debtors respectfully request that the Bankruptcy Court grant the relief requested.

## Relief Requested

5.    The Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order,"[5] and, together with the Interim Order, collectively, the "Orders"):

a.    authorizing the Borrower to obtain postpetition financing ("DIP Financing") pursuant to a senior secured, superpriority debtor-in-possession credit facility in an aggregate principal amount of up to $1,000,000,000 on the terms and conditions set forth in the DIP Term Sheet attached as **Exhibit B** and the DIP Credit Agreement, by and among the Borrower, as borrower, the DIP Guarantors, as guarantors, the several banks and other financial institutions or entities from time to time party thereto as lenders (collectively, the "DIP Lenders"), Citigroup Global Markets Inc., on behalf of Citi,[6] and the other arrangers from time to time party thereto (collectively, together with their affiliates in such capacity, the "DIP Arranger"), Citi, as administrative agent and collateral agent (in such capacities, and together with its successors and permitted assigns, the "DIP Agent"), and the Letter of Credit Issuer[7] of the DIP L/C Sub-Facility, and which credit facility shall comprise (a) a revolving credit facility (the "DIP Revolving Facility"; the loans incurred thereunder, the "DIP Revolving Loans") with aggregate commitments of up to $500,000,000, including a letter of credit sub-facility in an aggregate amount of up to $50,000,000 (the "DIP L/C Sub-Facility") and (b) a term loan facility (the "DIP Term Loan Facility") in an aggregate principal amount of $500,000,000 (the loans incurred thereunder, the "DIP Term Loans", together with the DIP Revolving Loans, the "DIP Loans"; the DIP Term Loan Facility, together with the DIP Revolving Facility, the "DIP Facilities");

(I)    upon entry of this Interim Order, subject to the terms and conditions set forth in the DIP Term Sheet and this Interim Order, an initial aggregate principal amount equal to $100 million under the DIP Revolving Facility and $300 million under the DIP Term Loan Facility shall be available to the Borrower;

---

[5]    The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

[6]    "Citi" means Citigroup Global Markets Inc., Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as Citi shall determine appropriate to provide the servicers contemplated herein.

[7]    "Letter of Credit Issuer" means, collectively, Citibank, N.A. or an affiliate thereof and each other Arranger under the Revolving Facility, on a pro rata basis in accordance with their commitments to the Revolving Facility.

(II)     upon entry of a final, non-appealable order in form and substance satisfactory to the DIP Agent (the "Final Order"), subject to the terms and conditions set forth in the DIP Term Sheet, the DIP Documents (as defined below) and the Final Order, the full remaining amounts under the DIP Revolving Facility and the DIP Term Loan Facility shall be available to the Borrower;

b.     authorizing the DIP Guarantors to jointly and severally guarantee on a senior secured superpriority basis the DIP Loans and the DIP Obligations (as defined below);

c.     authorizing the Debtors party thereto to execute and deliver the DIP Term Sheet, the DIP Credit Agreement and other documentation, including credit agreements, security agreements, pledge agreements, control agreements, mortgages, guarantees, promissory notes, certificates, instruments, intellectual property security agreements, notes, that certain Administrative Agent Fee Letter, dated as of February 25, 2019, by and among the DIP Agent, Holdings and the Borrower (the "Agency Fee Letter"), that certain Commitment Letter, dated as of February 25, 2019, by and among the DIP Agent, Holdings and the Borrower (the "Commitment Letter"), that certain Fee Letter, dated as of February 25, 2019, by and among the DIP Agent, Holdings and the Borrower (the "DIP Fee Letter", and together with the Agency Fee Letter and the Commitment Letter, the "Fee Letters"), and such other documentation which may be necessary or required to implement the DIP Facilities and perform thereunder and/or that may be reasonably requested by the DIP Agent, in each case, as amended, restated, supplemented, waived and/or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Term Sheet and the DIP Credit Agreement, the "DIP Documents"); all loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, commitment fees, administrative agency fees and other fees payable pursuant to the Fee Letters), costs, expenses and other liabilities, all other obligations (including indemnities and similar obligations, whether contingent or absolute) and all other amounts due or payable under the DIP Documents, (collectively, the "DIP Obligations"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

d.     granting to the DIP Agent for the benefit of the DIP Lenders (collectively, the "DIP Secured Parties") allowed superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations, and valid, enforceable, non-avoidable and automatically perfected liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and postpetition property of the DIP Loan Parties' estates (other than certain excluded property as provided in the DIP Documents (the "Excluded Assets") and all proceeds thereof, including, subject only to and

effective upon entry of the Final Order (as defined herein), any Avoidance Proceeds (as defined herein), in each case subject to the Carve Out (as defined herein);

e.   authorizing the Debtors, subject to entry of the Final Order, to waive: (a) the Debtors' right to surcharge the Prepetition Collateral and the DIP Collateral (as defined herein) (together, but excluding any Excluded Assets, the "Collateral") pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

f.   authorizing the Debtors to use proceeds of the DIP Facilities, solely in accordance with this Interim Order and the DIP Documents;

g.   authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

h.   subject to the restrictions set forth in the DIP Documents and this interim Order, authorizing the Debtors to use the Prepetition Collateral (as defined herein), including Cash Collateral of the Prepetition Secured Parties under the Prepetition Debt Documents (each as defined herein) and provide adequate protection to the Prepetition Secured Parties for any diminution in value of their respective interests in the Prepetition Collateral (including Cash Collateral), resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral (including Cash Collateral), and the priming of their respective interests in the Prepetition Collateral (including Cash Collateral);

i.   approving of certain stipulations by the Debtors with respect to the Prepetition Loan Documents and the Prepetition Collateral as set forth herein;

j.   modifying the automatic stay to the extent set forth herein and in the DIP Documents; and

k.   scheduling a final hearing (the "Final Hearing") to consider final approval of the DIP Facilities and use of Cash Collateral pursuant to a Final Order, as set forth in the DIP Motion and the DIP Documents filed with this Court.

**Jurisdiction and Venue**

6.   The United States Bankruptcy Court for the Southern District of New York

(the "Bankruptcy Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334

and the *Amended Standing Order of Reference from the United States District Court for the*

*Southern District of New York*, dated February 1, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Bankruptcy Court in connection with this Motion to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

## Concise Statements Pursuant to
## Bankruptcy Rule 4001(b) and Local Rule 4001-2[8]

9.      The below chart contains a summary of the material terms of the proposed DIP Facilities, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.

---

[8]    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced, including the DIP Credit Agreement and the Interim Order.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

| Bankruptcy Code/Local Rule | Summary of Material Terms | |
|---|---|---|
| **Borrower** Bankruptcy Rule 4001(c)(1)(B) | Windstream Service, LLC. *See* DIP Term Sheet, p. 1. | |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Holdings and each existing and future direct and indirect domestic subsidiary of the Borrower to the extent required by Section 5.10 of the Existing Credit Facility (collectively, the "Guarantors"). *See* DIP Term Sheet, p. 1. | |
| **DIP Financing Lenders** Bankruptcy Rule 4001(c)(1)(B) | With respect to the Term Facility, the Arranger (as defined in the DIP Term Sheet) and the other institutions identified in the DIP Term Sheet, and other financial institutions or entities acceptable to Citi (as defined in the DIP Term Sheet) and the Borrower (such acceptance not to be unreasonably withheld) (other than certain Disqualified Institutions). With respect to the Revolving Facility, the Arranger or any of their respective affiliates, and other financial institutions or entities acceptable to Citi and the Borrower (such acceptance not to be unreasonably withheld) (other than Disqualified Institutions). *See* DIP Term Sheet, p. 3. | |
| **Reporting Information** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The Debtors shall continue to provide the agents and indenture trustees under the Existing Primed Secured Facilities and the Existing Midwest Notes with financial and other reporting substantially in compliance with the Existing Primed Secured Facilities and the Existing Midwest Notes and any reporting described herein; provided that no audited financial statements shall be required as adequate protection and there shall be longer deadlines to be mutually agreed for certain reporting. *See* DIP Term Sheet, p. 9-10. | |
| **Entities with Interests in Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(i) | Prepetition Secured Parties, as defined and described in the Interim Order. *See* Interim Order ¶ F.(i)-(xii). | |
| **Term** Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) Local 4001-2(a)(ii) | The maturity date will be (and all loans and obligations shall be repaid in full in cash on) the stated maturity, which shall be the date that is 24 months after the Closing Date (as defined in the DIP Term Sheet) *See* DIP Term Sheet, p. 5. | |
| **Adequate Protection** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) *See* Interim Order ¶ 15. | **Adequate Protection Obligations** | **Applicable Parties** |
| | Valid and automatically perfected replacement liens and security interests in and upon the DIP Collateral, subject and subordinate to (A) the DIP Liens and any liens to which the DIP Liens are junior and (B) the Carve Out. | Prepetition Revolving Lenders, Prepetition Term Loan Lenders, and Prepetition First Lien Noteholders |

| Bankruptcy Code/Local Rule | Summary of Material Terms | |
|---|---|---|
| | Valid and automatically perfected replacement liens and security interests in and upon the DIP Collateral, subject and subordinate to (A) the DIP Liens and any liens to which the DIP Liens are junior, (B) the First Lien Adequate Protection Liens, (C) the Prepetition First Lien Notes Liens and (D) the Carve Out. | Prepetition Second Lien Noteholders |
| | Valid and automatically perfected replacement liens and security interests in and upon any and all assets (including, without limitation, any DIP Collateral) held or owned by (i) the Prepetition Midwest Notes Issuer, (ii) Windstream Network Services of the Midwest, Inc. and/or (iii) each of the Prepetition Midwest Notes Issuer's Debtor subsidiaries that are not currently obligors under the Prepetition Credit Agreement or the Prepetition First Lien Notes, but are (or become) DIP Loan Parties, subject and subordinate only to (A) the DIP Liens and any liens to which the DIP Liens are junior and (B) the Carve Out. | Prepetition Midwest Notes Secured Parties |
| | Valid and automatically perfected replacement liens and security interests in and upon the DIP Collateral, subject and subordinate to (A) the DIP Liens and any liens to which the DIP Liens are junior and (B) the Carve Out. | Prepetition Revolving Lenders, Prepetition Term Loan Lenders, and Prepetition First Lien Noteholders |
| | Cash interest and letter of credit fees at default rate | Prepetition Credit Facility Secured Parties |
| | Cash interest at the non-default rate | Prepetition First Lien Noteholders and Prepetition Midwest Notes Secured Parties |

| Bankruptcy Code/Local Rule | Summary of Material Terms | |
|---|---|---|
| | Consent and Consent Fee | As soon as reasonably practicable after entry of the Interim Order, the Debtors are authorized to distribute to all Prepetition Lenders a request for formal consent to the DIP Loan Parties' use of Cash Collateral and the other Prepetition Collateral, and the DIP Loan Parties' entry into the DIP Documents in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents pursuant to documentation reasonably satisfactory to the Debtors and the Prepetition Agent, and each Prepetition Lender that affirmatively provides such formal consent within fourteen (14) days after entry of this Interim Order shall earn and receive a consent fee in the amount of 0.75 percent of such Prepetition Lender's outstanding principal amount of loans and Revolving Credit Exposure (as defined in Prepetition Credit Agreement) under the Prepetition Credit Facilities (any such consenting Prepetition Term Loan Lender, a "Consenting Term Loan Lender"); provided that, to the extent the Debtors have not confirmed a chapter 11 plan or otherwise effectuated the Discharge of First-Priority Obligations (as defined in the Junior Lien Intercreditor Agreement) before the date that is 18 months after the Petition Date, each Prepetition Lender that affirmatively provides such formal consent shall earn and receive an additional consent fee in the amount of 0.50 percent of such Prepetition Lender's outstanding principal amount of loans and Revolving Credit Exposure under the Prepetition Credit Facilities. |
| | Superpriority administrative claims under section 507(b) of the Bankruptcy Code | All Prepetition Secured Parties (solely following discharge of First-Priority Obligations (as defined in the Junior Lien Intercreditor Agreement) |
| | Certain professional fees and expenses | Substantially all Prepetition Secured Parties |
| | Monitoring of prepetition collateral | Substantially all Prepetition Secured Parties |
| | Certain financial reporting | Substantially all Prepetition Secured Parties |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The DIP Facilities provide that upon the occurrence of an Event of Default and certain other events and after five (5) business days from the date written notice of an Event of Default is delivered, the DIP Agent may proceed against and realize upon the DIP Collateral or any other assets or properties of Debtors' Estates upon which the DIP Agent has been or may hereafter be granted liens or security interests. *See* Interim Order ¶ 10(d). |
| **Carve Out** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(i)(f) | The Interim Order provides a "Carve-Out" of certain statutory fees, allowed professional fees of the Debtors, and any official committee of unsecured creditors appointed under section 1102 of the Bankruptcy Code (the "Creditors' Committee") appointed in these chapter 11 cases pursuant to section 1103 of the Bankruptcy Code, including a Post-Carve-Out Trigger Notice Cap, all as detailed in the Interim Order. *See* Interim Order ¶ 6. |
| **506(c) Waiver** Bankruptcy Rule 4001(c)(l)(B)(x) Local Rule 4001-2(a)(i)(C) | Except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, acting at the direction of the Required Lenders (as defined in the DIP Documents, the "Required DIP Lenders"), and, subject to and effective upon entry of the Final Order, the Prepetition Agent, acting at the direction of the Required Lenders (as defined in the Prepetition Credit Agreement), and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Agent, the DIP Lenders or the Prepetition Secured Parties to any charge, lien, assessment or claim against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise. *See* Interim Order ¶ 11, 12. |
| **Section 552(b)** Bankruptcy Rule 4001(c)(l)(B) Local Rule 4001-2(a(i)(h) | The Prepetition Secured Parties are entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and upon entry of the Final Order, the "equities of the case" exception shall not apply to the secured claims of the Prepetition Secured Parties. *See* Interim Order ¶ 10(d), 12. |
| **Commitment** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | $500,000,000 in Term Loan Commitments (as defined in the DIP Term Sheet) and $500,00,000 in Revolving Commitments (as defined in the DIP Term Sheet). *See* DIP Term Sheet, p. 2. |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | (i) the Applicable Margin (as defined in the sealed Fee Letter) *plus* the Alternate Base Rate defined as the highest of (i) the DIP Agent's base rate, (ii) the three-month certificate of deposit rate plus 1/2 of 1%, (iii) the Federal Funds Effective Rate plus 1/2 of 1% and (iv) the one-month LIBO Rate plus 1.00% per annum, in each case, calculated on a 365/366-day basis and payable monthly in arrears; or<br><br>(ii) the Applicable Margin *plus* the current LIBO rate as quoted by Reuters Screen LIBOR01 Page, adjusted for reserve requirements, if any, and subject to customary change of circumstance provisions, for interest periods of one month (the "LIBO Rate"), calculated on a 360-day basis and payable at the end of the relevant interest period, but in any event at least quarterly; *provided* that the LIBO Rate will at no time be less than 0% per annum.<br><br>*See* DIP Term Sheet, Annex III. |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | None. |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001-2(a)(i)(B) | The Challenge Period is (a) seventy-five (75) calendar days from the date of entry of the Interim Order with respect to parties in interest with requisite standing other than the Creditors' Committee and (b) sixty (60) calendar days from the date of appointment of the Creditors' Committee; *provided, however,* that nothing in the Interim Order shall permit any party to challenge the extent or validity of the obligations of the DIP Loan Parties under the Prepetition Debt Documents, including the Prepetition Debt.<br><br>*See* Interim Order ¶ 21. |
| **Use of DIP Financing Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(ii)<br>Local Rule 4001-2(a)(ii) | The proceeds will be used:  (i) to pay related transaction costs, fees and expenses, (ii) to provide working capital for the Debtors and for other general corporate purposes of the Debtors, (iii) to pay Adequate Protection Obligations payments as authorized by the Bankruptcy Court in the Interim Order or the Final Order (each as defined herein), (iv) to pay obligations arising from or related to the Carve-Out and (v) to pay restructuring costs incurred in connection with the Cases.<br><br>*See* DIP Term Sheet, pp. 2-3. |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br>Local Rule 4001-2(a)(i)(B) | Without prejudice to the rights of the Committee or other parties-in-interest as and to the extent set forth in Section F of the Interim Order, the Debtors admit, stipulate, acknowledge, and agree as immediately upon entry of the Interim Order as to certain stipulations regarding the validity and extent of each of the Prepetition Credit Facility Secured Parties', the Prepetition First Lien Notes Secured Parties', the Prepetition Midwest Notes Secured Parties', and the Prepetition Second Lien Notes Secured Parties' claims and liens. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br>Bankruptcy Rule 4001(c)(1)(B)(vii) | *See* Interim Order ¶ F. |

| | |
|---|---|
| **Repayment Features**<br>Local Rule 4001-2(a)(i)(E) | <u>Scheduled Payments</u>. The Borrower promises to pay all DIP Loans, together with all other amounts owed hereunder with respect thereto on the Maturity Date.<br><br><u>Voluntary Payments and Commitment Reductions</u>.<br><br>• The Borrower may repay the loans under the DIP Term Loan Facility and/or reduce the Term Loan Commitments under the DIP Term Loan Facility (1) subject to a prepayment premium of 1.00% of the principal amount of loans under the DIP Term Loan Facility so prepaid or the Term Loan Commitments so reduced, if the prepayment or reduction occurs prior to the six month anniversary of the Closing Date or (2) without premium or penalty, if the prepayment or reduction occurs on or after the six month anniversary of the Closing Date (other than breakage costs) upon (i) at least 3 business days' notice in the case of LIBOR Loans and (ii) one business days' notice in the case of ABR Loans; provided that in the case of repayment, each partial repayment shall be in an amount of $1,000,000 or multiples of $250,000 in excess thereof (or, if less, the outstanding amount of applicable loans), and, in the case of reduction of the Term Loan Commitments, each partial reduction shall be in an amount of $1,000,000 or multiples of $250,000 in excess thereof (or, if less, the remaining available balance of the Term Loan Commitments).<br><br>• The Borrower may repay the loans under the DIP Revolving Facility at any time without premium or penalty (other than breakage costs, if applicable) upon (i) at least 3 business days' notice in the case of LIBOR Loans and (ii) one business days' notice in the case of ABR Loans; provided that in the case of repayment, each partial repayment shall be in an amount of $1,000,000 or multiples of $250,000 in excess thereof (or, if less, the outstanding amount of applicable loans), and, in the case of reduction of the Revolving Commitments, each partial reduction shall be in an amount of $1,000,000 or multiples of $250,000 in excess thereof (or, if less, the remaining available balance of the Revolving Commitments).<br><br><u>Mandatory Prepayments</u>.<br><br>• <u>Asset Sales</u>: Prepayments of the DIP Term Loan Facility in an amount equal to 100% of the net cash proceeds of certain non-ordinary course sales or other dispositions to be mutually agreed of any property or assets of the Borrower or any of its respective subsidiaries that exceeds $25,000,000 in the aggregate for each fiscal year.<br><br>• <u>Insurance Proceeds</u>: Prepayments of the DIP Term Loan Facility in an amount equal to 100% of the net cash proceeds of insurance paid on account of any loss of any property or assets of the Borrower or any of its subsidiaries (other than any such proceeds received prior to the date of commencement of the Cases), subject to any Legal Limitations and with restrictions to be agreed, and subject to exceptions to be agreed on in the Definitive Documentation.<br><br>• <u>Incurrence of Indebtedness</u>: Prepayments of the DIP Term Loan Facility in an amount equal to 100% of the net cash proceeds received from the incurrence of indebtedness by the Borrower or any of its other restricted subsidiaries (other than indebtedness otherwise permitted under the DIP Documents), payable no later than the date of receipt.<br><br>• <u>DIP Revolving Facility Overdraw</u>. On any date that outstanding loans under the DIP Revolving Facility and Letter of Credit exposures exceed DIP Revolving Facility Availability then, not later than the next business day, the Borrower must prepay the loans under the Revolving Facility so that outstanding loans under the |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | Revolving Facility and Letter of Credit exposures no longer exceed Revolving Facility Availability. *See* DIP Term Sheet, p. 6-7. |
| **Fees** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | <u>Unused Commitment Fee</u>: 0.50% per annum on the daily average unused portion of the DIP Revolving Facility (whether or not then available), payable quarterly in arrears and on the date when the commitments under the DIP Facilities is due. <u>Letter of Credit Fees</u>: the Applicable LIBOR Margin to the DIP Lenders, and 0.125% per annum to the Letter of Credit Issuer, payable quarterly in arrears and computed on a 360-day basis. <u>OID</u>: Sealed pursuant to the *Debtors' Motion Seeking Entry of an Order Authorizing the Debtors to (I) Restrict Access to Confidential Fee Letters Related to Proposed Debtor-in-Possession Financing and (II) Redact Certain Terms in the Leone Declaration* (the "<u>Fee Sealing Motion</u>"), filed contemporaneously herewith. <u>Underwriting Fees</u>: Sealed pursuant to the Fee Sealing Motion. *See* DIP Term Sheet, Annex IIII. |
| **Budget** Bankruptcy Rule 4001 (c)(1)(B) Local Rule 4001-2(a)(ii) | <u>Budget</u>: The Initial Budget is attached to the Interim Order. *See* Interim Order, **Schedule 1**. |
| **Variance Covenant** Bankruptcy Rule 4001(c)(l)(B) Local Rule 4001-2(a)(ii) | Each of the Debtors shall deliver periodic updates of the Cash Flow Forecast (as defined in the DIP Term Sheet) and weekly variance reports, but there are no defaults related to Budget variances, *See* DIP Term Sheet, p. 12. |
| **Liens and Priorities** Bankruptcy Rule 4001(c)(l)(B)(i) Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(ii) | <u>Liens</u>. In order to secure the DIP Obligations, effective immediately upon entry of the Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, are granted pursuant to the Interim Order, as of the Petition Date, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens, in and upon all DIP Collateral. <u>DIP Lien Priority in DIP Collateral</u>. The DIP Liens securing the DIP Obligations shall be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with sections 363, 364 or any other section of the Bankruptcy Code or other applicable law; *provided, however*, that the DIP Priming Liens shall be (i) subject and junior to the Carve Out, (ii) senior in all respect to the Prepetition Liens, and (iii) senior to the Adequate Protection Liens. *See* Interim Order ¶ F (viii)-(xv). |
| **Liens on Avoidance Actions** Local Rule 4001-2(a)(i)(D) | Subject to entry of the Final Order, all proceeds of any property recovered as a result of transfers or obligations avoided or actions maintained or taken Chapter 5 of the Bankruptcy Code. *See* Interim Order ¶ 8(i). |

14

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001-2(a)(ii) | Usual and customary for financings of this type.<br><br>*See* Interim Order ¶ 19(b). |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Documents and Interim Order contain indemnification provisions ordinary and customary for debtor-in-possession financings of this type by the Borrower and each DIP Guarantor (jointly and severally).<br><br>*See* Interim Order ¶ 3. |
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | <u>Conditions Precedent to Initial Availability</u>.<br><br>The DIP Term Sheet includes conditions to initial borrowing that are customary and appropriate for similar debtor-in-possession financings of this type.<br><br><u>Conditions Precedent to All Full Availability</u>.<br><br>The DIP Term Sheet includes conditions to full availability that are customary and appropriate for similar debtor-in-possession financings of this type.<br><br>*See* DIP Term Sheet, Annex II. |

## **Background**

### I.    **The Debtors' Prepetition Capital Structure.**

10.    As of the Petition Date, Windstream was liable for nearly $5.6 billion in aggregate funded-debt obligations.  These obligations arise under the Prepetition Revolving Credit Facility, the Prepetition Term Loan Facility, the Prepetition First Lien Notes, the Prepetition Midwest Notes, the Prepetition 2024 Second Lien Notes, the Prepetition 2025 Second Lien Notes, and the six series of unsecured notes listed in the table below.  Holdings is not party to Windstream's debt obligations.  All debt has been incurred by Windstream and its guarantor subsidiaries.  The table below summarizes Windstream's capital structure as of the Petition Date.

| *First Lien Debt Obligations* | *Principal Amount* (in US$ millions) |
|---|---|
| Term Loan, Tranche B6 – variable rates, due March 29, 2021 | $1,180.6 |
| Term Loan, Tranche B7 – variable rates, due February 17, 2024 | $568.4 |
| Revolver – variable rates, due April 24, 2020 | $802.0 |
| 2025 First Lien Notes – 8.625%, due October 31, 2025 | $600.0 |
| | |
| *Secured Subsidiary Notes* | |
| Subsidiary First Lien Notes – 6.75%, due April 1, 2028 | $100.0[9] |
| | |
| *Second Lien Debt Obligations* | |
| 2024 Second Lien Notes - 10.500%, due June 20, 2024 | $414.9 |
| 2025 Second Lien Notes - 9.00%, due June 30, 2025 | $802.0 |
| **Total Secured Debt Obligations** | **$4,467.8** |
| | |
| *Unsecured Note Issuances* (in US$ millions) | |
| 2020 Senior Notes – 7.750%, due October 15, 2020 | $78.1 |
| 2021 Senior Notes – 7.750%, due October 1, 2021 | $70.1 |
| 2022 Senior Notes – 7.500%, due June 1, 2022 | $36.2 |
| 2023 Senior Notes – 7.500%, due April 1, 2023 | $34.4 |
| 2023 Senior Notes – 6.375%, due August 1, 2023 | $806.9 |
| 2024 Senior Notes – 8.750%, due December 15, 2024 | $105.8 |
| **Total Unsecured Note Obligations** | **$ 1,131.5** |
| | |
| **Total Funded-Debt Obligations** | **$5,599.3 million[10]** |

## A.    Intercreditor Agreements

11.    The Debtors' prepetition indebtedness is subject to three intercreditor agreements:

(a) the First Lien Pari Passu Intercreditor Agreement; (b) the Second Lien Pari Passu Intercreditor

---

[9]    These notes were assumed as part of an acquisition transaction and are secured by certain assets of the issuer of these notes and its subsidiaries.  The issuer of these notes, Windstream Holdings of the Midwest, Inc., is a guarantor of Windstream Services other debt obligations.

[10]    Includes less of a net discount on long-term debt (31.7), unamortized debt issuance costs (60.8), and current maturities (17.9).

Agreement; and (c) the Junior Lien Intercreditor Agreement (collectively, the "Intercreditor Agreements").[11]   The First Lien Pari Passu Intercreditor Agreement governs the relative contractual rights between and among the Prepetition Revolving Lenders, Prepetition Term Loan Lenders, and Prepetition First Lien Noteholders.   The Second Lien Pari Passu Intercreditor Agreement governs the relative contractual rights of the Prepetition 2024 Second Lien Noteholders and the Prepetition 2025 Second Lien Noteholders.   Finally, the Junior Lien Intercreditor Agreement governs the relative contractual rights of the Prepetition Revolving Lenders, Prepetition Term Loan Lenders, Prepetition First Lien Noteholders, Prepetition 2024 Second Lien Noteholders, and Prepetition 2025 Second Lien Noteholders.   Each of these agreements sets forth the rights and responsibilities of the respective parties thereto with respect to enforcement and turnover provisions in the event of a bankruptcy filing.   Significantly, the First Lien Pari Passu Intercreditor Agreement provides that each pari passu first lien lender agrees that it will not raise an objection to debtor-in-possession financing and use of cash collateral, unless certain other parties in the first lien capital structure raise an objection, including the Prepetition Agent or the Prepetition Midwest Noteholders.

12.    Moreover, the Junior Lien Intercreditor Agreement prohibits the trustee for the Prepetition Second Lien Holders to object to debtor-in-possession financing and use of cash collateral provided to any of the first lien lenders or their representatives.   The Junior Lien Intercreditor Agreement further provides that the Prepetition Second Lien Noteholders are not entitled to any adequate protection in their own right; however, the Prepetition Second Lien

---

[11]    Despite that the Prepetition Midwest Noteholders, the Debtors reserve their rights to argue that the Prepetition Midwest Noteholders are subject to the Intercreditor Agreements.

Noteholders may receive adequate protection in the form of replacement liens if the Prepetition

Lenders, or Prepetition First Lien Noteholders, receive replacement liens.

## II.    The Debtors' Need for Postpetition Financing and Access to Cash Collateral

13.    Prior to the Petition Date, PJT ran a thorough and effective marketing process to

arrange postpetition financing on an expedited timeline.  As part of this process, PJT engaged with

multiple potential lenders and eventually obtained favorable financing terms under the proposed

DIP Facilities that provide sufficient liquidity to preserve their businesses as a going concern.  The

terms of the DIP Facilities are favorable for the Debtors and help facilitate the conditions necessary

to maximize value for the Debtors and the Debtors' estates.

14.    Prior to engaging in debtor-in-possession discussions with potential lenders, PJT

assisted the Debtors in evaluating potential out-of-court financing alternatives for raising

incremental capital to address an alleged default under the indenture governing Debtor

Windstream Services, LLC's ("Windstream Services") 6.375% senior unsecured notes due 2023

(the "6 3/8% Notes Indenture" governing the "6 3/8% Notes") as well as a potential adverse ruling

of the United States District Court for the Southern District of New York (the "District Court").

As described more fully in the First Day Declaration, on February 15, 2019, the District Court

issued its findings of fact and conclusions of law against Windstream Services, finding that the

Uniti spin-off transaction constituted a prohibited sale and leaseback transaction under the 6 3/8%

Notes Indenture, that the Windstream Services did not cure the default, and that the notice of

acceleration was valid.  Although the Debtors disagree with the District Court's ruling for a number

of reasons, the ruling found that an event of default occurred that has not been cured or waived.

The ruling triggered a cross-default under the Prepetition Credit Agreement governing

Windstream's secured term and revolving loan obligations and a cross-acceleration event of

default under the indentures governing Windstream's other series of secured and unsecured notes.[12]

15.    As a result of the cross-defaults under the Prepetition Term Loan Facility and Prepetition Revolving Credit Facility, absent a waiver from a majority of their Prepetition Revolving Lenders, the Debtors cannot access the approximately $425 million in availability under their Prepetition Revolving Credit Facility (*i.e.*, access to cash), which the Debtors rely upon for day-to-day funding needs.   The Debtors have not historically retained significant amounts of excess cash, and instead have funded operations through revolver borrowings.   As of February 15, 2019, the day the District Court issued its findings of fact and conclusions of law, the Debtors had approximately $20 million in cash on hand and limited access to additional liquidity.

16.    Absent the immediate relief requested by this Motion, the Debtors face a material risk of substantial, irreparable, and ongoing harm.   Access to Cash Collateral and new capital under the DIP Facilities, both on an interim basis and throughout these chapter 11 cases, will ensure the Debtors have sufficient funds to preserve and maximize the value of their estates, responsibly administer these chapter 11 cases.

### III.    The Debtors' Prepetition Marketing Efforts

17.    Prior to the filing of these chapter 11 cases, PJT explored several options for out-of-court financing to address the adverse ruling in the District Court, and obviate the need for a bankruptcy filing.   For example, the Debtors explored potential financing alternatives to fund a settlement with Aurelius Capital Master, Ltd. ("Aurelius") or repay or defease the outstanding 6 3/8% Notes to render the litigation moot.   Any attempt to raise capital and repay or discharge

---

[12]    For the avoidance of doubt, the Debtors reserve all rights with respect to the findings, including pursuit of remedies provided for under the Bankruptcy Code, such as equitable subordination.

the 6 3/8% Notes would have raised a number of legal and execution issues, as described more fully in the First Day Declaration.

18.     On February 21, 2019, the Debtors received a preliminary, non-binding proposal, which was revised on February 22, 2019, from certain large financial institutions (the "Out-of-Court Proposal").   The Out-of-Court Proposal included the potential for a new or refinanced revolving credit facility and other funding, potentially providing up to $700 million of incremental capital to the Debtors.   While management and the Debtors' advisors recognized that the Out-of-Court Proposal could have addressed the event of default, it would have required the satisfaction of several challenging conditions, including the resolution of significant objections from the Debtors' funded debt stakeholders, as further described in the First Day Declaration.   Accordingly, in the exercise of the business judgment of their board of directors and management, the Debtors chose not to pursue the out-of-court financing alternatives and instead focus on a chapter 11 filing with debtor-in-possession financing.

19.     Simultaneously with analyzing the potential above-mentioned out-of-court alternatives, management and the advisors worked diligently to evaluate options for debtor-in-possession financing.   More specifically, PJT worked closely with the Debtors' management to determine the Debtors' cash requirements for their businesses including the effect of the chapter 11 filing on the operations of the business, financing costs associated with a DIP Facilities, professional fees, and required operational payments.   PJT worked with the Debtors' management and the other advisors, including their proposed legal advisor, Kirkland & Ellis LLP ("K&E"), and, for a limited time, its proposed restructuring advisor, Alvarez & Marsal LLC ("A&M"), to estimate the Debtors' postpetition financing needs.

20.     Prior to the commencement of these chapter 11 cases, on February 20, 2019, PJT launched a formal marketing process designed to canvas the market and identify the best possible solution to the Debtors' particular financing needs.   PJT began the marketing process by developing a list of sophisticated institutions knowledgeable about the Debtors' business that would be most capable of expeditiously providing postpetition financing.  The list included certain of the Prepetition Revolving Lenders.  PJT consulted with the Debtors and their other advisors throughout this process and sought to foster a process to most efficiently raise necessary capital and obtain postpetition financing on the best terms possible.

21.     In this case, obtaining access to postpetition financing on an unsecured basis was difficult because the Debtors' Prepetition Secured Parties assert that nearly all of the Debtors' assets are encumbered under its existing capital structure, which, along with the Debtors' uncertain financial condition, restricts the availability of, and options for, postpetition financing.  To avoid a protracted and expensive priming fight, the Debtors would either need to (a) obtain the consent of the Prepetition Secured Parties to the priming of their liens by a third-party lender or (b) locate a third-party lender willing to provide postpetition financing on an unsecured basis.  None of the parties contacted were willing to provide debtor-in-possession financing junior to the Prepetition Secured Lenders.

22.     Beginning on February 20, 2019, PJT reached out to eight financial institutions that were members of the Prepetition Revolving Lender group under the Prepetition Revolving Credit Facility to gauge their interest in providing such debtor-in-possession financing to the Debtors. PJT requested proposals for up to $1.0 billion in postpetition financing, consisting of a revolving credit facility and a term loan facility, based on the business plan, cash flow forecast, and other key assumptions considered at that time.  PJT requested that lenders submit proposals by February

22, 2019 (*i.e.*, two days after commencing the marketing process). Of those eight, six institutions delivered non-binding proposals to the Debtors.

23.    After receiving the competing proposals and in light of the short period between receiving proposals and the anticipated chapter 11 filing date, the Debtors and PJT engaged in negotiations with the DIP Lenders regarding key economic and structural terms of the proposal under consideration. These negotiations involved: (a) multiple telephone conferences with the Debtors' management and advisors; (b) the exchange of multiple iterations of term sheet proposals and related documents reflecting the proposed debtor-in-possession financing terms; and (c) circulation of the proposed budget and other due diligence materials to potential lenders.

24.    A key consideration for the Debtors during the marketing and negotiation process was the competitive nature of each proposal, the impact a "priming" facility would impose on the Prepetition Secured Parties, and the risks such financing would place on ultimately obtaining approval of such financing. Through these negotiations, the Debtors were able to achieve favorable economic terms, financial flexibility, and overall certainty of funding.

25.    The proposed debtor-in-possession financing serves as an important component of the Debtors' overall restructuring efforts because it provides the Debtors with the stability and certainty that they will have sufficient liquidity to continue operations in the ordinary course of business during these chapter 11 cases. Based on the results of this marketing process, and given the facts and circumstances of these chapter 11 cases, the DIP Facilities are the best available possible financing options for the Debtors at this time.[13]

---

[13]    Based on the Debtors' forecasts, management also determined, along with PJT and its other advisors, that administering these chapter 11 estates solely on a "cash collateral" basis without access to postpetition financing to provide the Debtors with additional liquidity would present a material risk to stakeholder value because the Debtors' cash on hand would be insufficient to fund their operations and administer these chapter 11 cases. The requested amount of interim financing will ensure that the Debtors have the necessary liquidity to continue to operate without material disruption following the Petition Date through the Final Hearing. Moreover, obtaining

## IV.     The Debtors' Proposed Adequate Protection Is Fair and Reasonable

26.     The proposed debtor-in-possession financing, as contemplated by the DIP Loan Documents, in each case subject to customary exclusions including the Carve Out, will provide the DIP Lenders continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral, subject to the Carve Out, which includes substantially all of the Debtors' assets, and excludes certain Excluded Assets (as defined in the DIP Documents).

27.     The adequate protection contemplated by the proposed debtor-in-possession financing is designed to protect the interests in the Debtors' property of the Prepetition Revolving Lenders, Prepetition Term Loan Lenders, Prepetition Midwest Notes Secured Parties, Prepetition First Lien Noteholders, and Prepetition Second Lien Noteholders from any diminution in value caused by the Debtors' use of the Prepetition Collateral, including Cash Collateral, during the pendency of these chapter 11 cases.  Specifically, the Debtors have agreed to provide the following forms of adequate protection subject, in each case, to the Carve Out (collectively, the "Adequate Protection Obligations"):

| Adequate Protection Obligations | Applicable Parties |
|---|---|
| Valid and automatically perfected replacement liens and security interests in and upon the DIP Collateral, subject and subordinate to (A) the DIP Liens and any liens to which the DIP Liens are junior and (B) the Carve Out. | • Prepetition Revolving Lenders, Prepetition Term Loan Lenders, and Prepetition First Lien Noteholders |
| Valid and automatically perfected replacement liens and security interests in and upon the DIP Collateral, subject and subordinate to (A) the DIP Liens and any liens to which the DIP Liens are junior, (B) the First Lien Adequate Protection Liens, (C) the Prepetition First Lien Notes Liens and (D) the Carve Out. | • Prepetition Second Lien Noteholders |

---

financing for the chapter 11 cases and the Debtors' continued business operations is key to avoiding the possibility of material, substantial harm to their value.

| Adequate Protection Obligations | Applicable Parties |
|---|---|
| Valid and automatically perfected replacement liens and security interests in and upon any and all assets (including, without limitation, any DIP Collateral) held or owned by (i) the Prepetition Midwest Notes Issuer, (ii) Windstream Network Services of the Midwest, Inc. and/or (iii) each of the Prepetition Midwest Notes Issuer's Debtor subsidiaries that are not currently obligors under the Prepetition Credit Agreement or the Prepetition First Lien Notes, but are (or become) DIP Loan Parties, subject and subordinate only to (A) the DIP Liens and any liens to which the DIP Liens are junior and (B) the Carve Out. | • Prepetition Midwest Notes Secured Parties |
| Cash interest and letter of credit fees at default rate | • Prepetition Credit Facility Secured Parties |
| Cash interest at the non-default rate | • Prepetition First Lien Noteholders and Prepetition Midwest Notes Secured Parties |
| Consent and Consent Fee | • As soon as reasonably practicable after entry of the Interim Order, the Debtors are authorized to distribute to all Prepetition Lenders a request for formal consent to the DIP Loan Parties' use of Cash Collateral and the other Prepetition Collateral, and the DIP Loan Parties' entry into the DIP Documents in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents pursuant to documentation reasonably satisfactory to the Debtors and the Prepetition Agent, and each Prepetition Lender that affirmatively provides such formal consent within fourteen (14) days after entry of this Interim Order shall earn and receive a consent fee in the amount of 0.75 percent of such Prepetition Lender's outstanding principal amount of loans and Revolving Credit Exposure (as defined in Prepetition Credit Agreement) under the Prepetition Credit Facilities (any such consenting Prepetition Term Loan Lender, a "Consenting Term Loan Lender"); provided that, to the extent the Debtors have not confirmed a chapter 11 plan or otherwise effectuated the Discharge of First-Priority Obligations (as defined in the Junior Lien Intercreditor Agreement) before the date that is 18 months after the Petition Date, each Prepetition Lender that affirmatively provides such formal consent shall earn and receive an additional consent fee in the amount of 0.50 percent of such Prepetition Lender's outstanding principal amount of loans and Revolving Credit Exposure under the Prepetition Credit Facilities. |

| Adequate Protection Obligations | Applicable Parties |
|---|---|
| Superpriority administrative claims under section 507(b) of the Bankruptcy Code | • All Prepetition Secured Parties (solely following discharge of First-Priority Obligations (as defined in the Junior Lien Intercreditor Agreement) |
| Certain professional fees and expenses | • Substantially all Prepetition Secured Parties |
| Monitoring of prepetition collateral | • Substantially all Prepetition Secured Parties |
| Certain financial reporting | • Substantially all Prepetition Secured Parties |

28.     In addition, there is significant equity cushion, which provides the prepetition first lien lenders with adequate protection in addition to the Adequate Protections Obligations.  While PJT has not yet undertaken a comprehensive valuation of the Debtors or their assets and does not have a view as to enterprise value, based on certain criteria, the Debtors submit that there is an equity cushion that provides sufficient adequate protection to such parties.

29.     The DIP Facilities further provide adequate protection to the Prepetition Secured Parties by providing the liquidity necessary to stabilize the Debtors' operations and preserve their ability to operate as a going concern.  Further, the incremental value generated by use of the proceeds of the proposed DIP Facilities will inure to the ultimate benefit of the Debtors' estates and their stakeholders.  Without the proposed debtor-in-possession financing, these estates could be required to undertake a liquidation process on a highly expedited basis and, in that scenario, secured creditor recoveries would likely be materially impaired when compared to recoveries available if the Debtors are able to access the proposed debtor-in-possession financing.  The proposed debtor-in-possession financing therefore mitigates the risk of an expedited liquidation and, by avoiding that possible near-term outcome, provides a direct benefit to the Prepetition Secured Parties.

30.     Moreover, as discussed above, the Junior Lien Intercreditor Agreement prohibits the trustee for the Prepetition Second Lien Noteholders from objecting to debtor-in-possession

financing and use of cash collateral provided to any of the first lien lenders or their representatives. The Junior Lien Intercreditor further provides that the Prepetition Second Lien Noteholders are not entitled to any adequate protection in their own right; however, the Prepetition Second Lien Noteholders may receive adequate protection in the form of replacement liens if the Prepetition Lenders, or Prepetition First Lien Noteholders, receive replacement liens.  Even if the trustee could object, however, the adequate protection should be approved because it is fair, reasonable, and sufficiently protects against any diminution in value.

## V.    The Rates and Fees in Connection with the DIP Facilities Are Reasonable

31.    The Debtors have agreed, subject to Bankruptcy Court approval, to pay certain interest and fees to the DIP Agent and the DIP Lenders pursuant to the DIP Loan Documents. Such rates and fees are summarized below:

| Interest and Fees | Amount |
|---|---|
| Interest Rate | The Applicable Margin (as defined in the sealed Fee Letter) *plus* the Alternate Base Rate defined as the highest of (i) the DIP Agent's base rate, (ii) the three-month certificate of deposit rate plus 1/2 of 1%, (iii) the Federal Funds Effective Rate plus 1/2 of 1% and (iv) the one-month LIBO Rate plus 1.00% per annum, in each case, calculated on a 365/366-day basis and payable monthly in arrears; or<br><br>the Applicable Margin *plus* the current LIBO rate as quoted by Reuters Screen LIBOR01 Page, adjusted for reserve requirements, if any, and subject to customary change of circumstance provisions, for interest periods of one month (the "<u>LIBO Rate</u>"), calculated on a 360-day basis and payable at the end of the relevant interest period, but in any event at least quarterly; *provided* that the LIBO Rate will at no time be less than 0% per annum. |
| Fees | <u>Unused Commitment Fee</u>:  0.50% per annum on the daily average unused portion of the DIP Revolving Facility (whether or not then available), payable quarterly in arrears and on the date when the commitments under the DIP Facilities is due.<br><br><u>Letter of Credit Fees</u>: The Applicable LIBOR Margin to the DIP Lenders, and 0.125% per annum to the Letter of Credit Issuer, payable quarterly in arrears and computed on a 360-day basis.<br><br><u>OID</u>:  Sealed pursuant to the Fee Sealing Motion.<br><br><u>Underwriting Fees</u>: Sealed pursuant to the Fee Sealing Motion. |
| Maturity | 24 months after the Closing Date. |

32.     Under the facts and circumstances of these chapter 11 cases, the interest rate and fees reflected in the DIP Facilities are reasonable.  Further, the interest rate and fees were subject to negotiation and are an integral component of the overall terms of the DIP Facilities, and were required by the DIP Agents and the DIP Lenders as consideration for the extension of postpetition financing.

## VI.    The DIP Facilities Are In the Best Interest of the Estates.

33.     As described above, the Debtors ultimately determined in their business judgment that the DIP Facilities provided the most attractive financing available.  The proceeds of the DIP Facilities will provide the Debtors with the ability to fund day-to-day operations, make critical capital expenditure investments, fund operations, finance operational restructuring and cost-savings initiatives, meet their administrative obligations during these chapter 11 cases, and emerge on a timely basis as a reorganized business enterprise.  The DIP Facilities contemplated by the Motion, including the access to Cash Collateral, will provide confidence to the Debtors' customers, vendors, employees, and contract counterparties that operations are appropriately funded and that the bankruptcy filing will not negatively impact the Debtors' businesses. Specifically, the Debtors' access to the DIP Facilities will communicate to all stakeholders that it will be able to continue meeting the needs of its customers, compensating its employees, paying its vendors, and managing its businesses in a manner as close to the ordinary course as possible.

34.     Access to the DIP Facilities, including the use of Cash Collateral, will provide the Debtors with sufficient funds to preserve and maximize the value of their estates, responsibly administer these chapter 11 cases, and implement their business plan.  In the event that either the Bankruptcy Court does not approve the proposed debtor-in-possession financing or the Debtors are denied access to Cash Collateral there is a substantial risk of immediate and irreparable harm

to the Debtors' estates. Absent access to the DIP Facilities, the Debtors would likely need to liquidate immediately, to the detriment of their stakeholders.

35.    While the Debtors are in need of an immediate infusion of liquidity, the Debtors have a fundamentally valuable going concern business and an experienced management team. Notwithstanding the fact that the Debtors arrived in chapter 11 without a pre-negotiated deal in place due to a sudden liquidity crisis, the Debtors intend to engage with all stakeholders postpetition and use the chapter 11 process as to attempt to build consensus around a value-maximizing result that will inure to the benefit of stakeholders enterprise-wide.

36.    Ultimately, the DIP Lenders offered the superior financing proposal in light of the circumstances of these chapter 11 cases, the time available, and the current market for such financing. As a result, the Debtors ultimately determined in their business judgment that the DIP Facilities were the most attractive financing available.

## Basis for Relief

**I.     The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

**A.     Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

37.    The Bankruptcy Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facilities, and continue using the Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant a debtor-in-possession considerable deference in acting in accordance with their business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14

28

(Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *accord In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) ("the applicable factors can be synthesized as follows:  (1) That the proposed financing is an exercise of sound and reasonable business judgment . . . .").

38.    Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

39.    Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus.* 294 B.R. at 886; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Bankruptcy Court may also appropriately take into

consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.

For example, in *In re ION Media Networks. Inc.*, the Bankruptcy Court for the Southern District

of New York held that:

> Although all parties, including the Debtors and the Committee, are
> naturally motivated to obtain financing on the best possible terms, a
> business decision to obtain credit from a particular lender is almost
> never based purely on economic terms. *Relevant features of the
> financing must be evaluated, including non-economic elements such
> as the timing and certainty of closing, the impact on creditor
> constituencies and the likelihood of a successful reorganization.*
> This is particularly true in a bankruptcy setting where cooperation
> and establishing alliances with creditor groups can be a vital part of
> building support for a restructuring that ultimately may lead to a
> confirmable reorganization plan. That which helps foster consensus
> may be preferable to a notionally better transaction that carries the
> risk of promoting unwanted conflict.

Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

40.     The Debtors' determination to move forward with the DIP Facilities is an exercise

of their sound business judgment following an arm's-length process and careful evaluation of

available alternatives.  Specifically, the Debtors and their advisors determined that postpetition

financing provides certainty with respect to capital necessary for the administration of these

chapter 11 cases through emergence.  The Debtors negotiated the DIP Term Sheet and other

DIP Documents with the DIP Lenders in good faith, at arm's length, and with the assistance of

their advisors, and the Debtors believe that they have obtained the best financing available because:

(a) the DIP Facilities permit the Debtors to avoid value-destructive priming issues and has the

support of a majority of their prepetition first lien lenders; (b) third-party lenders were unwilling

to provide viable debtor-in-possession financing junior to the Prepetition Secured Parties to the

Debtors' high level of existing secured debt obligations (b) the DIP Facilities present the best

financing reasonably available to the Debtors with significant availability, competitive pricing, a

24-month maturity date, all without overly burdensome case controls.  Finally, entry into the

DIP Facilities with the Debtors' Prepetition Secured Parties will likely avoid a costly priming and adequate protection fight at the outset of these chapter 11 cases that would cause significant uncertainty among vendors, employees, customers, and other stakeholders. Accordingly, the Bankruptcy Court should authorize the Debtors' entry into the DIP Documents, as doing so is a reasonable exercise of the Debtors' business judgment.

### B.    The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.

41.    The Debtors propose to obtain financing under the DIP Facilities by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code. Specifically, the Debtors propose to provide to the DIP Lenders continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral, subject to the Carve Out and excluding the collateral securing the Prepetition Midwest Noteholders.

42.    The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c); *see In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

    a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

    b.    the credit transaction is necessary to preserve the assets of the estate; and

      c.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. at 37–40; *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02

(Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

43.     The Debtors meet each part of this test. As described above and as set forth in the Leone Declaration, due to the Debtors' high level of existing secured debt obligations, no lenders were willing to provide postpetition financing junior to the Prepetition Secured Parties. In addition, the Out-of-Court Proposal was non-actionable for the reasons described above. Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing likely would require the support of, or be provided by, the Debtors' existing lenders. Absent the DIP Facilities, which will provide certainty that the Debtors will have sufficient liquidity to administer these chapter 11 cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders. Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facilities, as set forth in the DIP Term Sheet, are fair, reasonable, and adequate, all as more fully set forth below. For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

44.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving superpriority claims in favor of the DIP Lenders is reasonable and appropriate.

45.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Accordingly, the Debtors may incur "priming" liens under the DIP Facilities if either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.  What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  *In re Mosello,* 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case."); *In re Realty Sw. Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992) ("'Adequate protection' is a question of fact because it has as its linchpin the concept of value, and therefore is determined on a case-by-case basis.") (citation omitted); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

46.     As an initial matter, and as described above, the relative rights of the Prepetition Secured Parties with respect to adequate protection, including in the context of debtor-in-possession financing, are set forth in the Intercreditor Agreements.  Even if certain of those parties were not contractually prohibited from objecting to the Debtors' proposed financing and use of Cash Collateral, the Debtors respectfully submit that their robust proposal more than satisfies the requirements of "adequate" protection.  As described more fully in the Interim Order,

the Debtors propose to provide a variety of adequate protection to protect the interests in the Debtors' property of the Prepetition Secured Parties from any diminution in value of the Cash Collateral (as well as the Prepetition Collateral) resulting from the use of the Cash Collateral by the Debtors and the imposition of the automatic stay, subject, in each case, to the Carve Out (collectively, the "Adequate Protection Obligations"):[14]

a.    Valid and automatically perfected replacement liens and security interests in and upon the DIP Collateral;

b.    superpriority administrative claims under section 507(b) of the Bankruptcy Code for all Prepetition Secured Parties (solely following discharge of First-Priority Obligations (as defined in the Junior Lien Intercreditor Agreement);

c.    payment of certain fees and expenses for substantially all Prepetition Secured Parties;

d.    monitoring of prepetition collateral and certain financial reporting for substantially all Prepetition Secured Parties; and

e.    payment of interest and fees on account of the Prepetition Credit Facilities at the contractual default rates, and the Prepetition First Lien Notes, and the Prepetition Midwest Notes (in each case, at the contractual non-default rate).

47.    The Prepetition Midwest Notes Indenture provides that upon the incurrence of any secured debt, the Prepetition Midwest Notes shall become secured equitably and ratably with such secured debt.  In connection with a prior acquisition, the Prepetition Midwest Notes become first lien senior secured debt under the Prepetition Credit Agreement.  Because the Prepetition Midwest Noteholder Secured Parties have taken the position that they are not bound by the First Lien Pari Passu Intercreditor Agreements, the Debtors determined in their business judgment to agree to the following additional adequate protection to the Prepetition Midwest Noteholders to avoid a

---

[14]    The following summary is qualified in its entirety by reference to the DIP Term Sheet and the Interim Order. In the event of inconsistency between this summary (including the defined terms therein), the DIP Term Sheet and the Interim Order shall control and govern.

priming fight.   Specifically, the Prepetition Midwest Noteholders shall receive, among other things:

- Valid and automatically perfected replacement liens and security interests in and upon any and all assets (including, without limitation, any DIP Collateral) held or owned by (i) the Prepetition Midwest Notes Issuer, (ii) Windstream Network Services of the Midwest, Inc. and/or (iii) each of the Prepetition Midwest Notes Issuer's Debtor subsidiaries that are not currently obligors under the Prepetition Credit Agreement or the Prepetition First Lien Notes, but are (or become) DIP Loan Parties, subject and subordinate only to (A) the DIP Liens and any liens to which the DIP Liens are junior and (B) the Carve Out;

- requiring the DIP Lenders to seek to recover against, and exercise commercially reasonable efforts to do so, assets of each of the DIP Loan Parties, other than Midwest or its subsidiaries, to satisfy the DIP Obligations, Adequate Protection Claims, Adequate Protection Liens, as the case may be, prior to seeking to enforce the such liabilities against Midwest, its subsidiaries, or their respective assets;

- financial reporting and DIP collateral monitoring to the same extent provided under the Interim and Final Order to the Prepetition Lenders and the Prepetition First Lien Noteholders.

The Debtors respectfully submit that this package is more than sufficient to constitute adequate protection here as "[a]dequate protection, not absolute protection, is the statutory standard." *In re Beker Indus. Corp.*, 58 B.R. at 741 (citation omitted).

48.    Second, as set forth in the Leone Declaration, the Debtors believe the likely alternative available to these chapter 11 cases would be an expedited liquidation of the Debtors' assets rather than the Debtors' continued operation as a going concern.   *See* Leone Decl. ¶ 23. Such an outcome would, in turn, undoubtedly diminish the value available for all stakeholders, including the Prepetition Secured Parties.   Thus, the DIP Facilities provide these parties with adequate protection by enhancing the value of these parties' collateral.   The Bankruptcy Court has recognized that a debtor's ability to maintain business value by operating in the ordinary course is itself a significant source of adequate protection.   *See In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a debtor's use of cash collateral to pay operating

35

expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 104-05 (Bankr. S.D.N.Y. 1991) (finding equity cushion alone was adequate protection when cash collateral was used to preserve value of a building pledged as collateral and noting such use would "preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the] mortgage").[15]

49.     The Debtors, therefore, submit that their provision of adequate protection as described herein is fair and reasonable, is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code, and, in any event, is permitted under the Debtors' Intercreditor Agreements.

**C.    No Comparable Alternative to the DIP Facilities Is Reasonably Available.**

50.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of

---

[15]    As a general matter, continued operations are far more likely to maintain or increase underlying collateral values compared with the catastrophic loss of value that could result from a debtor's inability to operate in the ordinary course. *See, e.g., In re Jim Kelley Ford of Dundee, Ltd.*, 14 B.R. 812 (N.D. Ill. 1980) (finding lender was adequately protected and debtor was authorized to use cash collateral to fund operations where lender benefited from the difference between the average sale price of a car sold at retail and the average sale price if the same vehicle were sold at a wholesale auction).

financing under section 364(a) and (b)) (citing *Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area)); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

51.    As noted above, the Debtors do not believe that comparable alternative sources of financing are reasonably available given the realities imposed by the Debtors' existing capital structure and the significant execution risk inherent in alternative financing proposals, including the time constraint of these chapter 11 cases.  Substantially all of the Debtors' existing assets, including Cash Collateral, are encumbered.  The Debtors conducted arm's-length negotiations with the DIP Lenders regarding the terms of the DIP Facilities.

52.    After careful consideration, the Debtors, in consultation with PJT, determined that the proposal provided by certain of the Prepetition Term Loan Lenders was not feasible due, primarily, to the insufficient funding quantum and the onerous case controls and bankruptcy milestones.  In contrast, the DIP Lenders' proposal offers $1.0 billion without case milestones and standard case controls.

53.    Thus, the Debtors determined that the DIP Facilities provide the best opportunity available for the Debtors under the circumstances to fund these chapter 11 cases.  In addition to evidence to be introduced at the hearing on the Interim Order if necessary, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

## II.    The Debtors Should Be Authorized to Use the Cash Collateral.

54.    Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the

secured party.  Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Mosello,* 195 B.R. at 289 ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case."); *In re Realty Sw. Assocs.*, 140 B.R. at 366 ("'Adequate protection' is a question of fact because it has as its linchpin the concept of value, and therefore is determined on a case-by-case basis.") (citation omitted); *In re Beker Indus. Corp.*, 58 B.R. at 736 (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

55.     As set forth above, the Debtors propose to provide the Prepetition Secured Parties the Adequate Protection Obligations (subject, in each case, to the Carve Out).  And, the Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Parties from any diminution in value to the Cash Collateral and Prepetition Collateral and satisfies the requirements of "adequate" protection: "[a]dequate protection, not absolute protection, is the statutory standard."  *In re Beker Indus. Corp.*, 58 B.R. at 741 (citation omitted).

56.     In addition to the proposed Adequate Protection Obligations, the critical liquidity provided by the proposed DIP Facilities permit the Debtors to continue as a going concern. The Debtors submit that continuing as a going concern provides additional adequate protection to the Prepetition Secured Parties.  *Cf. In re Salem Plaza Assocs.*, 135 B.R. at 758 (holding that the

debtor's use of cash collateral from shopping center to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor); *In re Constable Plaza Assocs., L.P.*, 125 B.R. at 104–05 (finding equity cushion alone was adequate protection when cash collateral was used to preserve value of a building pledged as collateral and noting such use would "preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the] mortgage"). Further, the incremental value generated by use of the proceeds of the proposed DIP Facilities will inure to the ultimate benefit of the Debtors' estates and their stakeholders. Courts have held enhancement of collateral is a critical component of adequate protection and have considered "whether the value of the debtor's property will increase as a result of the" use of the collateral. *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626 (Bankr. S.D.N.Y. 1992) (finding that improvements to collateral financed by postpetition financing proceeds would improve collateral value in excess of loans and, therefore, provided adequate protection); *see In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996) (approving postpetition financing to be used, in part, to fund cleanup costs of encumbered property anticipated to improve the value of the collateral, thereby serving the goal of adequate protection).

57.     In light of the foregoing, the Debtors further submit, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Parties are appropriate. Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

### III.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lenders Under the DIP Documents.

58.     Under the DIP Documents, the Debtors have agreed, subject to Bankruptcy Court approval, to pay certain fees to the DIP Agent and the DIP Lenders.   The Debtors and the DIP Agent and DIP Lenders each agree that these fees are an integral component of the overall terms of the DIP Facilities, and required by the DIP Agent and the DIP Lenders as consideration for the extension of postpetition financing. *See* Leone Decl. ¶ 26.     Accordingly, the Bankruptcy Court should authorize the Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.

### IV.    The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e).

59.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and their right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

60.     As one court in this district explained, "the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Pan Am Corp.*, Case No. 91 CIV. 8319 (LMM), 1992 WL 154200, at *4 (S.D.N.Y. June 18, 1992) (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)); *accord In re Gen. Growth Properties, Inc.*, 423 B.R. 716, 722 (S.D.N.Y. 2010).

61.     As explained herein, and in the Leone Declaration, the DIP Documents are the result of:  (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing, and (b) arm's-length, good-faith negotiations between the Debtors and the DIP Agent and DIP Lenders.  To say these negotiations were hard-fought would be more than appropriate.  *Cf. General Growth Properties*, 423 B.R. at 722 (finding good faith based on testimony that the terms of the debtor-in-possession financing were "vigorously negotiated at arm's length and in good faith.").

62.     The Debtors submit that the terms and conditions of the DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facilities will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Bankruptcy Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.     The Automatic Stay Should Be Modified on a Limited Basis.**

63.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents to validate and perfect the liens and security interests granted to them under the Interim Order. The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant the DIP Liens to the DIP Lenders and to incur all liabilities and obligations set forth in the Interim Order.  Finally, the proposed Interim Order provides that, following the occurrence of an Event of Default, the automatic stay shall be modified to the extent necessary to permit the DIP Agent to exercise all rights and remedies in accordance with the DIP

Documents, or applicable law, subject to the Debtors' right to seek relief (including the non-consensual use of cash collateral) on an expedited basis.

64.    Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g.*, *In re Aegean Marine Petroleum Network, Inc.*, Case No. 18-13374 (MEW) (Bankr. S.D.N.Y. Dec. 17, 2018); *In re Cenveo, Inc.*, Case No. 18-22178 (RDD) (Bankr. S.D.N.Y. Mar. 8, 2018); *In re BCBG Max Azria Global Holdings, LLC*, Case No. 17-10466 (SCC) (Bankr. S.D.N.Y. Mar. 28, 2017); *In re Avaya, Inc.*, Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Mar. 10, 2017); *In re Dacco Transmission Parts (NY), Inc.*, Case No. 16-13245 (MKV) (Bankr. S.D.N.Y. December 23, 2016).

## VI.    Failure to Obtain Immediate Interim Access to the DIP Facilities and Cash Collateral Would Cause Immediate and Irreparable Harm.

65.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Bankruptcy Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

66.    For the reasons noted above, the Debtors have an immediate postpetition need to use Cash Collateral and to borrow up to $400 million under the DIP Documents on an interim basis.  The Debtors anticipate that the commencement of these chapter 11 cases will significantly and immediately increase the demands on their liquidity as a result of, among other things, the costs of administering these chapter 11 cases, implementing critical restructuring initiatives, and addressing key constituents' concerns regarding the Debtors' financial health and ability to

continue operations in light of these chapter 11 cases. The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to liquidity. Importantly, the Debtors believe that substantially all of their available cash constitutes the Prepetition Secured Parties' Cash Collateral. The Debtors will therefore be unable to operate their business or otherwise fund these chapter 11 cases without access to Cash Collateral and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest. In short, the Debtors' ability to administer these chapter 11 cases through the use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates.

67.    The Debtors request that the Bankruptcy Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facilities. Accordingly, the Debtors believe that this relief will enable them to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest, pending the Final Hearing. *See* Leone Decl. ¶ 28.

## Request for Final Hearing

68.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Bankruptcy Court set a date for the Final Hearing that is as soon as practicable, and in no event after 25 days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

69.    To successfully implement the foregoing, the Debtors request that the Bankruptcy Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

43

## Motion Practice

70.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of its application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## Notice

71.     The Debtors will provide notice of this Motion to the following parties and/or their respective counsel, as applicable:  (a) the Office of the United States Trustee for the Southern District of New York; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) Davis Polk & Wardwell LLP, counsel to the agent under the proposed postpetition debtor in possession financing facility; (d) the administrative agents and indenture trustees under the Debtors' prepetition credit agreement and note indentures; (e) Milbank LLP, counsel to an *ad hoc* group of second lien noteholders; (f) Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel to an *ad hoc* group of first lien term lenders; (g) Shearman & Sterling LLP, counsel to the Midwest noteholders; (h) the Pension Benefit Guaranty Corporation; (i) the United States Attorney's Office for the Southern District of New York; (j) the Internal Revenue Service; (k) the United States Securities and Exchange Commission; (l) the attorneys general in the states where the Debtors conduct their business operations; (m) the Federal Communications Commission; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

72.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Bankruptcy Court enter the

Orders granting the relief requested herein and such other relief as the Bankruptcy Court deems

appropriate under the circumstances.

| | |
|---|---|
| Dated:  February 26, 2019<br>New York, New York | _/s/ Stephen E. Hessler_<br>Stephen E. Hessler, P.C.<br>Marc Kieselstein, P.C.<br>Cristine Pirro Schwarzman<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:     (212) 446-4800<br>Facsimile:      (212) 446-4900<br><br>- and -<br><br>James H.M. Sprayregen, P.C.<br>Ross M. Kwasteniet, P.C. (_pro hac vice_ pending)<br>Brad Weiland (_pro hac vice_ pending)<br>John R. Luze (_pro hac vice_ pending)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:     (312) 862-2000<br>Facsimile:      (312) 862-2200<br><br>_Proposed Counsel to the Debtors and Debtors in Possession_ |

**<u>Exhibit A</u>**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| WINDSTREAM HOLDINGS, INC., *et al.*, | ) | Case No. 19-22312 (RDD) |
| | ) | |
| Debtors. [1] | ) | (Joint Administration Requested) |
| | ) | |

**INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (E) MODIFYING THE AUTOMATIC STAY, (F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF**

Upon the motion (the "**DIP Motion**")[2] of Windstream Holdings, Inc. ("**Holdings**"), Windstream Services, LLC (the "**Borrower**"), guarantors under the DIP Term Sheet,[3] (an execution copy of which is attached as **Exhibit B** to the DIP Motion (the "**DIP Term Sheet**")) (the "**DIP Guarantors**" and, collectively, with the Borrower and Holdings, the "**DIP Loan Parties**"), and each of Holdings' and Borrower's affiliates that are debtors and debtors-in-possession (collectively, the "**Debtors**") in the above-captioned cases (the "**Chapter 11 Cases**") and pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3),

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith. The location of the Debtors' service address is: 4001 North Rodney Parham Road, Little Rock, Arkansas 72212.

[2] Capitalized terms used herein and not herein defined have the meaning ascribed to such terms in the Motion.

[3] The DIP Term Sheet shall be superseded and replaced in all respects by the credit agreement to be executed by the Borrower, the DIP Guarantors and the DIP Agent, in form and substance consistent with the DIP Term Sheet and otherwise reasonably acceptable to the DIP Arranger (the "**DIP Credit Agreement**").

364(d)(1), 364(e), 503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**") seeking, among other things:

(i)     authorizing the Borrower to obtain postpetition financing ("**DIP Financing**") pursuant to a senior secured, superpriority debtor-in-possession credit facility in an aggregate principal amount of up to $1,000,000,000 on the terms and conditions set forth in the DIP Term Sheet and the DIP Credit Agreement, by and among the Borrower, as borrower, the DIP Guarantors, as guarantors, the several banks and other financial institutions or entities from time to time party thereto as lenders (collectively, the "**DIP Lenders**"), Citigroup Global Markets Inc., on behalf of Citi,[4] and the other arrangers from time to time party thereto (collectively, together with their affiliates in such capacity, the "**DIP Arranger**"), Citi, as administrative agent and collateral agent (in such capacities, and together with its successors and permitted assigns, the "**DIP Agent**"), and the Letter of Credit Issuer[5] of the DIP L/C Sub-Facility, and which credit facility shall comprise (a) a revolving credit facility (the "**DIP Revolving Facility**"; the loans incurred thereunder, the "**DIP Revolving Loans**") with aggregate commitments of up to $500,000,000, including a letter of credit sub-facility in an aggregate amount of up to $50,000,000 (the "**DIP L/C Sub-Facility**") and (b) a term loan facility (the "**DIP Term Loan Facility**") in an aggregate principal amount of $500,000,000 (the loans incurred thereunder, the "**DIP Term Loans**", together with the DIP Revolving Loans, the "**DIP Loans**"; the DIP Term Loan Facility, together with the DIP Revolving Facility, the "**DIP Facilities**");

(I)     upon entry of this Interim Order, subject to the terms and conditions set forth in the DIP Term Sheet and this Interim Order, an initial aggregate principal amount equal to $100 million under the DIP Revolving Facility and $300 million under the DIP Term Loan Facility shall be available to the Borrower;

(II)    upon entry of a final, non-appealable order in form and substance satisfactory to the DIP Agent (the "**Final Order**"), subject to the

---

[4] "**Citi**" means Citigroup Global Markets Inc., Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as Citi shall determine appropriate to provide the servicers contemplated herein.

[5] "**Letter of Credit Issuer**" means, collectively, Citibank, N.A. or an affiliate thereof and each other Arranger under the Revolving Facility, on a pro rata basis in accordance with their commitments to the Revolving Facility.

2

terms and conditions set forth in the DIP Term Sheet, the DIP Documents (as defined below) and the Final Order, the full remaining amounts under the DIP Revolving Facility and the DIP Term Loan Facility shall be available to the Borrower;

(ii)    authorizing the DIP Guarantors to jointly and severally guarantee on a senior secured superpriority basis the DIP Loans and the DIP Obligations (as defined below);

(iii)    authorizing the Debtors party thereto to execute and deliver the DIP Term Sheet, the DIP Credit Agreement and other documentation, including credit agreements, security agreements, pledge agreements, control agreements, mortgages, guarantees, promissory notes, certificates, instruments, intellectual property security agreements, notes,    that certain DIP Structuring Fee Letter, dated as of February 25, 2019, by and among the DIP Agent, Holdings and the Borrower (the "**DIP Structuring Fee Letter**"), that certain Commitment Letter, dated as of February 25, 2019, by and among the DIP Agent, Holdings and the Borrower (the "**Commitment Letter**"), that certain Fee Letter, dated as of February 25, 2019, by and among the DIP Agent, Holdings and the Borrower (the "**DIP Fee Letter**", and together with the DIP Structuring Fee Letter and the Commitment Letter, the "**Fee Letters**"), and such other documentation which may be necessary or required to implement the DIP Facilities and perform thereunder and/or that may be reasonably requested by the DIP Agent, in each case, as amended, restated, supplemented, waived and/or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Term Sheet and the DIP Credit Agreement, the "**DIP Documents**"); all loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, commitment fees, administrative agency fees and other fees payable pursuant to the Fee Letters), costs, expenses and other liabilities, all other obligations (including indemnities and similar obligations, whether contingent or absolute) and all other amounts due or payable under the DIP Documents, (collectively, the "**DIP Obligations**"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(iv)    granting to the DIP Agent for the benefit of the DIP Lenders (collectively, the "**DIP Secured Parties**") allowed superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations, and valid, enforceable, non-avoidable and automatically perfected liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and postpetition property of the DIP Loan Parties' estates (other than certain excluded property as provided in the DIP Documents (the "**Excluded Assets**") and all proceeds thereof, including, subject only to and effective upon entry of the Final Order (as

defined herein), any Avoidance Proceeds (as defined herein)), in each case subject to the Carve Out (as defined herein);

(v)      authorizing the Debtors, subject to entry of the Final Order, to waive: (a) the Debtors' right to surcharge the Prepetition Collateral and the DIP Collateral (as defined herein) (together, but excluding any Excluded Assets, the "**Collateral**") pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(vi)      authorizing the Debtors to use proceeds of the DIP Facilities, solely in accordance with this Interim Order and the DIP Documents;

(vii)      authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(viii)      subject to the restrictions set forth in the DIP Documents and this interim Order, authorizing the Debtors to use the Prepetition Collateral (as defined herein), including Cash Collateral of the Prepetition Secured Parties under the Prepetition Debt Documents (each as defined herein) and provide adequate protection to the Prepetition Secured Parties for any diminution in value of their respective interests in the Prepetition Collateral (including Cash Collateral), resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral (including Cash Collateral), and the priming of their respective interests in the Prepetition Collateral (including Cash Collateral);

(ix)      approving of certain stipulations by the Debtors with respect to the Prepetition Loan Documents and the Prepetition Collateral as set forth herein;

(x)      modifying the automatic stay to the extent set forth herein and in the DIP Documents; and

(xi)      scheduling a final hearing (the "**Final Hearing**") to consider final approval of the DIP Facilities and use of Cash Collateral pursuant to a proposed final order (the "**Final Order**"), as set forth in the DIP Motion and the DIP Documents filed with this Court.

The Court having considered the DIP Motion, the exhibits attached thereto, the *Declaration of Nicholas Leone in Support of the Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Status,*

4

(D) *Granting Adequate Protection to the Prepetition Lenders, (E) Modifying the Automatic Stay,*

(F) *Scheduling a Final Hearing, and (G) Granting Related Relief* (the "**Leone Declaration**"), the

*Declaration of Tony Thomas, Chief Executive Officer and President of Windstream Holdings, Inc.,*

(I) *in Support of Chapter 11 Petitions and First Day Motions and (II) Pursuant to Local*

*Bankruptcy Rule 1007-2* (the "**First Day Declaration**"), the DIP Documents, and the evidence

submitted and arguments made by the Debtors at the interim hearing held on February 26, 2019

(the "**Interim Hearing**"); and notice of the Interim Hearing having been given in accordance with

Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Interim

Hearing having been held and concluded; and all objections, if any, to the interim relief requested

in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing

that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate

and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is

fair and reasonable and in the best interests of the Debtors and their estates, and is essential for the

continued operation of the Debtors' businesses and the preservation of the value of the Debtors'

assets; and it appearing that the Debtors' entry into the DIP Documents is a sound and prudent

exercise of the Debtors' business judgment; and after due deliberation and consideration, and good

and sufficient cause appearing therefore.

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY**

**THE DEBTORS, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND**

**CONCLUSIONS OF LAW:**[6]

---

[6] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

A.     *Petition Date*.  On February 25, 2019 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (the "**Court**").

B.     *Debtors in Possession*.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.     *Jurisdiction and Venue*.  This Court has core jurisdiction over the Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.  Venue for the Chapter 11 Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     *Committee Formation*.  As of the date hereof, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") has not yet appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "**Creditors' Committee**").

E.     *Notice*.  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Proper, timely, adequate and sufficient notice of the DIP Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and no other or further notice of the DIP Motion or the entry of this Interim Order shall be required.

F.     *Debtors' Stipulations*.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of the Debtors or any other party in interest (but

subject to the limitations thereon contained in paragraph 21 below), the Debtors admit, stipulate and agree that:

    (i)    *Prepetition Credit Facility.*  Pursuant to that certain Sixth Amended and Restated Credit Agreement, originally dated as of July 17, 2006, and as amended and restated as of April 24, 2015 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition Credit Agreement**", and collectively with the Security Agreement (as defined in the Prepetition Credit Agreement, the "**Prepetition Credit Facility Security Agreement**") and the other Loan Documents (as defined in the Prepetition Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "**Prepetition Loan Documents**"), among (a) Windstream Services, LLC, as borrower (in such capacity, the "**Prepetition Borrower**"), (b) JPMorgan Chase Bank, N.A., as administrative agent, collateral agent and letter of credit issuing bank (in such capacities, the "**Prepetition Agent**"), and (c), the Tranche B-6 Lenders (as defined in the Prepetition Credit Agreement) party thereto and the Tranche B-7 Lenders (as defined in the Prepetition Credit Agreement) party thereto (collectively with the Tranche B-6 Lenders, the "**Prepetition Term Loan Lenders**") and the revolving lenders party thereto (the "**Prepetition Revolving Lenders**", together with the Prepetition Term Loan Lenders, the "**Prepetition Lenders**") (the Prepetition Lenders, collectively with the Prepetition Agent and all other holders of Prepetition Credit Facility Debt (as defined below), the "**Prepetition Credit Facility Secured Parties**"), the Prepetition Revolving Lenders provided revolving credit and other financial accommodations to, and issued letters of credit for the account of, the Prepetition Borrower pursuant to the Prepetition Loan Documents (the "**Prepetition Revolving Credit Facility**") and the Prepetition Term Loan Lenders

7

provided term loans to the Prepetition Borrower pursuant to the Prepetition Loan Documents (the "**Prepetition Term Loan Facility**", and together with the Prepetition Revolving Credit Facility, the "**Prepetition Credit Facilities**").  Pursuant to that certain Amended and Restated Guarantee Agreement,  originally dated as of July 17, 2006, and as amended and restated as of April 24, 2015 (as amended, restated, amended and restated, supplemented, waived, and/or otherwise modified from time to time), the subsidiary Debtors party thereto (the "**Prepetition Guarantors**") guaranteed on a joint and several basis the obligation of the Prepetition Borrower under the Prepetition Credit Agreement and the other Prepetition Loan Documents.

(ii)    *Prepetition Credit Facility Debt*.  As of the Petition Date, the Prepetition Borrower and the Prepetition Guarantors were justly and lawfully indebted and liable to the Prepetition Credit Facility Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $3.151 billion including (a) $802 million in outstanding principal amount of Revolving Loans (as defined in the Prepetition Credit Agreement), including outstanding letters of credit, (b) $ 1.1806 billion in outstanding principal amount of Tranche B-6 Term Loan  (as defined in the Prepetition Credit Agreement) and (c) $568.4 million in outstanding principal amount of Tranche B-7 Term Loan  (as defined in the Prepetition Credit Agreement) (collectively, together with accrued and unpaid interest, outstanding letters of credit and bankers' acceptances, any reimbursement obligations (contingent or otherwise) in respect of letters of credit and bankers' acceptances, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing,

8

due, owing, or chargeable in respect of any of the Prepetition Borrower's or the Prepetition Guarantors' obligations pursuant to, or secured by, the Prepetition Loan Documents, including all Facility Obligations (as defined in the Prepetition Credit Agreement), and all interest, fees, prepayment premiums, early termination fees, costs and other charges allowable under section 506(b) of the Bankruptcy Code, but less any original issue discount that is disallowed as unmatured interest pursuant to section 502(b)(2) of the Bankruptcy Code pursuant to a final, non-appealable order of the Bankruptcy Court, the "**Prepetition Credit Facility Debt**"), which Prepetition Credit Facility Debt has been guaranteed on a joint and several basis by all of the Prepetition Guarantors.

(iii)    *Prepetition Credit Facility Liens*.  As more fully set forth in the Prepetition Loan Documents, prior to the Petition Date, the Prepetition Borrower and the Prepetition Guarantors granted to the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, a first priority security interest in and continuing lien on (the "**Prepetition Credit Facility Liens**") substantially all of their assets and property, excluding any Excluded Assets (the "**Prepetition First Lien Collateral**").

(iv)    *Prepetition First Lien Secured Notes*.  Pursuant to that certain Indenture for certain 8.625% notes due 2025 dated as of November 6, 2017 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition First Lien Notes Indenture**", collectively and with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, and/or otherwise modified from time to time, the "**Prepetition First Lien Notes Documents**") by and among (a) Windstream Services, LLC and Windstream Finance Corp., as co-issuers (the "**Prepetition Secured Notes Issuers**"), (b) the Prepetition Guarantors party thereto, as guarantors, (c) U.S. Bank, National Association, as trustee and notes collateral agent

(in such capacities, together with its successors in such capacity, the "**Prepetition First Lien Notes Indenture Trustee**") and (d) the Holders (as defined in the Prepetition First Lien Notes Indenture, the "**Prepetition First Lien Noteholders**", collectively with the Prepetition First Lien Notes Indenture Trustee, the "**Prepetition First Lien Notes Secured Parties**"), the Prepetition Secured Notes Issuers incurred indebtedness to the Prepetition First Lien Noteholders of 8.625% Senior First Lien Notes Due 2025 (collectively, the "**Prepetition First Lien Notes**").

(v)     *Prepetition First Lien Secured Notes Obligations*.   Pursuant to the Prepetition First Lien Notes Indenture, the Prepetition First Lien Notes were originally issued with a face value of $600 million.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition First Lien Notes was $600 million (collectively, together with accrued and unpaid interest, indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Secured Notes Issuers' and the Prepetition Guarantors' obligations pursuant to the Prepetition First Lien Notes and the Prepetition First Lien Notes Documents, but less any original issue discount that is disallowed as unmatured interest pursuant to section 502(b)(2) of the Bankruptcy Code pursuant to a final, non-appealable order of the Bankruptcy Court, the "**Prepetition First Lien Notes Obligations**").

(vi)     *Prepetition First Lien Secured Notes Liens*.  As more fully set forth in the Prepetition First Lien Notes Documents, prior to the Petition Date, the Prepetition Secured Notes Issuers and the Prepetition Guarantors granted to the Prepetition First Lien Notes Indenture Trustee, for the benefit of itself and the Prepetition First Lien Noteholders, a first priority security interest in and continuing lien on (the "**Prepetition First Lien Notes Liens**") on Prepetition First Lien Collateral.

(vii)    *Prepetition Midwest Notes*.   Pursuant to that certain Indenture for certain 6.75% notes due 2028 dated as of February 23, 1998 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition Midwest Notes Indenture**", collectively and with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition Midwest Notes Documents**") by and among (a) Windstream Holding of the Midwest, Inc. (f/k/a Aliant Communications, Inc.), as issuer (the "**Prepetition Midwest Notes Issuer**"), (b) U.S. Bank National Association, as trustee (in such capacity, together with its successors in such capacity, the "**Prepetition Midwest Notes Indenture Trustee**") and (c) the Holders, Holders of Securities and Securityholders (each as defined in the Prepetition Midwest Notes Indenture, the "**Prepetition Midwest Noteholders**", collectively with the Prepetition Midwest Notes Indenture Trustee, the "**Prepetition Midwest Notes Secured Parties**"), the Prepetition Midwest Notes Issuer incurred indebtedness to the Prepetition Midwest Noteholders of 6.75% Notes Due 2028 (collectively, the "**Prepetition Midwest Notes**").

(viii)    *Prepetition Midwest Notes Obligations*.   Pursuant to the Prepetition Midwest Notes Indenture, the Prepetition Midwest Notes were originally issued with a face value of $100 million.   As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Midwest Notes was $100 million (collectively, together with accrued and unpaid interest, indemnification obligations, fees, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Midwest Notes Issuer's obligations pursuant to the Prepetition Midwest Notes and the Prepetition Midwest Documents, but less any original issue

11

discount that is disallowed as unmatured interest pursuant to section 502(b)(2) of the Bankruptcy Code pursuant to a final, non-appealable order of the Bankruptcy Court, the "**Prepetition Midwest Notes Obligations**").

(ix)    *Prepetition Midwest Notes Liens*.  As more fully set forth in the Prepetition Credit Facility Security Agreement, prior to the Petition Date, the Prepetition Midwest Notes Issuer and its "restricted subsidiaries" (as such term is defined in the Prepetition Midwest Notes Indenture) granted to the Prepetition Agent, for the benefit of the Prepetition Midwest Notes Secured Parties, a first priority security interest in and continuing lien on (the "**Prepetition Midwest Notes Liens**") on substantially all of their assets and property (the "**Prepetition Midwest Notes Collateral"**).

(x)    *Prepetition Second Lien Secured Notes*.  Pursuant to that certain Indenture for certain 10.5% notes due 2024 dated as of August 2, 2018 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition 2024 Second Lien Notes Indenture**", collectively and with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition 2024 Second Lien Notes Documents**") by and among (a) the Prepetition Secured Notes Issuers, as co-issuers, (b) the Prepetition Guarantors party thereto, as guarantors, (c) Wilmington Trust, National Association, as trustee and notes collateral agent (in such capacities, together with its successors in such capacity, the "**Prepetition 2024 Second Lien Notes Indenture Trustee**") and (d) the Holders (as defined in the 2024 Second Lien Notes Indenture, the "**Prepetition 2024 Second Lien Noteholders**", collectively with the 2024 Second Lien Notes Indenture Trustee, the "**Prepetition 2024 Second Lien Notes Secured Parties**"), the Prepetition Secured Notes Issuers incurred

12

indebtedness to the Prepetition 2024 Second Lien Noteholders of 10.5% Senior Second Lien Notes Due 2024 (collectively, the "**Prepetition 2024 Second Lien Notes**").  Pursuant to that certain Indenture for certain 9.0% notes due 2025 dated as of August 2, 2018 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition 2025 Second Lien Notes Indenture**", collectively and with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition 2025 Second Lien Notes Documents**", together with the Prepetition 2024 Second Lien Notes Documents, the "**Prepetition Second Lien Notes Documents**" (collectively with the Prepetition Loan Documents, the Prepetition First Lien Notes Documents and the Prepetition Midwest Notes Documents, the "**Prepetition Debt Documents**", and the obligations of any of the Debtors, as applicable, under the Prepetition Debt Documents, collectively, the "**Prepetition Debt**") by and among (a) the Prepetition Secured Notes Issuers, as co-issuers, (b) the Prepetition Guarantors party thereto, as guarantors, (c) Wilmington Trust, National Association, as trustee and notes collateral agent (in such capacities, together with its successors in such capacity, the "**Prepetition 2025 Second Lien Notes Indenture Trustee**")[7] and (d) the Holders (as defined in the 2025 Second Lien Notes Indenture, the "**Prepetition 2025 Second Lien Noteholders**" (together with the Prepetition 2024 Second Lien Noteholders, the "**Prepetition Second Lien Noteholders**"), collectively with the 2025 Second Lien Notes Indenture Trustee, the "**Prepetition 2025 Second Lien Notes Secured Parties**" (together with the Prepetition 2024 Second Lien Notes Secured Parties, the "**Prepetition Second Lien Notes Secured Parties**" and collectively with the

---

[7] The Prepetition First Lien Notes Indenture Trustee, the Prepetition Midwest Notes Indenture Trustee, the Prepetition 2024 Second Lien Notes Indenture Trustee, Prepetition 2025 Second Lien Notes Indenture Trustee are collectively referred to as the "**Prepetition Notes Trustees**".

Prepetition Credit Facility Secured Parties, the Prepetition First Lien Notes Secured Parties and the Prepetition Midwest Notes Secured Parties, the "**Prepetition Secured Parties**")), the Prepetition Secured Notes Issuers incurred indebtedness to the Prepetition 2025 Second Lien Noteholders of 9.0% Senior Second Lien Notes Due 2025 (collectively, the "**Prepetition 2025 Second Lien Notes**", and together with the Prepetition 2024 Second Lien Notes, the "**Prepetition Second Lien Notes**").

(xi)     *Prepetition Second Lien Secured Notes Obligations.*    Pursuant to the Prepetition 2024 Second Lien Notes Indenture, the Prepetition Second Lien Notes were originally issued with a face value of not less than $414,905,000.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition 2024 Second Lien Notes was not less than $414,905,000 (collectively, together with accrued and unpaid interest, indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Secured Notes Issuers' and the Prepetition Guarantors' obligations pursuant to the Prepetition 2024 Second Lien Notes and the Prepetition 2024 Second Lien Notes Documents, but less any original issue discount that is disallowed as unmatured interest pursuant to section 502(b)(2) of the Bankruptcy Code pursuant to a final, non-appealable order of the Bankruptcy Court, the "**Prepetition 2024 Second Lien Notes Obligations**").  Pursuant to the Prepetition 2025 Second Lien Notes Indenture, the Prepetition First Lien Notes were originally issued with a face value of $801,964,000.00.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition 2025 Second Lien Notes was $801,964,000.00. (collectively, together with accrued and unpaid interest, indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due,

owing, or chargeable in respect of any of the Prepetition Secured Notes Issuers' and the Prepetition Guarantors' obligations pursuant to the Prepetition 2025 Second Lien Notes and the Prepetition 2025 Second Lien Notes Documents, but less any original issue discount that is disallowed as unmatured interest pursuant to section 502(b)(2) of the Bankruptcy Code pursuant to a final, non-appealable order of the Bankruptcy Court, the "**Prepetition 2025 Second Lien Notes Obligations**", together with the Prepetition 2024 Second Lien Notes Obligations, the "**Prepetition Second Lien Notes Obligations**").

(xii)    *Prepetition Second Lien Secured Notes Liens*.  As more fully set forth in the Prepetition 2024 Second Lien Notes Documents and Prepetition 2025 Second Lien Notes Documents, prior to the Petition Date, the Prepetition Secured Notes Issuers and the Prepetition Guarantor granted to the Prepetition 2024 Second Lien Notes Indenture Trustee, for the benefit of itself and the Prepetition 2024 Second Lien Noteholders and Prepetition 2025 Second Lien Notes Indenture Trustee, for the benefit of itself and the Prepetition 2025 Second Lien Noteholders, a second priority security interest in and continuing lien on (the "Prepetition Second Lien Notes Liens") on substantially all of their assets and property (the "Prepetition Second Lien Collateral", together with the Prepetition First Lien Collateral and Prepetition Midwest Notes Collateral, the "Prepetition Collateral").

(xiii)    *Intercreditor Agreements.* (i) That certain Intercreditor Agreement, dated as of August 2, 2018, among the Prepetition Agent, the Prepetition First Lien Notes Indenture Trustee, the Prepetition 2024 Second Lien Notes Indenture Trustee, the Prepetition 2025 Second Lien Notes Indenture Trustee, Services and the other prepetition obligors party thereto (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "**Junior Lien Intercreditor Agreement**"), (ii) that certain Intercreditor Agreement, dated as of

15

November 6, 2017, among the Prepetition Agent, the Prepetition First Lien Notes Indenture Trustee, Services and the other prepetition obligors party thereto (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "**First Lien Pari Passu Intercreditor Agreement**") and (iii) that certain Intercreditor Agreement, dated as of August 2, 2018, among the Prepetition 2024 Second Lien Notes Indenture Trustee, the Prepetition 2025 Second Lien Notes Indenture Trustee, Services and the other prepetition obligors party thereto (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "**Second Lien Pari Passu Intercreditor Agreement**")[8] are, in each case, binding and enforceable against the prepetition obligors in accordance with their terms, and the prepetition obligors are not entitled to take any actions that would be contrary to the provisions thereof;

(xiv) *Validity, Perfection and Priority of Prepetition Credit Facility Liens and Prepetition Credit Facility Debt.* The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition Credit Facility Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition Credit Facility Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Credit Facility Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition First Lien Notes Liens on the Prepetition Collateral, which ranks equally in priority with the Prepetition Credit Facility Liens, (2) the Prepetition Midwest Notes Liens on the Prepetition Midwest Notes Collateral, which ranks equally in priority with the Prepetition Credit Facility Liens with respect to the Prepetition Midwest Notes

---

[8] The (i) Junior Lien Intercreditor Agreement, (ii) First Lien Pari Passu Intercreditor Agreement and (iii) Second Lien Pari Passu Intercreditor Agreement and are collectively referred to as the "**Intercreditor Agreements**".

Collateral and (3) certain liens senior by operation of law or otherwise permitted by the Prepetition

Loan Documents (solely to the extent any such permitted liens were valid, properly perfected, non-

avoidable and senior in priority to the Prepetition Credit Facility Liens as of the Petition Date, the

"**Prepetition Credit Facility Permitted Prior Liens**"); (c) the Prepetition Credit Facility Debt

constitutes legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in

accordance with the terms of the applicable Prepetition Loan Documents; (d) no offsets,

recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature to

any of the Prepetition Credit Facility Liens or Prepetition Credit Facility Debt exist, and no portion

of the Prepetition Credit Facility Liens or Prepetition Credit Facility Debt is subject to any

challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or

subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-

bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of

action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy

Code or applicable state law equivalents or actions for recovery or disgorgement, against any of

the Prepetition Credit Facility Secured Parties or any of their respective affiliates, agents, attorneys,

advisors, professionals, officers, directors and employees arising out of, based upon or related to

the Prepetition Credit Facilities; and (f) the Debtors waive, discharge, and release any right to

challenge any of the Prepetition Credit Facility Debt, the priority of the Debtors' obligations

thereunder, and the validity, extent, and priority of the liens securing the Prepetition Credit Facility

Debt.

(xv)    *Validity, Perfection and Priority of Prepetition First Lien Notes Liens and*

*Prepetition First Lien Notes Obligations*.  The Debtors acknowledge and agree that as of the

Petition Date (a) the Prepetition First Lien Notes Liens on the Prepetition Collateral were valid,

binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit

of, the Prepetition First Lien Notes Secured Parties for fair consideration and reasonably equivalent

value; (b) the Prepetition First Lien Notes Liens were senior in priority over any and all other liens

on the Prepetition Collateral, subject only to (1) the Prepetition Credit Facility Liens on the

Prepetition Collateral, which ranks equally in priority with the Prepetition First Lien Notes Liens,

(2) the Prepetition Midwest Notes Liens on the Prepetition Midwest Notes Collateral, which ranks

equally in priority with the Prepetition First Lien Notes Liens with respect to the Prepetition

Midwest Notes Collateral and (3) certain liens senior by operation of law or otherwise permitted

by the Prepetition First Lien Notes Documents (solely to the extent any such permitted liens were

valid, properly perfected, non-avoidable and senior in priority to the Prepetition First Lien Notes

Liens as of the Petition Date, the "**Prepetition First Lien Notes Permitted Prior Liens**", and,

together with the Prepetition Credit Facility Permitted Prior Liens, the "**Permitted Prior Liens**"));

(c) the Prepetition First Lien Notes Obligations constitute legal, valid, binding, and non-avoidable

obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition

First Lien Notes Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims

or counterclaims of any kind or nature to any of the Prepetition First Lien Notes Liens or

Prepetition First Lien Notes Obligations exist, and no portion of the Prepetition First Lien Notes

Liens or Prepetition First Lien Notes Obligations is subject to any challenge or defense, including

avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or

otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors

and their estates have no claims, objections, challenges, causes of action, and/or choses in action,

including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law

equivalents or actions for recovery or disgorgement, against any of the Prepetition First Lien Notes

Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the Prepetition First Lien Notes; and (f) the Debtors waive, discharge, and release any right to challenge any of the Prepetition First Lien Notes Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition First Lien Notes Obligations.

(xvi)    *Validity, Perfection and Priority of Prepetition Midwest Notes Liens and Prepetition Midwest Notes Obligations*.  The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition Midwest Notes Liens on the Prepetition Midwest Notes Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition Midwest Notes Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Midwest Notes Liens were senior in priority over any and all other liens on the Prepetition Midwest Notes Collateral, subject only to (1) the Prepetition Credit Facility Liens and the Prepetition First Lien Notes Liens, which rank equally in priority with the Prepetition Midwest Notes Liens, and (2) certain liens, senior by operation of law or otherwise, permitted by the Prepetition Midwest Notes Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Midwest Notes Liens as of the Petition Date); (c) the Prepetition Midwest Notes Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Midwest Notes Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Midwest Notes Liens or Prepetition Midwest Notes Obligations exist, and no portion of the Prepetition Midwest Notes Liens or any Prepetition Midwest Notes Obligations is subject to any challenge or defense, including, without limitation, avoidance, disallowance,

19

disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Midwest Notes Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the Prepetition Midwest Notes; and (f) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Midwest Notes Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Midwest Notes Obligations.

(xvii)  *No Control*.  None of the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition Credit Agreement, the Prepetition First Lien Notes Indenture, the Prepetition Midwest Notes Indenture, the Prepetition 2024 Second Lien Notes Indenture and the Prepetition 2025 Second Lien Notes Indenture.

(xviii) *No Claims or Causes of Action*.  No claims or causes of action exist against, or with respect to, the Prepetition Credit Facility Secured Parties, the Prepetition First Lien Notes Secured Parties or the Prepetition Midwest Notes Secured Parties under any agreements by and among the Debtors and any such party that is in existence as of the Petition Date.

(xix)  *Release*.  Effective as of the date of entry of this Interim Order, the Debtors hereby absolutely and unconditionally release and forever discharge and acquit the Prepetition

Credit Facility Secured Parties, the Prepetition First Lien Notes Secured Parties, the Prepetition

Midwest Notes Secured Parties, the DIP Secured Parties, and each of the foregoing's respective

Representatives (as defined herein), solely in their capacity as such (collectively, the "**Released**

**Parties**"), from any and all obligations and liabilities to the Debtors (and their successors and

assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, liabilities,

actions and causes of action arising prior to the Petition Date (collectively, the "**Released Claims**")

of any kind, nature or description, whether matured or unmatured, known or unknown, foreseen

or unforeseen, liquidated or unliquidated, arising in law or equity, upon contract or tort or under

any state or federal law or otherwise, arising out of or related to (as applicable) the Prepetition

Debt Documents, the DIP Documents, the obligations owing and the financial obligations made

thereunder, the negotiation thereof and of the deal reflected thereby, and the obligations and

financial obligations made thereunder, in each case that the Debtors at any time had, now have or

may have, or that their successors or assigns hereafter can or may have against any of the Released

Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time

on or prior to the date of this Interim Order.

(xx)    *Cash Collateral*.  All of the Debtors' cash, including any cash in deposit

accounts (whether subject to control agreements or otherwise) constitutes "cash collateral" of the

Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the

"**Cash Collateral**").

G.    *Findings Regarding the DIP Financing and Use of Cash Collateral*.

(i)    Good and sufficient cause has been shown for the entry of this Interim Order.

(ii)    The DIP Loan Parties have an immediate and critical need to obtain the DIP

Financing and to use Prepetition Collateral (including Cash Collateral) in each case on an interim

basis, in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, and to satisfy other working capital and operational needs. The access of the DIP Loan Parties to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness under the DIP Documents and other financial accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the going concern values of the DIP Loan Parties and to a successful reorganization of the DIP Loan Parties.

(iii)    The DIP Loan Parties are unable to obtain financing on more favorable terms from sources other than the DIP Lenders and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The DIP Loan Parties are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the DIP Loan Parties granting to the DIP Secured Parties, subject to the Carve Out, the DIP Liens and the DIP Superpriority Claims (as defined herein) and, subject to the Carve Out, incurring the Adequate Protection Obligations, in each case, under the terms and conditions set forth in this Interim Order and in the DIP Documents.

(iv)    Based on the DIP Motion, the Leone Declaration, the First Day Declaration, and the record presented to the Court at the Interim Hearing, the terms of the DIP Financing and the terms on which the DIP Loan Parties may continue to use the Prepetition Collateral (including Cash Collateral) pursuant to this Interim Order and the DIP Documents are fair and reasonable, reflect the DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

22

(v)     To the extent such consent is required, the Prepetition Secured Parties have consented, will be solicited for their consent or are deemed under the Intercreditor Agreements or other applicable Prepetition Debt Documents to have consented to the DIP Loan Parties' use of Cash Collateral and the other Prepetition Collateral, and the DIP Loan Parties' entry into the DIP Documents in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

(vi)     The DIP Financing and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the DIP Loan Parties, and the DIP Secured Parties, and all of the DIP Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Documents, including, without limitation:  all DIP Loans made to the DIP Loan Parties pursuant to the DIP Documents, any "**Obligations**" (as defined in the DIP Documents), and any "**Cash Management Agreements**" and "**Swap Agreements**" (each as defined in the DIP Documents), shall be deemed to have been extended by the DIP Agent and the DIP Lenders and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(vii)     The Prepetition Credit Facility Secured Parties have acted in good faith regarding the DIP Financing and the DIP Loan Parties' continued use of the Prepetition Collateral (including Cash Collateral) to fund the administration of the DIP Loan Parties' estates and continued operation of their businesses (including the incurrence and payment of the Adequate

23

Protection Obligations and the granting of the Adequate Protection Liens (as defined herein)), in accordance with the terms hereof, and the Prepetition Credit Facility Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of section 363(m) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(viii)   The Prepetition Secured Parties are entitled to the adequate protection provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the DIP Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the DIP Loan Parties' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Cash Collateral; *provided* that nothing in this Interim Order or the DIP Documents shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Interim Order and in the context of the DIP Financing authorized by this Interim Order to the extent such consent has been or will be given, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties, subject to any applicable provisions of the Intercreditor Agreements, to seek new, different or additional adequate protection or assert the interests of any of the Prepetition Secured Parties and the rights of any other party in interest to object to such relief are hereby preserved.

(ix)   The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Rules.  Absent granting the relief

set forth in this Interim Order, the DIP Loan Parties' estates will be immediately and irreparably harmed.  Consummation of the DIP Financing and the use of Prepetition Collateral (including Cash Collateral), in accordance with this Interim Order and the DIP Documents are therefore in the best interests of the DIP Loan Parties' estates and consistent with the DIP Loan Parties' exercise of their fiduciary duties.

H.      *Permitted Prior Liens; Continuation of Prepetition Liens*.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, or a Creditors' Committee (if appointed), to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien and/or security interests.  The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien and is expressly subject to the liens and interests granted to the Prepetition Secured Parties (the "**Prepetition Liens**") and the DIP Liens.  The Prepetition Liens, and the DIP Liens that prime the Prepetition Liens, are continuing liens and the DIP Collateral is and will continue to be encumbered by such liens in light of the integrated nature of the DIP Facilities, the DIP Documents, and the Prepetition Secured Documents.

I.      *Immediate Entry*.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).

J.      *Compliance with Local Rule 4001-2*.  The DIP Motion and this Interim Order comply with the requirements of Local Rule 4001-2.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.    *Interim Financing Approved*.  The DIP Motion is granted, the interim financing described herein is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents and this Interim Order.  All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled.

2.    *Authorization of the DIP Financing and the DIP Documents*.

(a)    The DIP Loan Parties are hereby authorized to execute, deliver, enter into and, as applicable, perform all of their obligations in accordance with, and subject to the terms of this Interim Order and the DIP Documents and such other and further acts as may be necessary, appropriate or desirable in connection therewith.  The Borrower is hereby authorized to borrow money and obtain letters of credit pursuant to the DIP Term Sheet and the DIP Credit Agreement, and the DIP Guarantors are hereby authorized to guaranty the DIP Obligations, (a) in each case up to an aggregate principal or face amount equal to $100 million under the DIP Revolving Facility, subject in each case to any limitations on borrowing under the DIP Documents for the account of the Borrower, and subject to entry of the Final Order, an additional $400 million, in each case subject to Revolving Facility Availability (as defined in the DIP Documents), in each case, which shall be used for all purposes permitted under the DIP Documents, subject to and in accordance with the budget (as the same may be modified from time to time consistent with the terms of the

DIP Documents and subject to such variances as permitted therein, the "**Budget**")[9] including, without limitation, to provide working capital for the DIP Loan Parties and for general corporate purposes and to pay interest, fees and expenses in accordance with this Interim Order and the DIP Documents and (b) in each case up to an aggregate principal amount equal to $300 million under the DIP Term Loan Facility on an interim basis and, subject to entry of the Final Order, an additional $200 million under the DIP Term Loan Facility, subject to any limitations on borrowing under the DIP Documents, which shall be used for all purposes permitted under the DIP Documents, subject to and in accordance with the Budget, including, without limitation, to pay certain costs, fees and expenses related to the Chapter 11 Cases, to pay the Adequate Protection Payments (as defined herein), and to fund the working capital needs and for general corporate purposes during the Chapter 11 Cases, in each case, in accordance with this Interim Order and the DIP Documents, including the Budget.

(b)       In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments, certificates, and agreements and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees in connection with or that may be reasonably required, necessary, or desirable for the DIP Loan Parties' performance of their obligations under or related to the DIP Financing, including, without limitation:

(i)       the execution and delivery of, and performance under, each of the DIP Documents;

---

[9] A copy of the initial Budget is attached hereto as **Schedule 1**.

(ii)    the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the DIP Loan Parties and the DIP Agent may agree, it being understood that no further approval of this Court shall be required for any authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees and other expenses (including attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other obligations paid in connection therewith) that do not (A) shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder or (B) increase existing fees or add new fees thereunder (excluding, for the avoidance of doubt, any amendment, consent or waiver fee).

(iii)    the non-refundable payment to the DIP Agent or the DIP Lenders, as the case may be, of all reasonable and documented fees including, without limitation but only as applicable, any letter of credit fees (including issuance, fronting, and other related charges), unused facility fees, amendment fees, prepayment premiums, early termination fees, servicing fees, audit fees, liquidator fees, structuring fees, administrative agent's or collateral agent's fees, upfront fees, closing fees, commitment fees, exit fees, backstop fees, agency fees, and/or professional fees (which fees shall be irrevocable, and shall be deemed to have been, approved upon entry of this Interim Order, whether or not such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of the indemnification obligations, in each

case referred to in the DIP Documents (and in any separate letter agreements, including, without limitation, any Fee Letters, between any or all DIP Loan Parties, on the one hand, and any of the DIP Agent and/or DIP Lenders, on the other, in connection with the DIP Financing) and the costs and expenses as may be due from time to time, including, without limitation, reasonable and documented fees and expenses of the professionals retained by any of the DIP Agent or DIP Lenders (including Davis Polk & Wardwell LLP and such other advisors as permitted under the DIP Documents), in each case, as provided for in the DIP Documents, without the need to file retention motions or fee applications or to provide notice to any party; *provided, however*, that nothing herein or in the DIP Documents shall limit the rights of any party-in-interest to seek payment of any fees and expenses in accordance with the Plan (as defined in the DIP Documents); and

(iv)    the performance of all other acts necessary, appropriate, or desirable under or in connection with the DIP Documents.

3.    *DIP Obligations.*  Upon execution and delivery of the DIP Documents, (i) the DIP Documents shall constitute valid, binding and non-avoidable obligations of the DIP Loan Parties, enforceable against each DIP Loan Party and their estates thereto in accordance with the terms of the DIP Documents and this Interim Order, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**").  Upon execution and delivery of the DIP Documents, the DIP Obligations will include all loans, letter of credit reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agent or any of the DIP Lenders, in

each case, under, or secured by, the DIP Documents or this Interim Order, including all principal, accrued interest, costs, fees, expenses and other amounts under the DIP Documents. Without limiting the foregoing, the DIP Obligations shall also include all Cash Management Obligations (as defined in the DIP Documents) and all obligations of any Debtor arising under any Cash Management Agreements or Swap Agreements to the extent described in, or secured by, the DIP Documents. The Debtors shall be jointly and severally liable for the DIP Obligations. The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease on the Termination Declaration Date (as defined herein), except as provided in paragraph 20 herein. No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens (as defined herein), and including in connection with any adequate protection provided to the Prepetition Secured Parties hereunder) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4.      *[Reserved]*

5.      *[Reserved]*

6.      *Carve Out.*

(a)      *Carve Out.*  As used in this Interim Order, the "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $20,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**").  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

31

(b)    *Fee Estimates.*    Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following the Closing Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "**Estimated Fees and Expenses**") incurred during the preceding week by such Professional Person (through Saturday of such week, the "**Calculation Date**"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "**Weekly Statement**"); *provided* that within one business day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional statement (the "**Final Statement**") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date.  If any Professional Person fails to deliver a Weekly Statement within three calendar days after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Carve Out Accounts (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Budget for such period for such Professional Person; *provided* that such Professional Person shall be entitled to be paid any unpaid amount of Allowed Professional Fees in excess of Allowed Professional Fees included in the Budget for such period for such Professional Person from a reserve to be funded by the Debtors from all cash on hand as of such date and any available cash thereafter held by any Debtor

32

pursuant to paragraph 6(c) below.  Solely as it relates to the Agents and the Lenders, any deemed

draw and borrowing pursuant to paragraph 6(c)(i)(x) for amounts under paragraph 6(a)(iii) above

shall be limited to the greater of (x) the sum of (I) the aggregate unpaid amount of Estimated Fees

and Expenses included in such Weekly Statements timely received by the Debtors prior to the

Termination Declaration Date plus, without duplication, (II) the lesser of (1) the aggregate unpaid

amount of Estimated Fees and Expenses included in the Final Statements timely received by the

Debtors pertaining to the period through and including the Termination Declaration Date and (2)

the Budgeted Cushion Amount (as defined below), and (y) the aggregate unpaid amount of

Allowed Professional Fees included in the Budget for the period prior to the Termination

Declaration Date (such amount, the "**DIP Professional Fee Carve Out Cap**").  For the avoidance

of doubt, each Agent shall be entitled to maintain at all times a reserve (the "**Carve-Out Reserve**")

in an amount (the "**Carve-Out Reserve Amount**") equal to the sum of (i) the greater of (x) the

aggregate unpaid amount of Estimated Fees and Expenses included in all Weekly Statements

timely received by the Debtors, and (y) the aggregate amount of Allowed Professional Fees

contemplated to be unpaid in the Budget at the applicable time, plus (ii) the Post-Carve Out Trigger

Notice Cap, plus (iii) the amounts contemplated under paragraphs 6(a)(i) and 6(a)(ii) above, plus

(iv) an amount equal to the amount of Allowed Professional Fees set forth in the Budget for the

then-current week occurring after the most recent Calculation Date and the two weeks succeeding

such current week (such amount set forth in (iv), regardless of whether such reserve is maintained,

the "**Budgeted Cushion Amount**").  Not later than 7:00 p.m. New York time on the fourth

business day of each week starting with the first full calendar week following the Closing Date,

the Debtors shall deliver to each Agent a report setting forth the Carve-Out Reserve Amount as of

such time, and, in setting the Carve-Out Reserve, each Agent shall be entitled to rely upon such

33

reports in accordance with the DIP Loan Documents.  Prior to the delivery of the first report setting

forth the Carve-Out Reserve Amount, the Agents shall calculate the Carve-Out Reserve Amount

by reference to the Budget for subsection (i) of the Carve-Out Reserve Amount.

        (c)      *Carve Out Reserves.*

        (i)      On the day on which a Carve Out Trigger Notice is given by any Agent to

the Debtors with a copy to counsel to the Creditors' Committee (the "**Termination Declaration

Date**"), the Carve Out Trigger Notice shall (x) be deemed a draw request and notice of borrowing

by the Debtors for loans to be made under the DIP Revolving Facility (each, a "**Revolving Loan**")

(on a pro rata basis based on the then-outstanding commitments under the DIP Revolving Facility),

in an amount equal to the sum of (1) the amounts set forth in paragraphs 6(a)(i) and 6(a)(ii) above,

and (2) the lesser of (a) the then unpaid amounts of the Allowed Professional Fees (b) the DIP

Professional Fee Carve Out Cap (any such amounts actually advanced shall constitute Revolving

Loans) and (y) also constitute a demand to the Debtors to utilize all cash on hand as of such date

and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the

sum of the amounts set forth in paragraphs 6(a)(i)–(iii) above.  The Debtors shall deposit and hold

such amounts in a segregated account at any Agent in trust to pay such then unpaid Allowed

Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims.

        (ii)      On the Termination Declaration Date, the Carve Out Trigger Notice shall

also (x) be deemed a request by the Debtors for Revolving Loans under the DIP Revolving Facility

(on a pro rata basis based on the then-outstanding commitments under the DIP Revolving Facility),

in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced

shall constitute Revolving Loans) and (y) constitute a demand to the Debtors to utilize all cash on

hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-

Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account at any Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") prior to any and all other claims.

(iii)    On the first business day after an Agent gives such notice to such Revolving Lenders, notwithstanding anything in the DIP Loan Documents to the contrary, including with respect to the existence of a Default or Event of Default (each as defined in the DIP Loan Documents), the failure of the Debtors to satisfy any or all of the conditions precedent for Revolving Loans under the Revolving Facility, any termination of the commitments under the DIP Revolving Facility following an Event of Default (as defined in the DIP Loan Documents), or the occurrence of the Maturity Date, each Revolving Lender with an outstanding commitment under the DIP Revolving Facility (on a pro rata basis based on the then-outstanding commitments under the DIP Revolving Facility) shall make available to the Revolving Facility Agent such Revolving Lender's pro rata share with respect to such borrowing in accordance with the Revolving Facility; *provided* that in no event shall the Revolving Facility Agent or the Revolving Lenders be required to extend Revolving Loans pursuant to a deemed draw and borrowing pursuant to paragraphs 6(c)(i)(x) and 6(c)(ii)(x) in an aggregate amount exceeding the Carve-Out Reserve Amount.

(iv)    All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "**Pre-Carve Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Agents for the benefit of the Lenders, unless the

Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Existing Primed Secured Parties in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the paragraph (a) above (the "**Post-Carve Out Amounts**"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Agents for the benefit of the Lenders, unless the Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Existing Primed Secured Parties in accordance with their rights and priorities as of the Petition Date.

(v)    Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 6, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph (c), prior to making any payments to the Agents or the Existing Primed Secured Parties, as applicable. Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the Agents and the agents under the Existing Primed Secured Facilities shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the Agents for application in accordance with the DIP Loan Documents.  Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as defined

in the DIP Loan Documents) or increase or reduce the Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facilities, or in any Existing Primed Secured Facilities, the Carve Out shall be senior to all liens and claims securing the DIP Facilities, the Adequate Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the Obligations or the obligations under the Existing Primed Secured Facilities.

(d)      *Payment of Allowed Professional Fees Prior to the Termination Declaration Date.*   Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)      *No Direct Obligation to Pay Allowed Professional Fees*.   None of the Agents, the Lenders, or the Existing Primed Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the Agents, the Lenders, or the Existing Primed Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)     *Payment of Carve Out On or After the Termination Declaration Date*.  Any

payment or reimbursement made on or after the occurrence of the Termination Declaration Date

in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-

for-dollar basis.   Any funding of the Carve Out shall be added to, and made a part of, the

Obligations secured by the Collateral and shall be otherwise entitled to the protections granted

under this Interim Order, the Loan Documents, the Bankruptcy Code, and applicable law.

7.     *DIP Superpriority Claims*.  Pursuant to section 364(c)(1) of the Bankruptcy Code,

all of the DIP Obligations shall constitute allowed superpriority administrative expense claims

against the DIP Loan Parties (without the need to file any proof of claim) with priority over any

and all claims against the DIP Loan Parties, now existing or hereafter arising, of any kind

whatsoever, including, without limitation, all administrative expenses of the kind specified in

sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or

other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b),

726, 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations),

whether or not such expenses or claims may become secured by a judgment lien or other non-

consensual lien, levy or attachment, which allowed claims (the "**DIP Superpriority Claims**")

shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative

expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority

Claims shall be payable from and have recourse to all prepetition and postpetition property of the

DIP Loan Parties and all proceeds thereof (excluding claims and causes of action under sections

502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under

the Bankruptcy Code or applicable state-law equivalents ("**Avoidance Actions**") but including,

any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions,

whether by judgment, settlement or otherwise ("**Avoidance Proceeds**")) in accordance with the DIP Documents and this Interim Order, subject only to the liens on such property and the Carve Out.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  The DIP Superpriority Claims shall be *pari passu* in right of payment with one another and senior to the 507(b) Claims (as defined herein).

8.    *DIP Liens*.

(a)    *DIP Liens*.  As security for the DIP Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution, recordation or filing by the DIP Loan Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements, notation of certificates of title for titled goods or other similar documents, or the possession or control by the DIP Agent of, or over, any Collateral, security interests and liens are hereby granted to the DIP Agent for its own benefit and the benefit of the DIP Lenders (all property identified in clauses (i) through (iii) below being collectively referred to as the "**DIP Collateral**"), subject only to the payment of the Carve Out (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Interim Order and the DIP Documents, the "**DIP Liens**"):

(i)    *Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the DIP Loan Parties, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to a valid, perfected and non-avoidable lien, including, without limitation, any and all unencumbered cash of the DIP Loan Parties (whether maintained with the DIP Agent or otherwise)

and any investment of such cash, inventory, accounts receivable, other rights to payment whether

arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery,

equipment, general intangibles, documents, instruments, securities, chattel paper, interests in

leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights

under license agreements and other intellectual property, capital stock of subsidiaries, wherever

located, and the proceeds, products, rents and profits of the foregoing, whether arising under

section 552(b) of the Bankruptcy Code or otherwise, of all the foregoing (the "**Unencumbered**

**Property**"), in each case other than:  (i) the Excluded Assets, but including the proceeds of

Excluded Assets that do not otherwise constitute Excluded Assets; and (ii) the Avoidance Actions,

but effective only upon entry of the Final Order, the Avoidance Proceeds;

(ii)    *Liens Priming Certain Prepetition Secured Parties' Liens*.  Pursuant to

section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully

perfected first priority priming security interest in and lien upon all prepetition and postpetition

property of the DIP Loan Parties of the same nature, scope and type as the Prepetition Collateral,

regardless of where located, regardless whether or not any liens on such assets are voided, avoided,

invalidated, lapsed or unperfected (the "**DIP Priming Liens**"), which shall prime all respects to

the interests of the Prepetition Secured Parties arising from current and future liens of the

Prepetition Secured Parties (including, without limitation, the Adequate Protection Liens granted

to the Prepetition Secured Parties) (the "**Primed Liens**").  Notwithstanding anything herein to the

contrary, the DIP Priming Liens shall be (i) subject and junior to the Carve Out in all respects, (ii)

senior in all respects to the Prepetition Liens and (iii) senior to the Adequate Protection Liens;

(iii)    *Liens Junior to Certain Other Liens*.  Pursuant to section 364(c)(3) of the

Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and

lien upon all tangible and intangible pre- and postpetition property of each DIP Loan Party other than the property that is subject to either (x) valid, perfected and non-avoidable liens in existence at the time of the commencement of the Chapter 11 Cases (other than the Primed Liens) or (y) valid and non-avoidable liens (other than the Primed Liens) in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code, which shall be (i) junior and subordinate to any valid, perfected and non-avoidable liens (other than the Primed Liens) in existence immediately prior to the Petition Date, and (ii) any such valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code; *provided* that nothing in the foregoing clauses (i) and (ii) shall limit the rights of the DIP Secured Parties under the DIP Documents to the extent such liens are not permitted thereunder; and

(iv)    *Liens Senior to Certain Other Liens.*  The DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the DIP Loan Parties and their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties, or (C) any intercompany or affiliate liens of the DIP Loan Parties or security interests of the DIP Loan Parties; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof.

9.      *Maintenance of Letters of Credit*.  To the extent permitted by the DIP Documents, the DIP Loan Parties are authorized to renew letters of credit issued under the DIP Documents on an uninterrupted basis and to take all actions reasonably appropriate with respect thereto on an uninterrupted basis.  Without limitation to the foregoing, the DIP Loan Parties are authorized to replace all outstanding Letters of Credit (as defined in the Prepetition Credit Agreement) with new letters of credit issued under the DIP L/C Sub-Facility.

10.     *Protection of DIP Lenders' Rights*.

(a)      So long as there are any DIP Obligations outstanding or the DIP Lenders have any outstanding Commitments (as defined in the DIP Documents) (the "**DIP Commitments**") under the DIP Documents, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Debt Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral or the Adequate Protection Liens; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, such DIP Collateral (but not any proceeds of such transfer, disposition or sale to the extent remaining after payment in cash in full of the DIP Obligations and termination of the DIP Commitments), to the extent such transfer, disposition, sale or release is authorized under the DIP Documents; (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in such DIP Collateral unless, solely as to this clause (iii), the DIP Agent or the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to this Interim Order, or as may be required by applicable state law to continue the perfection of valid and non-avoidable liens or security interests as of the Petition Date; and (iv) deliver or cause to be delivered, at the DIP Loan

42

Parties' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agent or the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of such DIP Collateral subject to any sale or disposition.

(b)    To the extent any Prepetition Secured Party has possession of any Prepetition Collateral or DIP Collateral or has control with respect to any Prepetition Collateral or DIP Collateral, or has been noted as secured party on any certificate of title for a titled good constituting Prepetition Collateral or DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Lenders, and the Prepetition Agent and Prepetition Notes Trustees shall comply with the instructions of the DIP Agent with respect to the exercise of such control.

(c)    Any proceeds of Prepetition Collateral subject to the Primed Liens received by any Prepetition Secured Parties, whether in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral or otherwise received by any of the Prepetition Agent and Prepetition Notes Trustees, shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Agent for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements.  The DIP Agent is hereby authorized to make any such endorsements as agent for each of the Prepetition Agent and Prepetition Notes Trustees or any such Prepetition Secured Parties.  This authorization is coupled with an interest and is irrevocable.

(d)    The automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to the extent necessary to permit the DIP Agent, acting at the direction of the

43

Required DIP Lenders, and the DIP Lenders to enforce all of their rights under the DIP Documents
and to (i) immediately upon the occurrence of an Event of Default, declare (A) the termination,
reduction or restriction of any further Commitment to the extent any such Commitment remains
and (B) all applicable DIP Obligations to be immediately due and payable, without presentment,
demand, protest or other notice of any kind, all of which are expressly waived by the DIP Loan
Parties; and (ii) upon the occurrence of an Event of Default and the giving by the DIP Agent of
five (5) business days' prior written notice (which shall run concurrently with any notice required
to be provided under the DIP Documents) (the "**Remedies Notice Period**") via email to counsel
to the Debtors and the Creditors' Committee, and the office of the United States Trustee for the
Southern District of New York (the "**U.S. Trustee**") to (A) withdraw consent to the Debtors'
continued use of Cash Collateral and (B) exercise all other rights and remedies provided for in the
DIP Documents and under applicable law; *provided* that,  during the Remedies Notice Period, the
Debtors may request an expedited hearing before the Bankruptcy Court to determine whether an
Event of Default has in fact occurred and/or seek nonconsensual use of Cash Collateral.  In no
event shall the DIP Agent, the DIP Lenders or the Prepetition Secured Parties be subject to the
equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, with
respect to the DIP Obligations or with respect to the Prepetition First Lien Debt; *provided* that the
DIP Agent and the DIP Lenders shall use commercially reasonable efforts to first use all DIP
Collateral other than the assets held or owned by (i) the Prepetition Midwest Notes Issuer, (ii)
Windstream Network Services of the Midwest, Inc. and/or (iii) each of the Prepetition Midwest
Notes Issuer's Debtor subsidiaries that are not currently obligors under the Prepetition Credit
Agreement or the Prepetition First Lien Notes, but are (or become) DIP Loan Parties, to repay the
DIP Obligations prior to using such other DIP Collateral to repay the DIP Obligations. Further,

subject only to and effective upon entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the secured claims of the Prepetition Secured Parties.

(e)     No rights, protections or remedies of the DIP Agent or the DIP Lenders granted by the provisions of this Interim Order or the DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to the DIP Loan Parties' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the DIP Loan Parties' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the DIP Loan Parties' continued use of Cash Collateral or the provision of adequate protection to any party.

11.    *Limitation on Charging Expenses Against Collateral*.  Except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, acting at the direction of the Required Lenders (as defined in the DIP Documents, the "**Required DIP Lenders**"), and, subject to and effective upon entry of the Final Order, the Prepetition Agent, acting at the direction of the Required Lenders (as defined in the Prepetition Credit Agreement), and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Agent, the DIP Lenders or the Prepetition Secured Parties to any charge, lien, assessment or claim against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.

12.     *Payments Free and Clear*.  Any and all payments or proceeds remitted to the DIP

Agent on behalf of the DIP Lenders pursuant to the provisions of this Interim Order, the Final

Order (if and when entered), any subsequent order of the Court or the DIP Documents shall be

irrevocable, received free and clear of any claim, charge, assessment or other liability, including,

without limitation, any such claim or charge arising out of or based on, directly or indirectly,

section 506(c) of the Bankruptcy Code (subject to the entry of the Final Order approving the waiver

of the Debtors' rights under section 506(c) of the Bankruptcy Code), whether asserted or assessed

by, through or on behalf of the Debtors, or 552(b) of the Bankruptcy Code, and solely in the case

of payments made or proceeds remitted after the delivery of a Carve Out Trigger Notice, subject

to the Carve Out in all respects.

13.     *Use of Cash Collateral*.  The DIP Loan Parties are hereby authorized, subject to the

terms and conditions of this Interim Order, to use all Cash Collateral; *provided* that (a) the

Prepetition Secured Parties are granted the adequate protection as hereinafter set forth and (b)

except on the terms and conditions of this Interim Order, the DIP Loan Parties shall be enjoined

and prohibited from at any times using the Cash Collateral absent further order of the Court.

14.     *Disposition of DIP Collateral*.  The Debtors shall not sell, transfer, lease, encumber

or otherwise dispose of any portion of the Collateral other than in the ordinary course of business

without the prior written consent of the DIP Agent, except as otherwise provided for in the DIP

Documents or otherwise ordered by the Court, and subject to the Intercreditor Agreements.

15.     *Adequate Protection of Prepetition Secured Parties*.  The Prepetition Secured

Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy

Code, to adequate protection of their interests in all Prepetition Collateral, including the Cash

Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Secured

Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code (the "**Prepetition Adequate Protection Claim**").   In consideration of the foregoing, the Prepetition Agent and Prepetition Notes Trustees, for the benefit of the Prepetition Secured Parties, are hereby granted the following (collectively, the "**Adequate Protection Obligations**"):

(a)    First Lien Adequate Protection Liens.  (i) The Prepetition Agent, for itself and for the benefit of the other Prepetition Credit Facility Secured Parties and (ii) the Prepetition First Lien Notes Indenture Trustee, for itself and for the benefit of the First Lien Noteholders, are each hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the Prepetition Credit Facility Secured Parties' Prepetition Adequate Protection Claims (in the case of the Prepetition Agent) and the First Lien Notes Secured Parties' Prepetition Adequate Protection Claims (in the case of the Prepetition First Lien Notes Indenture Trustee), a valid, perfected replacement security interest in and lien upon all of the DIP Collateral or, solely as to the Prepetition Agent, upon any other assets on which the Midwest Notes Adequate Protection Liens are granted, in each case subject and subordinate only to (A) the DIP Liens and any liens to which the DIP Liens are junior and (B) the Carve Out (the "**First Lien Adequate Protection Liens**").  The First Lien Adequate Protection Liens granted pursuant to this paragraph in favor of the Prepetition Agent shall be *pari passu* with the First Lien Adequate Protection Liens granted pursuant to this paragraph in favor of the Prepetition First Lien Notes Indenture Trustee.

(b)    Second Lien Adequate Protection Liens.  (i) The Prepetition 2024 Second Lien Notes Indenture Trustee, for itself and for the benefit of the Second Lien 2024 Noteholders

47

and (ii) the Prepetition 2025 Second Lien Notes Indenture Trustee, for itself and for the benefit of the Second Lien 2025 Noteholders, are each hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the Second Lien 2024 Notes Secured Parties' Prepetition Adequate Protection Claims (in the case of the Prepetition 2024 Second Lien Notes Indenture Trustee) and the Second Lien 2025 Notes Secured Parties' Prepetition Adequate Protection Claims (in the case of the Prepetition 2025 Second Lien Notes Indenture Trustee), a valid, perfected replacement security interest in and lien upon all of the DIP Collateral, in each case subject and subordinate to (A) the DIP Liens and any liens to which the DIP Liens are junior, (B) the First Lien Adequate Protection Liens, (C) the Prepetition Credit Facility Liens, (D) the First Lien Notes Liens and (E) the Carve Out (the "**Second Lien Adequate Protection Liens**").   The Second Lien Adequate Protection Liens granted pursuant to this paragraph in favor of the Prepetition 2024 Second Lien Notes Indenture Trustee shall be *pari passu* with the Second Lien Adequate Protection Liens granted pursuant to this paragraph in favor of the Prepetition 2025 Second Lien Notes Indenture Trustee.

(c)      Midwest Notes Adequate Protection Liens.  The Prepetition Midwest Notes Indenture Trustee, for itself and for the benefit of the Prepetition Midwest Noteholders, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution or filing of any mortgages, security agreements, pledge agreements, financing statements or other agreements or notices), in the amount of the Prepetition Midwest Noteholders' Prepetition Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon any and all assets (including, without limitation, any DIP Collateral) held or owned by (i) the Prepetition Midwest Notes Issuer, (ii) Windstream Network Services of the Midwest, Inc. and/or

(iii) each of the Prepetition Midwest Notes Issuer's Debtor subsidiaries that are not currently obligors under the Prepetition Credit Agreement or the Prepetition First Lien Notes, but are (or become) DIP Loan Parties, subject and subordinate only to (A) the DIP Liens and any liens to which the DIP Liens are junior and (B) the Carve Out (the "**Midwest Notes Adequate Protection Liens**" and, together with the First Lien Adequate Protection Liens and Second Lien Adequate Protection Liens, the "**Adequate Protection Liens**")  The Midwest Notes Adequate Protection Liens granted pursuant to this paragraph shall be *pari passu* with the First Lien Adequate Protection Liens and shall be senior to the Second Lien Adequate Protection Liens.

(d)      First Lien Section 507(b) Claims.  (i) The Prepetition Agent, for itself and for the benefit of the other Prepetition Credit Facility Secured Parties (ii) the Prepetition First Lien Notes Indenture Trustee, for itself and for the benefit of the First Lien Noteholders, are each hereby granted, subject to the Carve Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Prepetition Credit Facility Secured Parties' Prepetition Adequate Protection Claims (in the case of the Prepetition Agent) and the First Lien Notes Secured Parties' Prepetition Adequate Protection Claims (in the case of the Prepetition First Lien Notes Indenture Trustee), in each case with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**First Lien 507(b) Claims**"); which First Lien 507(b) Claims shall have recourse to and be payable from all of the DIP Collateral.  The First Lien 507(b) Claims shall be subject and subordinate only to the Carve Out and the DIP Superpriority Claims.  Except to the extent expressly set forth in this Interim Order, the Final Order or the DIP Documents, the Prepetition Credit Facility Secured Parties or Prepetition First Lien Notes Secured Parties shall not receive or retain any payments, property or

other amounts in respect of the First Lien 507(b) Claims unless and until the DIP Obligations
(other than contingent indemnification obligations as to which no claim has been asserted) have
indefeasibly been paid in cash in full and all DIP Commitments have been terminated.

(e)     Second Lien Section 507(b) Claims.  Solely following the Discharge of
First-Priority Obligations (as defined in the Junior Lien Intercreditor Agreement), (i) the
Prepetition 2024 Second Lien Notes Indenture Trustee, for itself and for the benefit of the Second
Lien 2024 Noteholders and (ii) the Prepetition 2025 Second Lien Notes Indenture Trustee, for
itself and for the benefit of the Second Lien 2025 Noteholders, are each hereby granted, subject to
the Carve Out, an allowed superpriority administrative expense claim as provided for in section
507(b) of the Bankruptcy Code in the amount of the Second Lien 2024 Notes Secured Parties'
Prepetition Adequate Protection Claims (in the case of the Prepetition 2024 Second Lien Notes
Indenture Trustee) and the Second Lien 2025 Notes Secured Parties' Prepetition Adequate
Protection Claims (in the case of the Prepetition 2025 Second Lien Notes Indenture Trustee), in
each case with, except as set forth in this Interim Order, priority in payment over any and all
administrative expenses of the kind specified or ordered pursuant to any provision of the
Bankruptcy Code (the "**Second Lien 507(b) Claims**"); which Second Lien 507(b) Claims shall
have recourse to and be payable from all of the DIP Collateral.  The Second Lien 507(b) Claims
shall be subject and subordinate to the Carve Out, the DIP Superpriority Claims, the First Lien
507(b) Claims and the prepetition claims of the Prepetition First Lien Notes Secured Parties and
the Prepetition Credit Facility Secured Parties.  Except to the extent expressly set forth in this
Interim Order, the Final Order, the DIP Documents or the DIP Credit Agreement, the Prepetition
Second Lien Notes Secured Parties shall not receive or retain any payments, property or other
amounts in respect of the Second Lien 507(b) Claims unless and until the DIP Obligations (other

than contingent indemnification obligations as to which no claim has been asserted) have indefeasibly been paid in cash in full and all DIP Commitments have been terminated.  For the avoidance of doubt, the Second Lien 507(b) Claims shall not come into existence or have any effect whatsoever unless the Discharge of First-Priority Obligations shall have occurred.

(f)    Midwest Notes Section 507(b) Claims.  The Prepetition Midwest Notes Indenture Trustee, for itself and for the benefit of the Prepetition Midwest Noteholders, are hereby granted, subject to the Carve Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Prepetition Midwest Noteholders' Prepetition Adequate Protection Claims, with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Midwest Notes 507(b) Claims**" and, together with the First Lien 507(b) Claims and Second Lien 507(b) Claims, the "**507(b) Claims**"); which Midwest Notes 507(b) Claims shall have recourse to and be payable (on a joint and several basis) from any and all assets (including, without limitation, any DIP Collateral) held or owned by (i) the Prepetition Midwest Notes Issuer, (ii) Windstream Network Services of the Midwest, Inc. and/or (iii) and each of the Prepetition Midwest Notes Issuer's Debtor subsidiaries that are not currently obligors under the Prepetition Credit Agreement or the Prepetition First Lien Notes, but are (or become) DIP Loan Parties.  The Midwest Notes 507(b) Claims shall be subject and subordinate only to the Carve Out and the DIP Superpriority Claims, and *pari passu* to the First Lien 507(b) Claims.  Except to the extent expressly set forth in this Interim Order, the Final Order or the DIP Documents, the Prepetition Midwest Noteholders shall not receive or retain any payments, property or other amounts in respect of the Midwest Notes 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim

has been asserted) have indefeasibly been paid in cash in full and all DIP Commitments have been terminated.

(g)    First Lien Secured Parties Cash Payments.  (i) The Prepetition Agent, for the benefit of the applicable Prepetition Credit Facility Secured Parties, shall receive current payment in cash on the last business day of each month in an amount equal to the sum of (A) all unpaid interest accruing on all outstanding principal, interest, fees and other amounts owing under the Prepetition Credit Agreement (as of the Petition Date) and (B) all outstanding and unpaid fees owing pursuant to Section 2.11 of the Prepetition Credit Agreement (in the case of Letter of Credit participation fees, for the avoidance of doubt, at the rates applicable after giving effect to Section 2.12(c)), in each case (x) whether accruing prior to, on or after the Petition Date, (y) accruing, on and after the Petition Date, at the applicable rate provided for under Section 2.12(c) of the Prepetition Credit Agreement in respect of overdue amounts and (z) no outstanding Borrowing may be converted or continued as a Eurodollar Borrowing (each as defined in the Prepetition Credit Agreement) at any time following the Petition Date; (ii) the Prepetition First Lien Notes Indenture Trustee, for the benefit of the applicable First Lien Notes Secured Parties, shall receive current payment in cash on the last business day of each month in an amount equal to the sum of (A) all unpaid fees owing to the Prepetition First Lien Notes Indenture Trustee under the First Lien Notes Indenture and (B) all interest accruing on the Notes (as defined in the First Lien Notes Indenture), whether accruing prior to, on or after the Petition Date, in each case at the non-default rate, and (iii) the Prepetition Midwest Notes Indenture Trustee, for the benefit of the applicable Prepetition Midwest Notes Secured Parties, shall receive current payment in cash on the last business day of each month in an amount equal to the sum of (A) all unpaid fees owing to the Prepetition Midwest Notes Indenture Trustee under the Prepetition Midwest Notes Indenture and (B) all interest

accruing on the Prepetition Midwest Notes, in each case whether accruing prior to, on or after the Petition Date, at the non-default rate (the payments in this paragraph 15(g), the "**Adequate Protection Payments**").

    (h) First Lien Secured Parties and Second Lien Secured Parties Fees and Expenses.  Without duplication of amounts required to be paid pursuant to the DIP Documents, (i) upon entry of this Interim Order, the DIP Loan Parties shall pay in cash all reasonable and documented out-of-pocket professional fees, expenses and disbursements payable to the advisors to the Prepetition Agent (and, as set forth below, the Prepetition Credit Agreement Lenders, the Prepetition First Lien Notes Indenture Trustee, the Prepetition Midwest Notes Indenture Trustee, the Midwest Noteholder Group, the Prepetition 2024 Second Lien Notes Indenture Trustee, and the Prepetition 2025 Second Lien Notes Indenture Trustee and/or the Second Lien Ad Hoc Committee (as defined below)) that accrued prior to the Petition Date, including the fees and expenses of (A) Simpson Thacher & Bartlett LLP, plus any prior counsel to the Prepetition Agent, as counsel for the Prepetition Agent, (B) FTI Consulting, Inc., as financial advisor for the Prepetition Agent, (C) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the ad hoc group of Prepetition Term Loan Lenders (the "**First Lien Term Lender Ad Hoc Group**"), (D) Evercore Group, L.L.S., as financial advisor to the First Lien Term Lender Ad Hoc Group, (E) counsel for the Prepetition First Lien Notes Indenture Trustee, (F) Shearman & Sterling LLP, as counsel to certain holders of Prepetition Midwest Notes (the "**Midwest Noteholder Group**"), (G) conflicts counsel for the Midwest Noteholder Group, (H) counsel to the Prepetition Midwest Notes Indenture Trustee, and (I) Milbank LLP, as counsel to an ad hoc committee of certain Prepetition 2024 Second Lien Noteholders and certain Prepetition 2024 Second Lien Noteholders (the "**Second Lien Ad Hoc Committee**"), ((A) through (I), collectively, the "**First and Second**

**Lien Advisors**") and (ii) the DIP Loan Parties shall pay in cash all reasonable and documented out-of-pocket professional fees, expenses and disbursements payable to the advisors to the Prepetition Agent, the Prepetition First Lien Notes Indenture Trustee, the Prepetition Midwest Notes Indenture Trustee, the Midwest Noteholder Group and the First Lien Term Lender Ad Hoc Group, the Prepetition 2024 Second Lien Notes Indenture Trustee, the Prepetition 2024 Second Lien Notes Indenture Trustee, and the Second Lien Ad Hoc Committee that have accrued on or after the Petition Date, including the fees and expenses of the First and Second Lien Advisors.  The payment of the fees, expenses and disbursements set forth in clause (ii) of the foregoing sentence shall be made within ten (10) days (which time period may be extended by the applicable professional) after the receipt by the Debtors, the U.S. Trustee and the Creditors' Committee, if appointed (the "**Review Period**") of invoices therefor without the necessity of filing formal fee applications or compliance with the U.S. Trustee's fee guidelines.  Such invoices provided to the Debtors, the U.S. Trustee and, as applicable, the Creditors' Committee, shall be summary copies, which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine.  Any objections raised by the Debtors, the U.S. Trustee or a Creditors' Committee with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional so as to be actually received prior to the expiration of the Review Period.  Following the Review Period, any such objection will be subject to resolution by the Court to the extent it remains unresolved.  Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Debtors.

Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Closing Date (as defined in the DIP Documents) all adequate protection fees and expenses incurred under this paragraph 15(h) on or prior to such date without the need for any applicable professional to first deliver a copy of its invoice or other supporting documentation. Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the (x) DIP Agent and DIP Lenders in connection with or with respect to the DIP Facility and (y) Prepetition Secured Parties in connection or with respect to these matters, are hereby approved in full and shall not be subject to avoidance, disgorgement or any similar form of recovery by the Debtors or any other person.

(i)   *Monitoring of Prepetition Collateral.*   The Prepetition Agents and Prepetition Notes Trustees shall be permitted to retain expert consultants and financial advisors at the expense of the Debtors, which consultants and advisors shall be given reasonable access for purposes of monitoring the business of the Debtors and the value of the applicable Prepetition Collateral.

(j)   *Financial Reporting.*   The Debtors shall continue to provide the Prepetition Agents and Prepetition Notes Trustees with financial and other reporting substantially in compliance with the Prepetition Debt Documents and any reporting described in this Interim Order or the other DIP Documents; *provided* that no audited financial statements shall be required and there shall be longer deadlines to be mutually agreed for certain reporting; *provided*, *further*, that the Prepetition Midwest Notes Indenture Trustee, the Second Lien Ad Hoc Committee, the Prepetition 2024 Second Lien Notes Indenture Trustee and the Prepetition 2025 Second Lien Notes Indenture Trustee shall each be entitled to all financial reporting delivered to the Prepetition Agent and the Prepetition First Lien Notes Indenture Trustee pursuant to the applicable Prepetition Debt Documents.

55

(k)      Notwithstanding anything to the contrary herein, except as expressly provided for herein with respect to the Prepetition Midwest Notes or in the following proviso, no Prepetition Secured Party shall receive the benefit of any Adequate Protection Liens on the assets of, or 507(b) Claims against, any Debtor except to the extent such Debtor was a prepetition obligor with respect to the applicable Prepetition Secured Party; *provided* that the First Lien Adequate Protection Liens shall attach to the assets of, and the First Lien 507(b) Claims shall be against, any Debtor that is or becomes a DIP Loan Party but that was not an obligor under the Prepetition Credit Facilities subject to the terms hereof.

16.      *Budget Maintenance*.  The initial Budget shall depict, on a weekly and line-item basis, for the first thirteen (13) week period from the Closing Date (A) (i) projected cash receipts, (ii) projected disbursements, including ordinary course operating expenses and bankruptcy-related expenses (including asset sales and any other fees and expenses relating to the DIP Documents), (iii) net cash flow, and (iv) DIP Facilities availability and total available liquidity, and (B) the other items set forth therein and such other information requested by the DIP Agent, and such initial Budget shall be approved by, and in form and substance reasonably satisfactory to, the DIP Agent in its sole discretion (it being acknowledged and agreed that the Budget attached hereto as **Schedule 1** is approved by and satisfactory to the DIP Agent).  The Budget shall be updated, modified or supplemented by the Debtors from time to time and upon the reasonable request of the DIP Agent (acting at the direction of the Required DIP Lenders), but in any event the Budget shall be updated by the Debtors not less than one time in each four (4) consecutive week period, and each such updated, modified or supplemented budget shall be deemed an approved Budget unless the DIP Agent acting in its reasonable discretion, objects by written notice delivered to the Debtors on or within five (5) business days after the receipt of such updated, modified or

56

supplemented budget; *provided* that, in the event that the DIP Agent objects, the current approved Budget shall remain the approved Budget until the DIP Agent and the Debtors agree as to an updated, modified or supplemented Budget.  Each Budget delivered to the DIP Agent shall be accompanied by such supporting documentation as reasonably requested by the DIP Agent.  Each Budget shall be prepared in good faith based upon assumptions that the Debtors believe to be reasonable.  A copy of any Budget (or updated Budget) shall be delivered to counsel for a Creditors' Committee (if appointed) and the U.S. Trustee after it has been approved in accordance with the DIP Documents.

17.    *Reservation of Rights of Prepetition Secured Parties*.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties and any other parties' holding interests that are secured by Primed Liens; *provided* that any of the Prepetition Agent and Prepetition Notes Trustees, acting on its own behalf or at the direction of the requisite Prepetition Secured Parties, upon a change in circumstances, may request further or different adequate protection, subject to and consistent with the terms of the Intercreditor Agreements, and the Debtors or any other party may contest any such request.  In addition, the Prepetition 2024 Second Lien Notes Indenture Trustee and the Prepetition 2025 Second Lien Notes Indenture Trustee reserve all rights to assert claims for interest, including default interest, and all other remedies provided under the Prepetition 2024 Second Lien Notes Documents and the Prepetition 2024 Second Lien Notes Documents.

18.    *Consent and Consent Fee*.  As soon as reasonably practicable after entry of this Interim Order, the Debtors are authorized to distribute to all Prepetition Lenders a request for

formal consent to the DIP Loan Parties' use of Cash Collateral and the other Prepetition Collateral, and the DIP Loan Parties' entry into the DIP Documents in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents pursuant to documentation reasonably satisfactory to the Debtors and the Prepetition Agent, and each Prepetition Lender that affirmatively provides such formal consent within fourteen (14) days after entry of this Interim Order shall earn and receive a consent fee in the amount of 0.75 percent of such Prepetition Lender's outstanding principal amount of loans and Revolving Credit Exposure (as defined in Prepetition Credit Agreement) under the Prepetition Credit Facilities (any such consenting Prepetition Term Loan Lender, a "**Consenting Term Loan Lender**"); *provided* that, to the extent the Debtors have not confirmed a chapter 11 plan or otherwise effectuated the Discharge of First-Priority Obligations (as defined in the Junior Lien Intercreditor Agreement) before the date that is 18 months after the Petition Date, each Prepetition Lender that affirmatively provides such formal consent shall earn and receive an additional consent fee in the amount of 0.50 percent of such Prepetition Lender's outstanding principal amount of loans and Revolving Credit Exposure under the Prepetition Credit Facilities.  All parties' rights are reserved (and shall not be prejudiced) to the extent the Prepetition Lenders that so provide such consent do not constitute Required Lenders under and as defined in the Prepetition Credit Agreement.

19.    *Perfection of DIP Liens and Adequate Protection Liens.*

(a)    Without in any way limiting the automatically effective perfection of the DIP Liens granted pursuant to paragraph 8 hereof and the Adequate Protection Liens granted pursuant to paragraph 12(a) and (b) hereof, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the DIP Loan Parties, as their true and lawful attorneys, with full power of substitution,

to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agent, on behalf of the DIP Lenders or the Prepetition Secured Parties shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over any cash or securities, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order.  Upon the request of the DIP Agent, each of the Prepetition Secured Parties and the DIP Loan Parties, without any further consent of any party, is authorized (in the case of the DIP Loan Parties) and directed (in the case of the Prepetition Secured Parties) to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)    A certified copy of this Interim Order may, in the discretion of the DIP Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Interim Order for filing and/or recording, as applicable.  The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agent to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

20.    *Preservation of Rights Granted Under this Interim Order.*

(a)    Other than the Carve Out and other claims and liens expressly granted by this Interim Order, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Agent and the DIP Lenders or the Prepetition Secured Parties shall be permitted while any of the DIP Obligations or the Adequate Protection Obligations remain outstanding, and, except as otherwise expressly provided in this Interim Order, the DIP Liens and the Adequate Protection Liens shall not be: (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the DIP Loan Parties' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the DIP Loan Parties.

(b)    The Debtors shall not seek, and it shall constitute an Event of Default and terminate the right of the DIP Loan Parties to use Cash Collateral if any of the DIP Loan Parties, without the prior written consent of the Required DIP Lenders seeks, proposes or supports (whether by way of motion or other pleadings filed with the Court or any other writing executed by any DIP Loan Party or by oral argument), or if there is entered or confirmed (in each case, as applicable), or if there occurs:

(i)    a failure of the Debtors to make any payment under this Interim Order to any of the Prepetition Secured Parties when due;

(ii)    a failure of the Debtors to (x) observe or perform any of the material terms or provisions contained in this Interim Order or (y) comply

60

with any covenant or agreement in this Interim Order in any material respect;

(iii)    any modifications, amendments, reversal or extensions of this Interim Order;

(iv)    an order converting to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases;

(v)    an order appointing a chapter 11 trustee in the Chapter 11 Cases;

(vi)    an order appointing an examiner with enlarged powers in the Chapter 11 Cases (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code);

(vii)    a plan of reorganization other than plan that provides for termination of the Commitments and payment in full in cash of the DIP Obligations being proposed by the Debtors or confirmation thereof;

(viii)    the sale of all or substantially all of the assets of the DIP Loan Parties (except to the extent permitted under the DIP Documents), which does not provide for the repayment in full in cash of all DIP Obligations (other than any contingent indemnification or expense reimbursement obligations for which no claim has been made); or

(ix)    the expiration of the Remedies Notice Period following the occurrence of any "Event of Default" as defined in the DIP Documents, unless such Event of Default has been cured or waived or the DIP Agent and/or the Required DIP Lenders have agreed in writing with the Debtors not to exercise any further remedies.

Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered: (i) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in full in cash (and that such DIP Superpriority Claims, 507(b) Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Interim Order shall not be affected; and (iii) this Court shall retain

61

jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agent and Prepetition Notes Trustees, as applicable, of the effective date of such reversal, modification, vacatur or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens.  Notwithstanding any such reversal, modification, vacatur or stay of any use of Cash Collateral, any DIP Obligations, DIP Liens, Adequate Protection Obligations or Adequate Protection Liens incurred by the DIP Loan Parties to the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agent and Prepetition Notes Trustees, as applicable, of the effective date of such reversal, modification, vacatur or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

(d)     Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, the 507(b) Claims and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by: (i) the

entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases or terminating the joint administration of these Chapter 11 Cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the DIP Loan Parties have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations; or (iv) any other act or omission.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Chapter 11 Cases, in any successor cases if these Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the Commitments have been terminated.

21.    *Effect of Stipulations on Third Parties*.  The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon the Debtors in all circumstances and for all purposes.  The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases (including the Creditors' Committee, if any) and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or

examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes

unless: (a) such committee or any other party in interest with requisite standing (subject in all

respects to any agreement or applicable law that may limit or affect such entity's right or ability to

do so), has timely filed an adversary proceeding or contested matter (subject to the limitations

contained herein, including, *inter alia*, in this paragraph 21) by no later than (i) (x) with respect to

parties in interest with requisite standing other than the Creditors' Committee, 75 calendar days

after entry of this Interim Order and (y) with respect to the Creditors' Committee, 60 calendar days

after the appointment of the Creditors' Committee, (ii) any such later date as has been agreed to,

in writing, by the Prepetition Agent (with the consent of the Required Lenders (as defined in the

Prepetition Credit Agreement), the DIP Agent and a majority of the Consenting Term Loan

Lenders (such consent not to be unreasonably withheld)) as applicable, and (iii) any such later date

as has been ordered by the Court for cause upon a motion filed and served within any applicable

period of time set forth in this paragraph (the time period established by the foregoing clauses (i),

(ii), and (iii), the "**Challenge Period**"), (A) objecting to or challenging the amount, validity,

perfection, enforceability, priority or extent of the Prepetition Debt or the Prepetition Liens, or (B)

otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances,

other avoidance power claims or any other claims, counterclaims or causes of action, objections,

contests or defenses (collectively, the "**Challenges**") against the Prepetition Secured Parties or

their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents,

financial advisors, attorneys, accountants, investment bankers, consultants, representatives and

other professionals and the respective successors and assigns thereof, in each case in their

respective capacity as such (each, a "**Representative**" and, collectively, the "**Representatives**")

in connection with matters related to the Prepetition Debt Documents, the Prepetition Debt, the

Prepetition Liens and the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred.  If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then: (a) the Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding on all parties in interest, including, without limitation, the Creditors' Committee (if any); (b) the obligations of the DIP Loan Parties under the Prepetition Debt Documents, including the Prepetition Debt, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, recoupment, offset or avoidance, for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s); (c) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense; and (d) the Prepetition Debt and the Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further claim or challenge by the Creditors' Committee (if any), any non-statutory committees appointed or formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defenses, claims, causes of action, counterclaims and offsets by the Creditors' Committee (if any), any non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party acting or seeking to act on behalf

of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Prepetition Debt Documents shall be deemed forever waived, released and barred.  If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any statutory or nonstatutory committee appointed or formed in the Chapter 11 Cases, including the Creditors' Committee (if any), and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.  Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Creditors' Committee (if any) or any non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Debt Documents, the Prepetition Debt or the Prepetition Liens.

22.     *Limitation on Use of DIP Financing Proceeds and Collateral*.  Notwithstanding any other provision of this Interim Order or any other order entered by the Court, no DIP Loans, DIP Collateral, Prepetition Collateral or any portion of the Carve Out, may be used directly or indirectly, (a) in connection with the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Agent, the DIP Lenders, the First Lien Secured Parties or their respective predecessors-in-interest, agents,

affiliates, representatives, attorneys, or advisors, in each case in their respective capacity as such, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, DIP Superpriority Claims, Prepetition Credit Facility Debt, the Prepetition First Lien Notes Obligations or the Midwest Notes Obligations (collectively, the "**First Lien Obligations**"), the Prepetition Credit Facility Liens, the Prepetition First Lien Notes Liens, the Midwest Notes Liens, and/or the Adequate Protection Obligations and Adequate Protection Liens granted to the First Lien Secured Parties, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the DIP Obligations, the First Lien Obligations and/or the liens, claims, rights, or security interests securing or supporting the DIP Obligations granted under this Interim Order, the Final Order, the DIP Documents or the Prepetition Debt Documents in respect of the First Lien Obligations, including, in the case of each (i) and (ii), without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise (provided that, notwithstanding anything to the contrary herein, the Debtors and the Creditors' Committee (if appointed) may use the proceeds of the DIP Loans and/or DIP Collateral (including Cash Collateral) to investigate but not to prosecute (A) the claims and liens of the Prepetition Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties up to an aggregate cap of no more than $50,000), (b) to prevent, hinder, or otherwise delay or interfere with the Prepetition Secured Parties', the DIP Agent's or the DIP Lenders', as applicable, enforcement or realization on the Prepetition Debt, Prepetition Collateral, DIP Obligations, DIP Collateral, and the liens, claims and rights granted to such parties under the Orders, each in accordance with the DIP Documents, the Prepetition Debt Documents or this Interim Order; (c) to seek to modify any of the rights and remedies granted to the Prepetition

Secured Parties, the DIP Agent or the DIP Lenders under this Interim Order, the Prepetition Debt Documents or the DIP Documents, as applicable; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the Definitive Documentation) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, adequate protection liens and superpriority claims and liens granted to the Prepetition Secured Parties; or (e) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved or authorized by the Bankruptcy Court, agreed to in writing by the Required DIP Lenders, expressly permitted under this Interim Order or permitted the DIP Documents (including the Budget), in each case unless all DIP Obligations, Prepetition Debt, adequate protection obligations, and claims granted to the DIP Agent, DIP Lenders or Prepetition Secured Parties under this Interim Order, have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit) or otherwise agreed to in writing by the Required DIP Lenders.

23.    *Loss or Damage to Collateral.*  Nothing in this Interim Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or any of the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts. So long as the DIP Agent and the DIP Lenders comply with their obligations under the DIP Documents and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Agent and the DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or

default of any carrier, servicer, bailee, custodian, forwarding agency or other person and (b) all risk of loss, damage or destruction of the DIP Collateral shall be borne by the DIP Loan Parties.

24.    *Interim Order Governs.*  In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents or any other order entered by this Court, the provisions of this Interim Order shall govern.  Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to any authorization contained in any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Interim Order and the DIP Documents, including, without limitation, the Approved Budget.

25.    *Binding Effect; Successors and Assigns.*  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the Creditors' Committee (if any), any other statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided* that the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

26.     *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Agent and the DIP Lenders shall not (i) be deemed to be in "control" of the operations of the Debtors; (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; and (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, *et seq.*, as amended, or any similar federal or state statute).

27.     *Master Proof of Claim*.  The Prepetition Agent, Prepetition Notes Trustees and/or any other Prepetition Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases or any successor case in order to assert claims on behalf of themselves or the Prepetition Secured Parties for payment of the Prepetition Debt arising under the Prepetition Debt Documents or the Midwest Notes Documents, including, without limitation, any principal, unpaid interest, fees, expenses and other amounts under the Prepetition Debt Documents.  The statements of claim in respect of the such indebtedness set forth in this Interim Order, together with any evidence accompanying the Motion and presented at the Interim Hearing, are deemed sufficient to and do constitute proofs of claim in respect of such debt and such secured status.  However, in order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, each of the Prepetition Agent, the Prepetition Notes Trustees and other Prepetition Midwest Notes Secured Parties is authorized to file in the Debtors' lead chapter 11 case *In re Windstream  Holdings, Inc.*, Case No. 19-22312 (RDD), a master proof of claim on behalf of its respective Prepetition Secured Parties on account of any and all of their respective

70

claims arising under the applicable Prepetition Debt Documents and hereunder (each, a "**Master Proof of Claim**") against each of the Debtors.  Upon the filing of a Master Proof of Claim by any of the Prepetition Agent and Prepetition Notes Trustees, such entity shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors (or, in the case of the Prepetition Midwest Notes Indenture Trustee or other Prepetition Midwest Notes Secured Parties, against each of the Prepetition Midwest Notes Issuer and its restricted subsidiaries) of any type or nature whatsoever with respect to the applicable Prepetition Debt Documents, and the claim of each applicable Prepetition Secured Party (and each of its respective successors and assigns), named in a Master Proof of Claim shall be treated as if such entity had filed a separate proof of claim in each of these Chapter 11 Cases (or, in the case of the Prepetition Midwest Notes Indenture Trustee, the Chapter 11 Cases of the Prepetition Midwest Notes Issuer and its restricted subsidiaries).  The Master Proofs of Claim shall not be required to identify whether any Prepetition Secured Party acquired its claim from another party and the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The provisions of this paragraph 27 and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the Prepetition Agent.

28.     *Insurance*.  To the extent that any of the Prepetition Agent or Prepetition Notes Trustees is listed as loss payee under the Borrowers' or Guarantors' insurance policies, the DIP Agent is also deemed to be the loss payee under such insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies, first, to the payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted), and second, to the payment of the applicable Prepetition Debt.

29.     *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

30.     *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

31.     *Payments Held in Trust*.  Except as expressly permitted in this Interim Order or the DIP Documents, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the

benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order.

32.    *Miscellaneous*.  Upon request of any of the DIP Agent, Prepetition Agent and First Lien Term Lender Ad Hoc Group, the Debtors' advisors shall make themselves reasonably available (including for reasonable weekly telephone conferences) to discuss significant items and developments in the Chapter 11 Cases, including with respect to any material contracts, any material litigation, and any material operational items.

33.    *Credit Bidding*.  (a) The DIP Agent shall have the right to credit bid, in accordance with the DIP Documents, up to the full amount of the DIP Obligations in any sale of the DIP Collateral, and (b) subject to the Intercreditor Agreements, the Prepetition Secured Parties shall have the right to credit bid up to the full amount of the Prepetition Debt in any sale of the DIP Collateral, in each case, as provided for in section 363(k) of the Bankruptcy Code and subject to any successful Challenge, without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363(k) or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

34.    *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

35.    *Necessary Action*.  The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Interim Order.

36.    *Retention of Jurisdiction*.  The Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation

and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

37.  *Final Hearing.*  The Final Hearing is scheduled for _____, 2019 at _____ __.m. before this Court.

38.  *Objections.*  Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon (a) the U.S. Trustee; (b) entities listed as holding the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Debtors, 4001 North Rodney Parham Road, Little Rock, Arkansas 72212 (Attn.: Office of the General Counsel); (d) counsel to the Debtors, Kirkland & Ellis LLP, 300 N. LaSalle Drive, Chicago, Illinois 60654 (Attn.: Brad Weiland and John R. Luze) and 601 Lexington Avenue, New York, New York 10022 (Attn.: Stephen E. Hessler, P.C.); (e) counsel to the DIP Agent, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (Attn.: Timothy Graulich, Natasha Tsiouris and Erik Jerrard); (f) counsel to the Prepetition Agent, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Attn.: Sandeep Qusba and Nicholas Baker); (g) the Office of the United States Attorney for the Southern District of New York; (h) the state attorneys general for states in which the Debtors' conduct business; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; (k) the Federal Communications Commission; and (l) any other party that has filed a request for notices with this Court, in each case to allow actual receipt by the foregoing no later than _____, 2019 at 4:00 p.m., prevailing Eastern Time.

39.  The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing, including, without limitation, notice that the Debtors will seek approval at the Final Hearing of a waiver of rights under sections 506(c) and

552(b) of the Bankruptcy Code) to the parties having been given notice of the Interim Hearing, to

any party that has filed a request for notices with this Court and to the Creditors' Committee after

the same has been appointed, or such Creditors' Committee's counsel, if the same shall have been

appointed.

Dated:   White Plains, New York
         February ___, 2019


_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

## <u>Schedule 1</u>

**Budget**

# 13-Week Cash Flow Forecast

($ in millions)

| | Feb-26 | Mar-4 | Mar-11 | Mar-18 | Mar-25 | Apr-1 | Apr-8 | Apr-15 | Apr-22 | Apr-29 | May-6 | May-13 | May-20 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning | Feb-26 | Mar-4 | Mar-11 | Mar-18 | Mar-25 | Apr-1 | Apr-8 | Apr-15 | Apr-22 | Apr-29 | May-6 | May-13 | May-20 | |
| Week Ending | Mar-3 | Mar-10 | Mar-17 | Mar-24 | Mar-31 | Apr-7 | Apr-14 | Apr-21 | Apr-28 | May-5 | May-12 | May-19 | May-26 | 13-Week |
| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
| **Operating Receipts** | | | | | | | | | | | | | | |
| Total Operating Receipts | $93 | $117 | $104 | $102 | $120 | $127 | $113 | $109 | $117 | $129 | $123 | $115 | $117 | $1,486 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Total Operating Disbursements | ($111) | ($185) | ($134) | ($142) | ($122) | ($174) | ($104) | ($139) | ($108) | ($135) | ($132) | ($115) | ($52) | ($1,653) |
| Cash Flow from Operations | ($18) | ($68) | ($30) | ($40) | ($2) | ($48) | $10 | ($31) | $9 | ($6) | ($9) | ($0) | $65 | ($167) |
| **Restructuring & Chapter 11 Disbursements** | | | | | | | | | | | | | | |
| Total Restructuring Disbursements | ($16) | $– | $– | $– | ($9) | ($8) | $– | $– | $– | ($11) | $– | $– | $– | ($44) |
| Cash Flow Pre-Financing | ($34) | ($68) | ($30) | ($40) | ($11) | ($55) | $10 | ($31) | $9 | ($17) | ($9) | ($0) | $65 | ($211) |
| **Cash Flow from Financing** | | | | | | | | | | | | | | |
| DIP Term Loan Issuance[1] | $300 | $– | $– | $– | $200 | $– | $– | $– | $– | $– | $– | $– | $– | $500 |
| DIP Interest (incl. fees) | (9) | – | – | – | (5) | – | – | – | – | (2) | – | – | – | (16) |
| Adequate Protection[2] | (34) | (1) | (1) | (10) | (2) | (5) | (1) | (12) | (0) | (28) | (2) | (13) | (0) | (108) |
| Cash Flow from Financing | $258 | ($1) | ($1) | ($10) | $194 | ($5) | ($1) | ($12) | ($0) | ($30) | ($2) | ($13) | ($0) | $376 |
| **Total Cash Flow** | **$224** | **($69)** | **($31)** | **($50)** | **$183** | **($60)** | **$9** | **($43)** | **$9** | **($47)** | **($11)** | **($13)** | **$64** | **$165** |
| Beginning Cash Balance | $6 | $230 | $161 | $130 | $80 | $262 | $202 | $211 | $168 | $177 | $130 | $119 | $106 | $6 |
| Plus: DIP Revolver Draw / (Paydown) | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Ending Cash Balance | $230 | $161 | $130 | $80 | $262 | $202 | $211 | $168 | $177 | $130 | $119 | $106 | $171 | $171 |
| (+) DIP Availability[3] | 77 | 77 | 77 | 77 | 477 | 477 | 477 | 477 | 477 | 477 | 477 | 477 | 477 | 477 |
| Total Liquidity | $307 | $238 | $207 | $157 | $739 | $679 | $688 | $645 | $654 | $607 | $596 | $583 | $648 | $648 |
| Memo: | | | | | | | | | | | | | | |
| DIP RCF Balance | $– | $– | $– | $– | $– | $– | $– | $– | $– | $– | $– | $– | $– | $– |

(1)  Assumes final DIP approval on 3/26/19.
(2)  Assumes 100% of revolving and term lenders consent to the DIP in exchange for a fee equal to 0.75% of their respective prepetition principal claim amounts.
(3)  DIP Availability net of $23mm of letters of credit outstanding.

**<u>Exhibit B</u>**

**DIP Term Sheet**

**Windstream Services, LLC**

SUMMARY OF TERMS AND CONDITIONS OF THE $1,000,000,000
SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION FACILITIES

| | |
|---|---|
| **Borrower:** | Windstream Services, LLC (the "**Borrower**"), as a debtor-in-possession under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**"), in jointly administered cases with certain of its subsidiaries and affiliates as debtors-in-possession under Chapter 11 of the Bankruptcy Code (collectively, the "**Cases**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") filed on or about February 25, 2019 (the "**Petition Date**") and any other Debtors that Citi and the Borrower shall agree. |
| **Guarantors:** | All obligations under the Facilities (defined below) and the other DIP Loan Documents (as defined below) will be unconditionally guaranteed (the "**Guarantee**") by (a) Windstream Holdings, Inc. ("**Holdings**") and (b) each existing and future direct and indirect domestic subsidiary of the Borrower to the extent required by Section 5.10 of the Existing Credit Facility (the "**Subsidiary Guarantors**", collectively with the Holdings, the "**Guarantors**"). |
| | The Guarantors shall be debtors-in-possession under Chapter 11 of the United States Bankruptcy Code (such Guarantors, together with the Borrower, the "**Debtors**", which have been identified in Annex I hereto). |
| **Certain Prepetition Facilities /Secured Notes:** | <u>Existing Credit Facility</u>.  That certain Sixth Amended and Restated Credit Agreement, originally dated as of July 17, 2006 and as amended and restated as of April 24, 2015 among the Borrower, as borrower, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, the other agents and other entities party thereto and the financial institutions and other persons or entities party thereto as lenders (in each case as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "**Existing Credit Facility**"). |
| | <u>Existing First Lien Notes</u>.  That certain Indenture dated as of November 6, 2017 for 8.625% notes due 2025 among the Borrower and Windstream Finance Corp., as co-issuers, the subsidiary guarantors party thereto, U.S. Bank, National Association, as trustee, as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "**Existing First Lien Notes**"). |

<u>Existing Midwest Notes</u>. That certain Indenture dated as of February 23, 1998 for 6.75% notes due 2028 among the Windstream Holdings of the Midwest, Inc., as issuer, U.S. Bank, National Association, as trustee and holders party thereto (in each case as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "**Existing Midwest Notes**").

<u>Existing Second Lien Notes</u>. That certain Indenture dated as of August 2, 2018 for 10.5% notes due 2024 among the Borrower and Windstream Finance Corp., as co-issuers, the subsidiary guarantors party thereto, Wilmington Trust, National Association, as trustee and notes collateral agent and holders party thereto (in each case as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "**Existing 2024 Second Lien Notes**") and that Indenture dated as of August 2, 2018 for 9.0% notes due 2025 among the Borrower and Windstream Finance Corp., as co-issuers, the subsidiary guarantors party thereto, Wilmington Trust, National Association, as trustee and notes collateral agent and holders party thereto (in each case as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "**Existing 2025 Second Lien Notes**", together with the Existing 2024 Second Lien Notes, the "**Existing Second Lien Notes**").

**DIP Facilities:**     <u>Term Facility</u>: A superpriority term loan facility (the "**Term Facility**") in an aggregate principal amount of up to $500,000,000 (the "**Term Loan Commitments**"). Amounts paid or prepaid under the Term Facility may not be reborrowed.

<u>Revolving Facility</u>: A superpriority non-amortizing revolving credit facility (the "**Revolving Facility**" and, together with the Term Facility, the "**Facilities**") in an aggregate principal amount of up to $500,000,000 (the "**Revolving Commitments**" and, together with the Term Loan Commitments the "**Commitments**"), subject to Revolving Availability (as defined below). Up to $50,000,000 of the Revolving Facility in connection with both the Initial Availability and Full Availability (as defined below), in each case subject to Revolving Facility Availability (as defined below), will be available in the form of letters of credit by the Issuer (as defined below) for the account of the Borrower ("**Letters of Credit**").

The Commitment of each Lender (as defined below) will be set forth on <u>Annex IV</u> hereto.

The Facilities will be documented under one credit agreement.

**Purpose/Use of Proceeds:**     The proceeds of the Facilities will be used: (i) to pay related transaction costs, fees and expenses, (ii) to provide working capital for the Debtors and for other general corporate purposes of the Debtors, (iii) to pay

-2-

Adequate Protection (as defined herein) payments as authorized by the Bankruptcy Court in the Interim Order or the Final Order (each as defined herein), (iv) to pay obligations arising from or related to the Carve-Out and (v) to pay restructuring costs incurred in connection with the Cases.

**Arranger:**

Citigroup Global Markets Inc. ("**CGMI**") on behalf of Citi (as defined below) and each Additional Arranger (as defined in the Commitment Letter) (collectively, together with their affiliates, the "**Arranger**").

"**Citi**" means CGMI, Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as Citi shall determine appropriate to provide the servicers contemplated herein.

**Lenders:**

With respect to the Term Facility, the Arranger and the other institutions identified in <u>Annex IV</u> hereto, and other financial institutions or entities acceptable to Citi and the Borrower ( such acceptance not to be unreasonably withheld) (other than Disqualified Institutions) (collectively, the "**Term Lenders**").

With respect to the Revolving Facility, the Arranger or any of their respective affiliates, and other financial institutions or entities acceptable to Citi and the Borrower (such acceptance not to be unreasonably withheld) (other than Disqualified Institutions) (collectively, the "**Revolving Lenders**", and together with the Term Lenders, the "**Lenders**").

**Letter of Credit Issuer:**

Citibank, N.A. or an affiliate thereof and each other Arranger under the Revolving Facility, on a pro rata basis in accordance with their commitments to the Revolving Facility (collectively, the "**Issuer**").

**Term Facility
Administrative Agent:**

Citi (the "**Term Facility Agent**").

**Revolving Facility
Administrative Agent:**

Citi or an affiliate (the "**Revolving Facility Agent**" and together with the Term Facility Agent, the "**Agents**").

**Term Facility
Initial Availability:**

During the period commencing on the date (the "**Interim Order Entry Date**") of the Bankruptcy Court's entry of the Interim Order (as defined in <u>Annex II</u> attached hereto) and ending on the date the Bankruptcy Court enters a final non-appealable order in form and substance satisfactory to Citi (the "**Final Order**") (such period, the "**Interim Period**"), a portion of the Term Loan Commitments shall be available to the Borrower, subject to satisfaction or waiver by all of the Lenders of the applicable conditions precedent set forth in Annex II of this Summary of Terms and Conditions (this "**Term Sheet**") (the "**Initial Availability**") in an amount equal to the lesser of $300,000,000 and such other amount as may be approved by order of the Bankruptcy Court, to be made available on the first day of the Interim Period.

#91769361v15

| | |
|---|---|
| **Term Facility Full Availability:** | Upon the Bankruptcy Court's entry of the Final Order (the "**Final Order Entry Date**"), the full remaining amount of the Term Loan Commitments shall be available to the Borrower, subject to the satisfaction or waiver by the Agent of the applicable conditions precedent in Annex II (the "**Full Availability**").  Subject to the terms hereof, the balance of the Term Facility may be borrowed in a single drawing on the Final Order Entry Date. |
| **Revolving Facility Initial Availability:** | Availability under the Revolving Facility ("**Revolving Facility Initial Availability**") will be, at any date after the Interim Order Entry Date and prior to the Final Order Entry Date, an amount equal to $100,000,000. |
| **Revolving Facility Full Availability:** | From and after the Final Order Entry Date, the full remaining amount of the Revolving Facility shall be available to the Borrower on a revolving basis from time to time, subject to the satisfaction or waiver in accordance with the DIP Loan Documents of the Conditions to All Borrowings referred to below. |
| **Budget:** | As used in this Term Sheet and in Annex II hereto, "**Budget**" means the following (each in form and substance satisfactory to Citi exercising its judgment in good faith): |

> (a)    in the case of the initial Budget (delivered as a condition to the closing and initial funding of the Facilities), a 13-week statement of sources and uses for the next 13 weeks of the Holdings and its subsidiaries,  on a consolidated basis, broken down by week, including the anticipated uses of the Facilities for such period (a "**13-week Projection**"), and thereafter, prior to the Final Order Entry Date, at the end of each four week period (and thereafter, as shall have been agreed to in the Definitive Documentation),  an updated 13-week Projection for the subsequent 13 week period; and

> (b)    a business plan and projected operating budget for a period of two (2) years (the "**Operating Forecast**"), broken down by month, including, without limitation, income statements, balance sheets, cash flow statements, projected capital expenditures, asset sales, cost savings and headcount reductions, targeted facility closures, targeted facility idlings and other milestones, a line item for total available liquidity for the period commencing on the date of such Budget, and which shall set forth the anticipated uses of the Facilities for such period; the associated underlying assumptions shall be mutually agreed by the Borrower and the Citi. Citi acknowledges and agrees that it has received the Operating Forecast and the underlying assumptions are acceptable to it.

#91769361v15

| | |
|---|---|
| **Maturity:** | The maturity date of the Facilities will be (and all loans and obligations under the Facilities shall be repaid in full in cash on) the stated maturity, which shall be the date that is 24 months after the Closing Date (as defined herein) (the "**Maturity Date**"). |
| | Any confirmation order entered in the Cases shall not discharge or otherwise affect in any way any of the joint and several obligations of the Debtors to the Lenders under the Facilities and the DIP Loan Documents, other than after the payment in full and in cash to the Lenders of all obligations under the Facilities and the DIP Loan Documents on or before the effective date of a plan of reorganization and the termination of the Commitments. |
| **Closing Date:** | The date on or before March 1, 2019 on which the specified portion of the Commitments is made available for borrowings under the Facilities (the "**Closing Date**"), which shall be no later than two (2) days after the Interim Order Entry Date, subject to satisfaction (or waiver) of the applicable conditions precedent set forth herein. |
| **Amortization:** | None. |
| **Interest Rate and Fees:** | As set forth on Annex III. |
| **Borrowing Procedure:** | Borrowings under the Revolving Facility will be in minimum amounts of $1,000,000 or multiples of $250,000 in excess thereof (or, if less, the remaining available balance of the applicable Commitments). |
| | Borrowings under the Term Facility after the Interim Order Entry Date will be in minimum amounts to be set forth in the Definitive Documentation (or, if less, the remaining available balance of the applicable Commitments). |
| | Borrowing requests under each facility shall be signed by the Borrower and, after the Closing Date, made (i) on three business days' notice, in the case of loans bearing interest at a rate based on LIBOR ("**LIBOR Loans**") and (ii) on one business day's notice, in the case of loans bearing interest based on the Alternate Base Rate ("**ABR Loans**"). |
| **Currency:** | Borrowings may be made in U.S. Dollars.  All payments under the Facilities will be made without setoff or counterclaim. |
| **Funding Protection:** | Subject to the Documentation Standard. |
| **Voluntary Prepayments and Commitment Reductions:** | The Borrower may repay the loans under the Term Facility and/or reduce the Term Loan Commitments (1) subject to a prepayment premium of 1.00% of the principal amount of loans under the Term Facility so prepaid or the Term Loan Commitments so reduced, if the prepayment or reduction occurs prior to the six month anniversary of the Closing Date or (2) without premium or penalty, if the prepayment or reduction occurs on or after the six month anniversary of the Closing |

-5-

Date (other than breakage costs) upon (i) at least 3 business days' notice in the case of LIBOR Loans and (ii) one business day's notice in the case of ABR Loans; *provided* that in the case of repayment, each partial repayment shall be in an amount of $1,000,000 or multiples of $250,000 in excess thereof (or, if less, the outstanding amount of applicable loans), and, in the case of reduction of the Term Loan Commitments, each partial reduction shall be in an amount of $1,000,000 or multiples of $250,000 in excess thereof (or, if less, the remaining available balance of the Term Loan Commitments).

The Borrower may repay the loans under the Revolving Facility at any time without premium or penalty (other than breakage costs, if applicable) upon (i) at least 3 business days' notice in the case of LIBOR Loans and (ii) one business day's notice in the case of ABR Loans; *provided* that in the case of repayment, each partial repayment shall be in an amount of $1,000,000 or multiples of $250,000 in excess thereof (or, if less, the outstanding amount of applicable loans), and, in the case of reduction of the Revolving Commitments, each partial reduction shall be in an amount of $1,000,000 or multiples of $250,000 in excess thereof (or, if less, the remaining available balance of the Revolving Commitments).

**Mandatory Prepayments:**    The following mandatory prepayments shall be required:

1.  <u>Asset Sales</u>:  Prepayments of the Term Facility in an amount equal to 100% of the net cash proceeds of certain non-ordinary course sales or other dispositions to be mutually agreed of any property or assets of the Borrower or any of its respective subsidiaries that exceeds $25,000,000 in the aggregate for each fiscal year.

2.  <u>Insurance Proceeds</u>:  Prepayments of the Term Facility in an amount equal to 100% of the net cash proceeds of insurance paid on account of any loss of any property or assets of the Borrower or any of its subsidiaries (other than any such proceeds received prior to the date of commencement of the Cases), subject to any Legal Limitations and with restrictions to be agreed, and subject to exceptions to be agreed on in the Definitive Documentation.

3.  <u>Incurrence of Indebtedness</u>:  Prepayments of the Term Facility in an amount equal to 100% of the net cash proceeds received from the incurrence of indebtedness by the Borrower or any of its other restricted subsidiaries (other than indebtedness otherwise permitted under the DIP Loan Documents), payable no later than the date of receipt

4.  <u>Revolving Facility Overdraw</u>.  On any date that outstanding loans under the Revolving Facility and Letter of Credit exposures exceed Revolving Facility Availability then, not later than the next business day, the Borrower must prepay the loans

-6-

under the Revolving Facility so that outstanding loans under the Revolving Facility and Letter of Credit exposures no longer exceed Revolving Facility Availability.

**Application of Mandatory Prepayments:**

Any mandatory prepayments (other than 4 and 5 above) shall be applied, first, to repayment of the loans under the Term Facility until repaid in full and second to repayment of loans under the Revolving Facility (without a corresponding commitment of the Revolving Facility), until repaid in full.

**Mandatory Cancellation of Commitments:**

Automatic if no loan under the Term Facility has been advanced by close of business in New York on the Closing Date.

**Priority/Security:**

All obligations of the Debtors to the Lenders under the DIP Loan Documents, including all loans made under the Facilities, shall, subject in each case to the Carve-Out (as defined below), at all times:

(i)      pursuant to Bankruptcy Code section 364(c)(1), be entitled to joint and several superpriority administrative expense claim status in the Cases, which claims in respect of the Revolving Facility and the Term Facility shall be pari passu;

(ii)     pursuant to Bankruptcy Code section 364(c)(2), be secured by a perfected first priority lien on the Collateral to the extent that such Collateral is not subject to valid, perfected and non-avoidable liens as of the commencement of the Cases or liens that were in existence immediately prior to the commencement of the Cases that are perfected as permitted by Section 546(b) of the Bankruptcy Code;

(iv)  pursuant to Bankruptcy Code section 364(d), be secured by a perfected superpriority priming lien on all Collateral to the extent that such Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties as of the commencement of the Cases, *including*, all accounts receivable, inventory, real and personal property, plant and equipment of the Debtors that secure the obligations of the Debtors under the Existing Credit Facility, the Existing First Lien Notes and the Existing Second Lien Notes (collectively, the "**Existing Primed Secured Facilities**"; the lenders, holders, agents and indenture trustees under the Existing Primed Secured Facilities, the "**Existing Primed Secured Parties**");

subject in each case only to the carve-out set forth in the draft DIP Order sent by Davis Polk & Wardwell LLP to Kirkland & Ellis LLP at 3:02 p.m. New York City time on February 25, 2019, subject to changes acceptable to Citi and the Borrower (the "**Carve-Out**").

"**Collateral**" means all now owned or hereafter acquired assets and property of the Debtors, including real and personal property, plant and

-7-

equipment and the proceeds thereof, but in each case not including the Excluded Assets.

"**Excluded Assets**" means: (a) all claims and causes of action under secitons 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (collectively, the "**Avoidance Actions**") and the proceeds of Avoidance Actions (collectively, the "**Avoidance Action Proceeds**"), (b) the assets and properties set forth in the last proviso to Section 2(a) of the Security Agreement (as defined in the Existing Credit Facility), (c) prior to entry of the Final Order, any amounts surcharged pursuant to section 506(c) of the Bankruptcy Code and (d) proceeds of any of the foregoing, but only to the extent such proceeds would otherwise independently constitute "Excluded Assets" under clauses (a)-(d).

The Carve-Out shall be applied pro rata to the Collateral securing the Revolving Facility and to the Collateral securing the Term Facility.

All of the liens described herein shall be effective and perfected as of the Interim Order Entry Date and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements.

**Adequate Protection:**    Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, the administrative agents and the indenture trustees under the applicable Existing Primed Secured Facilities and the Existing Midwest Notes, for the benefit of themselves and the respective lenders and holders thereunder, shall be granted, respectively, the following adequate protection (collectively, the "**Adequate Protection**") of their respective pre-petition security interests for, and equal in amount to, the diminution in the value (each such diminution, a "**Diminution in Value**") of the pre-petition security interests of such lender under the Bankruptcy Code:

(a) <u>Adequate Protection Lien</u>.  As security for and solely to the extent of any Diminution in Value of the pre-petition security interests, the agents and indenture trustees under the Existing Primed Secured Facilities and Existing Midwest Notes shall be granted for their benefit and the benefit of the applicable lenders, effective and perfected as of Interim Order Entry Date and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, a security interest in and lien on Collateral (provided that, with respect to the Existing Midwest Notes, a security interest and lien on only the assets of the issuer of the Existing Midwest Notes (the "**Prepetition Midwest Notes Issuer**") and Windstream Network Services of the Midwest, Inc.) (together, the "**Adequate Protection Liens**"), subject and subordinate to (x) the Carve-Out and (y) the liens securing the Facilities, which Adequate Protection Liens shall rank in the same relative priority and right as do the respective security

-8-

interests and liens of the respective Existing Primed Secured Facilities as of the Petition Date.

(b) <u>Super-Priority Claim</u>.  To the extent of any Diminution in Value of the pre-petition security interests, the agents and indenture trustees under the Existing Primed Secured Facilities, on behalf of themselves and the applicable lenders and holders, shall be granted, subject to the payment of the Carve-Out, a superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code, immediately junior to the claims under section 364(c)(1) of the Bankruptcy Code held by the Term Facility Agent and Revolving Facility Agent and the lenders under the Facilities, which superpriority claim shall respectively among the Existing Primed Secured Parties and Existing Midwest Notes rank in the same right and priority as do the respective claims thereof as of the Petition Date, *provided* that the Agents, Lenders and holders under the Existing Primed Secured Facilities and Existing Midwest Notes shall not receive or retain any payments, property or other amounts in respect of the superpriority claims under section 507(b) of the Bankruptcy Code granted hereunder or under the Existing Primed Secured Facilities or Existing Midwest Notes unless and until the obligations under the Facilities have indefeasibly been paid in cash in full; *provided further,* that the Existing Midwest Notes' superpriority claim shall be payable only from the assets of the Prepetition Midwest Notes Issuer and Windstream Network Service of the Midwest, Inc.

(c) <u>Fees and Expenses</u>.  The agents and indenture trustees under the Existing Primed Secured Facilities and Existing Midwest Notes shall receive (for the benefit of the lenders thereunder) from the Debtors current cash payments of all reasonable professional fees and expenses payable to any agent or indenture trustees pursuant to the documentation of the Existing Primed Secured Facilities, including, but not limited to, the reasonable fees and disbursements of counsel, financial and other consultants for the agents and indenture trustees under the Existing Primed Secured Facilities promptly upon receipt of invoices therefor.

(d) <u>Monitoring of Pre-Petition Collateral</u>.  The agents and indenture trustees under the Existing Primed Secured Facilities and Existing Midwest Notes shall be permitted to retain expert consultants and financial advisors at the expense of the Debtors, which consultants and advisors shall be given reasonable access for purposes of monitoring the business of the Debtors and the value of the collateral that secures the Existing Primed Secured Facilities.

(e) <u>Financial Reporting</u>.  The Debtors shall continue to provide the agents and indenture trustees under the Existing Primed Secured Facilities and the Existing Midwest Notes with financial and other reporting substantially in compliance with the Existing Primed

-9-

Secured Facilities and the Existing Midwest Notes and any reporting described herein; provided that no audited financial statements shall be required as adequate protection and there shall be longer deadlines to be mutually agreed for certain reporting.

As additional adequate protection, the agent under the Existing Credit Facility, the Existing First Lien Notes and the Existing Midwest Notes, on behalf of itself and the lenders and noteholders thereunder, are hereby granted the following:

(a) <u>Interest</u>. The agent under the Existing Credit Facility and trustees under the Existing First Lien Notes and Existing Midwest Notes shall receive from the Debtors (i) immediate cash payment of all accrued and unpaid interest on the Existing Credit Facility, Existing First Lien Notes and Existing Midwest Notes, as applicable, and letter of credit fees at the non-default rates provided for in the Existing Credit Facility, Existing First Lien Notes and Existing Midwest Notes, as applicable, and all other accrued and unpaid fees and disbursements owing to any of the agent or lenders under the Existing Credit Facility, Existing First Lien Notes and Existing Midwest Notes, as applicable, and incurred prior to the Petition Date and (ii) on the first business day of each month, subject to satisfaction of an excess cash flow test to be determined, all accrued but unpaid interest on the Existing Credit Facility, Existing First Lien Notes and Existing Midwest Notes, as applicable, and letter of credit and other fees at the non-default contract rate applicable on the Petition Date (including LIBOR pricing options available in accordance with the Existing Credit Facility) under the Existing Credit Facility, Existing First Lien Notes and Existing Midwest Notes, as applicable.

All intercompany/affiliate liens of the Debtors, if any (other than any liens securing the Revolving Facility or the Term Facility), will be contractually subordinated to the Facilities and to the Adequate Protection on terms satisfactory to Citi.

-10-

**Documentation Standard:**  (a) The Facilities will be documented in a credit agreement that will be negotiated in good faith and be substantially consistent with the Existing Credit Facility (including customary provisions regarding yank-a-bank, defaulting lenders, disqualified lenders and other customary provisions) (collectively, with the related collateral documents, the "**DIP Loan Documents**") and will reflect the terms and provisions set forth in this Term Sheet, and (b) subject to the following, the DIP Loan Documents will be generally consistent with those in the Existing Credit Facility, as applicable, and the related collateral documents, in each case modified (i) to the extent required to reflect the express terms and conditions set forth in this Term Sheet, (ii) to the extent required to reflect the shorter tenor of the Facilities, (iii) to account for the existence and continuance of the Cases (including customary representations and warranties, covenants and events of default for facilities of this type), the operational needs and requirements of the Debtors between the commencement of the Cases and the Maturity Date and to include provisions applicable to debtor-in-possession facilities generally and other customary changes to be mutually agreed including with respect to additional restrictions on indebtedness, liens, restricted payments, asset sales and investments, (iv) to reflect changes in law and market practice since the date of the Existing Credit Facility, (v) to reflect the policies and procedures of the Administrative Agent in deals where it acts as administrative agent and (vi) as otherwise agreed between the Borrower and Citi. Notwithstanding the foregoing or any other provision hereof, certain "thresholds," "baskets," "grace periods," and "cure periods" shall be modified in a customary manner for debtor-in-possession facilities and the Borrower and Citi agree to negotiate such modifications in good faith. The provisions of clauses (a) and (b) are collectively referred to as the "**Documentation Standard**."

**Representations and Warranties:**  Each of the Debtors under the Facilities makes the representations and warranties set forth in the Existing Credit Facility (excluding the representations and warranties contained in Sections 3.04(b), 3.06(a), 3.06(c) and 3.07 (excluding clause (a) thereof) of the Existing Credit Facility and any other representations and warranties that cannot be made as a result of the commence of the Cases or the events and circumstances giving rise thereto) and, in addition, that: there are no defaults under material agreements entered into after the date of commencement of the Cases; specific material contracts have been continued and are in full force and effect; orders of the Bankruptcy Court remain in effect; the Debtors have not failed to disclose any material assumptions with respect to the Budget. The representations and warranties in the DIP Loan Documents will include the foregoing and be consistent with the Documentation Standards.

**Covenants:**

-11-

**Affirmative covenants:**    Each of the Debtors under the Facilities (with respect to itself and each of its subsidiaries) agrees to the affirmative covenants set forth in the Existing Credit Facility (excluding the affirmative covenants contained in Sections 5.01(a), 5.01(c), 5.02(a), 5.02(b) and 5.05 of the Existing Credit Facility and any other affirmative covenants that cannot be complied with, in each case, to the extent such non-compliance is a result of the commencement of the Cases or the events and circumstances giving rise thereto) and the following:

(a)    delivery of periodic updates of the Cash Flow Forecast (as defined in Annex II attached hereto) and weekly variance reports;

(b)    delivery of (i) annual audited financial statements within 90 days of the end of any fiscal year (commencing with the fiscal year ended December 31, 2018) and quarterly unaudited financial statements within 45 days of the end of the first three fiscal quarters of any fiscal year, and, with annual financial statements to be accompanied by an opinion of an independent accounting firm (which opinion shall not contain any scope qualification);

(c)    delivery of monthly reports by the company's financial advisor with respect to asset sales, cost savings, facility closures and other matters reasonably requested by the Lenders;

(d)    delivery to the Agent as soon as practicable in advance of filing with the Bankruptcy Court the Interim Order and the Final Order (which must be in form and substance satisfactory to the Agent in its capacity as such), any plan of reorganization or liquidation, and/or any disclosure statement related to such plan;

(e)    additional reporting requirements consistent with the Documentation Standard, including, without limitation, with respect to litigation, contingent liabilities, material contracts (together with consultation rights) and ERISA and environmental events;

(f)    access to information (including historical information) and personnel, including, without limitation, regularly scheduled telephonic meetings as mutually agreed with senior management and PJT and other company advisors and the Arranger shall be provided with access to all information it shall reasonably request; and

(g)    use of commercially reasonable efforts to obtain credit ratings in respect of the Facilities from (x) either of Standard & Poor's Ratings Services or Fitch Ratings and (y) Moody's Investors Service, Inc.

-12-

The affirmative covenants in the DIP Loan Documents will include the foregoing and be consistent with the Documentation Standards.

**Negative covenants:**

Each of the Debtors under the Facilities (with respect to itself and each of its subsidiaries) agrees to the negative covenants set forth in the Existing Credit Facility, modified to eliminate the baskets and carve-outs set forth therein (other than baskets and carveouts to the extent necessary for the Debtors to run their business in the ordinary course of business), and agrees that the DIP Loan Documents will contain negative covenants consistent with the foregoing and the Documentation Standard (with baskets and carve-outs to be agreed consistent therewith) and additional restrictions on the following:

(a)    creating or permitting to exist any liens or encumbrances on any assets, other than liens securing the Facilities and any permitted liens (which liens shall include scheduled liens in existence on the Closing Date to the extent subordinated pursuant to the orders, junior liens granted in connection with adequate protection granted by the Debtors as required hereunder) and other liens described in "Priority/Security" above;

(b)    creating or permitting to exist any other superpriority claim which is pari passu with or senior to the claims of the Lenders under the Facilities, except for the Carve-Out and liens securing the obligations;

(c)    disposing of assets outside of the ordinary course of business (including, without limitation, any sale and leaseback transaction and any disposition under Bankruptcy Code section 363) in respect of a transaction for total consideration of more than $25 million in the aggregate for each fiscal year (with an exception for the currently pending sale of certain out-of-territory fiber network located in Nebraska for a sale price of approximately $11,000,000);

(d) modifying or altering (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) its organizational documents, except as required by the Bankruptcy Code or in a manner that is not materially adverse to the interests of the DIP lenders in their capacities as such;

(e)    paying pre-petition indebtedness, except as expressly provided for herein or pursuant to "first day" or other orders entered upon pleadings in form and substance reasonably satisfactory to Citi;

(f)    asserting any right of subrogation or contribution against any other Debtors until all borrowings under the Facilities are paid in full and the Commitments are terminated; and

(g)    making Investments (as defined in the Definitive Documentation) and restricted payments (including debt prepayments).

-13-

For the avoidance of doubt, intercompany transactions among the Debtors in the ordinary course of business shall be permitted if they are not otherwise prohibited.

**Events of Default:**

The Facilities shall be subject to the events of default set forth in the Existing Credit Facility (excluding, for the avoidance of doubt, the events of default contained in Sections 7(b), , 7(e), 7(g), 7(h), 7(j), 7(k), 7(l), 7(s) and 7(t)) of the Existing Credit Facility and any other events of defaults in each case to the extent triggered prior to the commencement of the Cases as a result of the commencement of the Cases or the events and circumstances giving rise thereto) and the following additional events of default.  The DIP Loan Documents will contain events of default consistent with the Documentation Standard and the following:

The Facilities shall be subject to additional events of default consistent with the Documentation Standards, including the following:

(a)    The Interim Order Entry Date shall not have been occurred within 5 business days after the Petition Date;

(b)    The Final Order Entry Date shall not have been occurred within 60 days after the Petition Date;

(c)    Any of the Cases shall be dismissed or converted to a Chapter 7 Case; a trustee, receiver, interim receiver or receiver and manager shall be appointed in any of the Cases, or a responsible officer or an examiner with enlarged powers shall be appointed in any of the Cases (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)); or any other superpriority administrative expense claim or lien (other than the Carve-Out) which is pari passu with or senior to the claims or liens of the Lender under the Facilities shall be granted in any of the Cases without the consent of the Arranger;

(d)    Other than payments authorized by the Bankruptcy Court in respect of "first day" or other orders entered upon pleadings in form and substance reasonably satisfactory to the Arranger, as required by the Bankruptcy Code, or as may be permitted in the DIP Loan Documents or herein, the Debtors shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition indebtedness or payables;

(e)    The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Debtors which have an aggregate value in excess of $25,000,000 or to permit other actions that

-14-

would have a material adverse effect on the Debtors or their estates;

(f)    An order shall be entered reversing, amending, supplementing, staying for a period of five days or more, vacating or otherwise modifying the Interim Order or the Final Order, or any of the Borrower or any of their affiliates shall apply for authority to do so, without the prior written consent of the Lenders, or the Interim Order or Final Order with respect to the Facilities shall cease to be in full force and effect;

(g)    Any judgments which are in the aggregate in excess of $25,000,000 as to any post-petition obligation shall be rendered against the Debtors or any other material subsidiaries and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants);

(h)    A plan shall be confirmed in any of the Cases that does not provide for termination of the Commitments under the Facilities and payment in full in cash of the Debtors' obligations under the DIP Loan Documents on the effective date of such plan of reorganization or liquidation, or an order shall be entered which dismisses any of the Cases and which order does not provide for termination of the Commitments under the Facilities and payment in full in cash of the Debtors' obligations under the DIP Loan Documents, or any of the Debtors shall seek, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order;

(i)    The Debtors or any other material subsidiaries shall take any action in support of any of the foregoing or any person other than the Debtors or any other material subsidiaries shall do so and such application is not contested in good faith by the Debtors or any other material subsidiaries and the relief requested is granted in an order that is not stayed pending appeal; and

(j)    Any DIP Loan Document shall cease to be effective or shall be contested by Borrower or any of their affiliates.

(k)    Any of the Borrower or their affiliates shall fail to comply with the Interim Order or Final Order.

(l)    The filing of a motion, pleading or proceeding by any of the Borrower or their affiliates which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or a determination by a court with respect to a

-15-

motion, pleading or proceeding brought by another party which results in a material impairment.

(m)    DIP Loan Documents, in form and substance satisfactory to the Citi acting in good faith, shall not have been entered into within twenty-one days after the Interim Order Entry Date and prior to the Final Order Entry Date, unless such date is extended by Citi acting in good faith.

**Conditions Precedent to Initial Borrowings:**

The obligation of the Lenders to make loans under the Facilities will be subject only to the conditions precedent listed on Annex II attached hereto.

**Conditions Precedent to Full Availability:**

The obligation to provide extensions of credit up to the full amount of the Commitments shall be subject to the satisfaction or waiver by the Requisite Lenders and the Requisite Term Lenders of the applicable conditions precedent listed on Annex II attached hereto.

**Conditions to All Borrowings:**

The conditions to all borrowings will be limited to prior written notice of borrowing, the accuracy in all material respects of representations and warranties, the absence of any Default or Event of Default and the following:

(a)    As a result of such extension of credit, usage of the Commitments shall not exceed (i) the applicable Commitments then in effect, (ii) the aggregate amount authorized by the Interim Order or the Final Order, as the case may be and (iii) in the case of the Revolving Facility, Revolving Facility Availability;

(b)    The Interim Order or Final Order, as the case may be, and the cash management order, shall be in full force and effect, and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in a manner, or relating to a matter, that is materially adverse to the interests of the Lenders;

(c)    The Debtors shall have paid the balance of all fees then due and payable as referenced herein; and

(d)    The making of such extension of credit will not violate any requirement of material law and shall not be enjoined, temporarily, preliminarily or permanently.

**Assignments and Participations:**

Each Lender may assign all or any part of the Facilities to one or more affiliates, banks, financial institutions or other entities (other than Disqualified Institutions) subject to the prior written consent of the Administrative Agent and Borrower, and in the case of an assignment under the Revolving Facility, each Issuer  (each such consent not to be

-16-

unreasonably withheld, delayed or conditioned); _provided_ that no consent of the Borrower shall be required with respect to any assignment to a Lender, an affiliate of such a Lender or a fund engaged in investing in commercial loans that is advised or managed by such a Lender (in each case, that is not a Disqualified Institution). Consent from the Borrower shall not be required during the continuance of an event of default under the DIP Loan Documents and shall be deemed given unless the Borrower shall object thereto by written notice to the Administrative Agent within five Business Days after having received notice thereof). Upon such assignment, such affiliate, bank, financial institution or entity will become a Lender for all purposes under the Loan Documents.  The Lenders will also have the right to sell participations (other than to Disqualified Institutions), subject to customary limitations on voting rights, in the Facilities.

The Agents shall have the authority to make the list of Disqualified Institutions available to all Lenders.

|  |  |
|---|---|
| **Requisite Lenders:** | The vote of Lenders holding more than 50% of total Commitments (or if no Commitments are outstanding, total exposure) under the Facilities (the "**Requisite Lenders**") shall be required to amend, waive or modify either Facility, except that with respect to matters relating to, among others consistent with the Documentation Standard, the reduction in, or compromise of payment rights with respect to, principal or interest rates, extension of maturity, release of guarantees and/or liens granted on all or substantially all of the Collateral (other than liens on Collateral subject to permitted dispositions), any waiver of the definition of Requisite Lenders, Requisite Lenders will be defined as Lenders holding 100% of total Commitments (or if no Commitments are outstanding, total exposure) under such Facility affected thereby or all affected Lenders, as appropriate. |
| **Taxes:** | The Facilities will include customary provisions reasonably acceptable to the Arranger, to the effect that all payments are to be made free and clear of any taxes (other than applicable franchise taxes and taxes on overall net income), imposts, assessments, withholdings or other deductions whatsoever, subject to customary qualifications. |
| **Indemnity; Expenses:** | The Borrower shall indemnify, pay and hold harmless the Arranger and the Lenders and their affiliates (and their respective directors, officers, employees, agents and advisors) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party) including the expenses incurred by the the Arranger and in connection with the negotiation, documentation and administration of the Facilities (including fees and expenses of counsel and other advisors), and expenses incurred by any Lender in connection with any default in respect of the Facilities and any exercise of remedies in respect thereof. |

-17-

**Governing Law and
Jurisdiction:**

The Facilities will provide that the Debtors will submit to the exclusive jurisdiction and venue of the Bankruptcy Court in New York; and shall waive any right to trial by jury.  New York law shall govern the Loan Documents (other than security documents to be governed by local law, to be determined by the Arranger).

#91769361v15

<u>**ANNEX I**</u>

**Windstream Services, LLC**

**LIST OF DEBTORS**

| <u>Name</u> | <u>Jurisdiction of Organization</u> |
|---|---|
| Allworx Corp. | Delaware |
| ARC Networks, Inc. | Delaware |
| ATX Communications, Inc. | Delaware |
| ATX Telecommunications Services of Virginia, LLC | Delaware |
| BOB, LLC | Illinois |
| Boston Retail Partners LLC | Massachusetts |
| BridgeCom Holdings, Inc. | Delaware |
| BridgeCom Solutions Group, Inc. | Delaware |
| Broadview Networks of Massachusetts, Inc. | Delaware |
| Broadview Networks of Virginia, Inc. | Virginia |
| Buffalo Valley Management Services, Inc. | Delaware |
| Business Telecom of Virginia, Inc. | Virginia |
| BV-BC Acquisition Corporation | Delaware |
| Cavalier IP TV, LLC | Delaware |
| Cavalier Services, LLC | Delaware |

-19-

| | |
|---|---|
| Cavalier Telephone, L.L.C. | Virginia |
| CCL Historical, Inc. | Delaware |
| Choice One Communications of Connecticut Inc. | Delaware |
| Choice One Communications of Maine Inc. | Delaware |
| Choice One Communications of Massachusetts Inc. | Delaware |
| Choice One Communications of Ohio Inc. | Delaware |
| Choice One Communications of Rhode Island Inc. | Delaware |
| Choice One Communications of Vermont Inc. | Delaware |
| Choice One of New Hampshire, Inc. | Delaware |
| Cinergy Communications Company of Virginia, LLC | Virginia |
| Conestoga Enterprises, Inc. | Pennsylvania |
| Conestoga Management Services, Inc. | Delaware |
| Connecticut Broadband, LLC | Connecticut |
| Connecticut Telephone & Communication Systems, Inc. | Connecticut |
| Conversent Communications Long Distance, LLC | New Hampshire |

-20-

| | |
|---|---|
| Conversent Communications of Connecticut, LLC | Connecticut |
| Conversent Communications of Maine, LLC | Maine |
| Conversent Communications of Massachusetts, Inc. | Massachusetts |
| Conversent Communications of New Hampshire, LLC | New Hampshire |
| Conversent Communications of Rhode Island, LLC | Rhode Island |
| Conversent Communications of Vermont, LLC | Vermont |
| CoreComm-ATX, Inc. | Delaware |
| CoreComm Communications, LLC | Delaware |
| CTC Communications of Virginia, Inc. | Virginia |
| D&E Communications, LLC | Delaware |
| D&E Management Services, Inc. | Nevada |
| D&E Networks, Inc. | Pennsylvania |
| Equity Leasing, Inc. | Nevada |
| Eureka Broadband Corporation | Delaware |
| Eureka Holdings, LLC | Delaware |
| Eureka Networks, LLC | Delaware |

#91769361v15

| | |
|---|---|
| Eureka Telecom of VA, Inc. | Virginia |
| Heart of the Lakes Cable Systems, Inc. | Minnesota |
| Info-Highway International, Inc. | Texas |
| InfoHighway Communications Corporation | Delaware |
| InfoHighway of Virginia, Inc. | Virginia |
| Iowa Telecom Data Services, L.C. | Iowa |
| Iowa Telecom Technologies, LLC | Iowa |
| IWA Services, LLC | Iowa |
| KDL Holdings, LLC | Delaware |
| McLeodUSA Information Services LLC | Delaware |
| McLeodUSA Purchasing, LLC | Iowa |
| MPX, Inc. | Delaware |
| Norlight Telecommunications of Virginia, LLC | Virginia |
| Oklahoma Windstream, LLC | Oklahoma |
| Open Support Systems, LLC | Connecticut |
| PaeTec Communications of Virginia, LLC | Virginia |
| PAETEC Holding, LLC | Delaware |

-22-

| | |
|---|---|
| PAETEC iTEL, L.L.C. | North Carolina |
| PAETEC Realty LLC | New York |
| PAETEC, LLC | Delaware |
| PCS Licenses, Inc. | Nevada |
| Progress Place Realty Holding Company, LLC | North Carolina |
| RevChain Solutions, LLC | Delaware |
| SM Holdings, LLC | Delaware |
| Southwest Enhanced Network Services, LLC | Delaware |
| Talk America of Virginia, LLC | Virginia |
| Teleview, LLC | Georgia |
| Texas Windstream, LLC | Texas |
| US LEC of Alabama LLC | North Carolina |
| US LEC of Florida LLC | North Carolina |
| US LEC of South Carolina LLC | Delaware |
| US LEC of Tennessee LLC | Delaware |
| US LEC of Virginia LLC | Delaware |
| US Xchange Inc. | Delaware |

#91769361v15

| | |
|---|---|
| US Xchange of Illinois, L.L.C. | Delaware |
| US Xchange of Michigan, L.L.C. | Delaware |
| US Xchange of Wisconsin, L.L.C. | Delaware |
| Valor Telecommunications of Texas, LLC | Delaware |
| WIN Sales & Leasing, Inc. | Minnesota |
| Windstream Alabama, LLC | Alabama |
| Windstream Arkansas, LLC | Delaware |
| Windstream Business Holdings, LLC | Delaware |
| Windstream BV Holdings, LLC | Delaware |
| Windstream Cavalier, LLC | Delaware |
| Windstream Communications Kerrville, LLC | Texas |
| Windstream Communications Telecom, LLC | Texas |
| Windstream CTC Internet Services, Inc. | North Carolina |
| Windstream Direct, LLC | Minnesota |
| Windstream Eagle Holdings LLC | Delaware |
| Windstream Eagle Services, LLC | Delaware |
| Windstream EN-TEL, LLC | Minnesota |

#91769361v15

| | |
|---|---|
| Windstream Finance Corp | Delaware |
| Windstream Holding of the Midwest, Inc. | Nebraska |
| Windstream Iowa Communications, LLC | Delaware |
| Windstream Iowa-Comm, LLC | Iowa |
| Windstream KDL-VA, LLC | Virginia |
| Windstream Kerrville Long Distance, LLC | Texas |
| Windstream Lakedale Link, Inc. | Minnesota |
| Windstream Lakedale, Inc. | Minnesota |
| Windstream Leasing, LLC | Delaware |
| Windstream Lexcom Entertainment, LLC | North Carolina |
| Windstream Lexcom Long Distance, LLC | North Carolina |
| Windstream Lexcom Wireless, LLC | North Carolina |
| Windstream Montezuma, LLC | Iowa |
| Windstream Network Services of the Midwest, Inc. | Nebraska |
| Windstream NorthStar, LLC | Minnesota |
| Windstream NuVox Arkansas, LLC | Delaware |
| Windstream NuVox Illinois, LLC | Delaware |

#91769361v15

| | |
|---|---|
| Windstream NuVox Indiana, LLC | Delaware |
| Windstream NuVox Kansas, LLC | Delaware |
| Windstream NuVox Oklahoma, LLC | Delaware |
| Windstream Oklahoma, LLC | Delaware |
| Windstream SHAL Networks, Inc. | Minnesota |
| Windstream SHAL, LLC | Minnesota |
| Windstream Shared Services, LLC | Delaware |
| Windstream South Carolina, LLC | South Carolina |
| Windstream Southwest Long Distance, LLC | Delaware |
| Windstream Sugar Land, LLC | Texas |
| Windstream Supply, LLC | Ohio |
| Xeta Technologies, Inc. | Oklahoma |

#91769361v15

## Annex II

**Windstream Services, LLC**

SUMMARY OF CONDITIONS PRECEDENT TO THE FACILITIES

*This Summary of Conditions Precedent outlines all of the conditions precedent to the Facilities referred to in the Summary of Terms and Conditions.*

A.    CONDITIONS TO INITIAL AVAILABILITY

1.    Interim Order/Bankruptcy Matters.

    (a)    The Bankruptcy Court shall have entered, upon motion in form and substance reasonably satisfactory to the Arranger, on such prior notice as may be reasonably satisfactory to the Arranger, an interim order (the "**Interim Order**") as to the Initial Availability no later than three (3) business days after the date of commencement of the Cases, approving and authorizing the Facilities, all provisions thereof and the priorities and liens granted under Bankruptcy Code section 364(c) and (d), as applicable, in form and substance satisfactory to the Arranger and their counsel.

    (b)    The Interim Order shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, without the consent of the Arranger.

    (c)    The Debtors shall be in compliance in all respects with the Interim Order.

    (d)    The Cases shall have been commenced in the Bankruptcy Court for the Southern District of New York and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Cases or shortly thereafter shall have been reviewed in advance by the Arranger and shall be reasonably satisfactory in form and substance to the Arranger.

    (e)    No trustee or examiner with enlarged powers (beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the Borrower or their respective properties.

    (f)    A cash management order encompassing the cash management arrangements currently in place under the Existing Credit Facility and otherwise reasonably satisfactory to the Arranger shall be in full force and effect.

    (g)    No material adverse change in the operations, assets, revenues, financial condition of Borrower and its subsidiaries (other than by virtue of the commencement of the Cases and the events and circumstances giving rise thereto) shall have occurred since December 31, 2017.

2.    Financial Statements, Budgets and Reports.

    (a)    The Arranger shall have received the Budget, which Budget shall be in form and substance reasonably satisfactory to them and at least in the detail attached in Annex II-1;

-27-

#91769361v15

(b)    The Arranger shall have received a forecast of sources and uses of cash by the Debtors on a weekly basis for the succeeding 13 calendar weeks, which shall be in form and substance reasonably satisfactory to them (the "**Cash Flow Forecast**"); and

(d)    The Arranger shall have received such information (financial or otherwise) as may be reasonably requested by them.

3.    <u>Performance of Obligations</u>.

(a)    All reasonable and documented costs, fees, expenses (including, without limitation, reasonable and documented legal fees) and other compensation contemplated by the Loan Documents to be payable to the Lenders shall have been paid to the extent due;

(b)    No Default or Event of Default shall exist; and

(c)    Representations and warranties shall be true and correct in all material respects.

4.    <u>Customary Closing Documents</u>.

(a)    Satisfaction of all other customary closing conditions as to: (i) authority, authorization, execution and delivery; corporate records and documents from public officials; and officer's certificates (ii) evidence of authority; (iii) obtaining of any material third party and governmental consents necessary in connection with the Facilities, the financing thereunder and related transactions; and (iv) Patriot Act and Beneficial Ownership.

(b)    Execution and delivery by the Debtors of this Term Sheet and promissory notes evidencing the loans made and to be made under the Facilities, in each case reasonably satisfactory in all respects to Citi; the parties hereto acknowledging that funding of the Initial Availability shall be made, as to loan documentation, solely on the basis of this Term Sheet and such promissory notes, and that funding of the Full Availability is subject to the parties entering into the DIP Loan Documents.

(c)    All corporate and judicial proceedings and all instruments and agreements in connection with the loan transactions among the Debtors and the Lenders contemplated by the Loan Documents shall be satisfactory in form and substance to the Arranger, and the Lenders shall have received all information and copies of all documents or papers requested by any of them.

B.    <u>CONDITIONS TO FULL AVAILABILITY</u>

1.    <u>Final Order</u>.

(a)    Not later than 60 days following the Petition Date, the Final Order shall have been entered by the Bankruptcy Court on a motion by the Debtors that is in form and substance reasonably satisfactory to the Arranger, which Final Order shall have been entered on such prior notice to such parties as may be reasonably satisfactory to the Arranger, approving and authorizing on a final basis the matters and containing the provisions described in A.1. above.

(b)    The Definitive Documentation shall have been entered into, and the lenders shall have perfection of liens and pledges on the UCC collateral securing the Facilities.

-28-

(b)     The Final Order shall not have been reversed, modified, amended, stayed or vacated.

(c)     The Debtors shall be in compliance with the Final Order.

2.      <u>Other Conditions</u>.

(a)     The delivery of legal opinions as to authority, authorization, execution and delivery; corporate records and documents from public officials; and officer's certificates;

(b)     The Lenders shall have received the required periodic updates of the Cash Flow Forecast and weekly variance reports, each in form and substance reasonably satisfactory to the Arranger;

(c)     No Default or Event of Default shall exist under the Facilities;

(d)     Representations and warranties shall be true and correct in all material respects at the date of each extension of credit except to the extent such representations and warranties relate to an earlier date;

(e)     The Debtors shall have paid the balance of all fees then payable as referenced herein;

#9176936lv15

## Annex III

### Windstream Services, LLC

#### INTEREST AND FEES

| | |
|---|---|
| **Interest Rates:** | Loans under the Term Facility and the Revolving Facility will bear interest, at the option of the Borrower, at one of the following rates: |
| | (i) the Applicable Margin (as defined in the Fee Letter) *plus* the Alternate Base Rate which shall be defined as the highest of (i) Citibank's base rate, (ii) the three-month certificate of deposit rate plus 1/2 of 1%, (iii) the Federal Funds Effective Rate plus 1/2 of 1% and (iv) the one-month LIBO Rate plus 1.00% per annum, in each case, calculated on a 365/366-day basis and payable monthly in arrears; or |
| | (ii) the Applicable Margin *plus* the current LIBO rate as quoted by Reuters Screen LIBOR01 Page, adjusted for reserve requirements, if any, and subject to customary change of circumstance provisions, for interest periods of one month (the "**LIBO Rate**"), calculated on a 360-day basis and payable at the end of the relevant interest period, but in any event at least quarterly; *provided* that the LIBO Rate will at no time be less than 0% per annum. |
| | Not more than 5 LIBO Rate interest periods may be in effect at any one time under either Facility. |
| **Default Interest:** | During the continuance of an event of default under the Facilities, loans will bear interest at an additional 2% *per annum*. |
| **Unused Commitment Fee:** | From and after the Closing Date, a non-refundable unused commitment fee will accrue at the rate of 0.50% per annum on the daily average unused portion of the Revolving Facility (whether or not then available), payable quarterly in arrears and on the date when the Commitments are terminated. |
| **Letter of Credit Fees:** | A percentage per annum equal to the Applicable LIBOR Margin to the Lenders, and 0.125% per annum to the Issuer, will accrue on the outstanding undrawn amount of any Letter of Credit, payable quarterly in arrears and computed on a 360-day basis. |
| **OID** | The "Up-Front Fee" as defined in the fee letter, which may take the form of original issue discount to be paid in connection with each borrowing under the Term Facility based on the amount borrowed. |
| **Nature of Fees:** | Fully earned on the Closing Date and non-refundable under all circumstances |

#91769361v15

**<u>Annex IV</u>**

**Commitments**

| Lender | Term Loan Commitment | Revolving Commitment |
|---|---|---|
| Citi | $500,000,000.00 | $500,000,000.00 |
| Total | $500,000,000.00 | $500,000,000.00 |

#91769361v15