**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| WINDSTREAM HOLDINGS, INC., *et al.*, | ) | Case No. 19-22312 (RDD) |
|  | ) |  |
| Debtors. [1] | ) | (Jointly Administered) |
|  | ) |  |

**INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (E) MODIFYING THE AUTOMATIC STAY, (F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF**

Upon the motion (the "**DIP Motion**") [2] of Windstream Holdings, Inc. ("**Holdings**"), Windstream Services, LLC (the "**Borrower**"), guarantors under the DIP Term Sheet, [3] (an execution copy of which is attached as **Exhibit B** to the DIP Motion (the "**DIP Term Sheet**")) (the "**DIP Guarantors**" and, collectively, with the Borrower and Holdings, the "**DIP Loan Parties**"), and each of Holdings' and Borrower's affiliates that are debtors and debtors-in-possession (collectively, the "**Debtors**") in the above-captioned cases (the "**Chapter 11 Cases**") and pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3),

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* filed contemporaneously herewith. The location of the Debtors' service address is: 4001 North Rodney Parham Road, Little Rock, Arkansas 72212.

[2] Capitalized terms used herein and not herein defined have the meaning ascribed to such terms in the Motion.

[3] The DIP Term Sheet shall be superseded and replaced in all respects by the credit agreement to be executed by the Borrower, the DIP Guarantors and the DIP Agent, in form and substance consistent with the DIP Term Sheet and otherwise acceptable only to the DIP Arranger(the "**DIP Credit Agreement**").

364(d)(1), 364(e), 503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**") seeking, among other things:

(i) authorizing the Borrower to obtain postpetition financing ("**DIP Financing**") pursuant to a senior secured, superpriority debtor-in-possession credit facility in an aggregate principal amount of up to $1,000,000,000 on the terms and conditions set forth in the DIP Term Sheet and the DIP Credit Agreement, by and among the Borrower, as borrower, the DIP Guarantors, as guarantors, the several banks and other financial institutions or entities from time to time party thereto as lenders (collectively, the "**DIP Lenders**"), Citigroup Global Markets Inc., on behalf of Citi,[4] and the other arrangers from time to time party thereto (collectively, together with their affiliates in such capacity, the "**DIP Arranger**"), Citi, as administrative agent and collateral agent (in such capacities, and together with its successors and permitted assigns, the "**DIP Agent**"), and the Letter of Credit Issuer[5] of the DIP L/C Sub-Facility, and which credit facility shall comprise (a) a revolving credit facility (the "**DIP Revolving Facility**"; the loans incurred thereunder, the "**DIP Revolving Loans**") with aggregate commitments of up to $500,000,000, including a letter of credit sub-facility in an aggregate amount of up to $50,000,000 (the "**DIP L/C Sub-Facility**") and (b) a term loan facility (the "**DIP Term Loan Facility**") in an aggregate principal amount of $500,000,000 (the loans incurred thereunder, the "**DIP Term Loans**", together with the DIP Revolving Loans, the "**DIP Loans**"; the DIP Term Loan Facility, together with the DIP Revolving Facility, the "**DIP Facilities**");

(I) upon entry of this Interim Order, subject to the terms and conditions set forth in the DIP Term Sheet and this Interim Order, an initial aggregate principal amount equal to $100 million under the DIP Revolving Facility and $300 million under the DIP Term Loan Facility shall be available to the Borrower;

(II) upon entry of a final, non-appealable order in form and substance satisfactory to the DIP Agent (the "**Final Order**"), subject to the

---

[4] "**Citi**" means Citigroup Global Markets Inc., Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as Citi shall determine appropriate to provide the servicers contemplated herein.

[5] "**Letter of Credit Issuer**" means, collectively, Citibank, N.A. or an affiliate thereof and each other Arranger under the Revolving Facility, on a pro rata basis in accordance with their commitments to the Revolving Facility.

terms and conditions set forth in the DIP Term Sheet, the DIP Documents (as defined below) and the Final Order, the full remaining amounts under the DIP Revolving Facility and the DIP Term Loan Facility shall be available to the Borrower;

(ii)    authorizing the DIP Guarantors to jointly and severally guarantee on a senior secured superpriority basis the DIP Loans and the DIP Obligations (as defined below);

(iii)   authorizing the Debtors party thereto to execute and deliver the DIP Term Sheet, the DIP Credit Agreement and other documentation, including credit agreements, security agreements, pledge agreements, control agreements, mortgages, guarantees, promissory notes, certificates, instruments, intellectual property security agreements, notes, that certain Administrative Agent Fee Letter, dated as of February 25, 2019, by and among the DIP Agent, Holdings and the Borrower (the "**Agency Fee Letter**"), that certain Commitment Letter, dated as of February 25, 2019, by and among the DIP Agent, Holdings and the Borrower (the "**Commitment Letter**"), that certain Fee Letter, dated as of February 25, 2019, by and among the DIP Agent, Holdings and the Borrower (the "**DIP Fee Letter**", and together with the Agency Fee Letter and the Commitment Letter, the "**Fee Letters**"), and such other documentation which may be necessary or required to implement the DIP Facilities and perform thereunder and/or that may be reasonably requested by the DIP Agent, in each case, as amended, restated, supplemented, waived and/or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Term Sheet and the DIP Credit Agreement, the "**DIP Documents**"); all loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, commitment fees, administrative agency fees and other fees payable pursuant to the Fee Letters), costs, expenses and other liabilities, all other obligations (including indemnities and similar obligations, whether contingent or absolute) and all other amounts due or payable under the DIP Documents, (collectively, the "**DIP Obligations**"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(iv)    granting to the DIP Agent for the benefit of the DIP Lenders (collectively, the "**DIP Secured Parties**") allowed superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations, and valid, enforceable, non-avoidable and automatically perfected liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and postpetition property of the DIP Loan Parties' estates (other than certain excluded property as provided in the DIP Documents (the "**Excluded Assets**") and all proceeds thereof, including, subject only to and effective upon entry of the Final Order (as

defined herein), any Avoidance Proceeds (as defined herein)), in each case subject to the Carve Out (as defined herein);

(v)      authorizing the Debtors, subject to entry of the Final Order, to waive: (a) the Debtors' right to surcharge the Prepetition Collateral and the DIP Collateral (as defined herein) (together, but excluding any Excluded Assets, the "**Collateral**") pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(vi)     authorizing the Debtors to use proceeds of the DIP Facilities, solely in accordance with this Interim Order and the DIP Documents;

(vii)    authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(viii)   subject to the restrictions set forth in the DIP Documents and this interim Order, authorizing the Debtors to use the Prepetition Collateral (as defined herein), including Cash Collateral of the Prepetition Secured Parties under the Prepetition Debt Documents (each as defined herein) and provide adequate protection to the Prepetition Secured Parties for any diminution in value of their respective interests in the Prepetition Collateral (including Cash Collateral), resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral (including Cash Collateral), and the priming of their respective interests in the Prepetition Collateral (including Cash Collateral);

(ix)    approving certain stipulations by the Debtors with respect to the Prepetition Loan Documents and the Prepetition Collateral as set forth herein;

(x)      modifying the automatic stay to the extent set forth herein and in the DIP Documents; and

(xi)    scheduling a final hearing (the "**Final Hearing**") to consider final approval of the DIP Facilities and use of Cash Collateral pursuant to a proposed final order (the "**Final Order**"), as set forth in the DIP Motion and the DIP Documents filed with this Court.

The Court having considered the interim relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of Nicholas Leone in Support of the Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Superpriority*

*Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Lenders, (E)
Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief*
(the "**Leone Declaration**"), the *Declaration of Tony Thomas, Chief Executive Officer and
President of Windstream Holdings, Inc., (I) in Support of Chapter 11 Petitions and First Day
Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* (the "**First Day Declaration**"), the
available DIP Documents, and the evidence submitted and arguments made at the interim hearing
held on February 26, 2019 (the "**Interim Hearing**"); and due and sufficient notice of the Interim
Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and
all applicable Local Rules; and the Interim Hearing having been held and concluded; and all
objections, if any, to the interim relief requested in the DIP Motion having been withdrawn,
resolved or overruled by the Court; and it appearing that approval of the interim relief requested
in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their
estates pending the Final Hearing, otherwise is fair and reasonable and in the best interests of the
Debtors and their estates, and is essential for the continued operation of the Debtors' businesses
and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry
into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and
after due deliberation and consideration, and good and sufficient cause appearing therefor,

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING,
THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS
OF LAW:**[6]

---

[6] The findings and conclusions set forth herein constitute the Court's findings of fact and
conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to
Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of
law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of
fact, they are adopted as such.

A.      *Petition Date*.  On February 25, 2019 (the "**Petition Date**"), each of the Debtors

filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States

Bankruptcy Court for the Southern District of New York (the "**Court**").

B.      *Debtors in Possession*.   The Debtors have continued in the management and

operation of their businesses and properties as debtors in possession pursuant to sections 1107 and

1108 of the Bankruptcy Code.

C.      *Jurisdiction and Venue*.  This Court has core jurisdiction over the Chapter 11 Cases,

the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)–(b)

and 1334 and the *Amended Standing Order of Reference from the United States District Court for*

*the Southern District of New York*, dated January 31, 2012.  Venue for the Chapter 11 Cases and

proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409.

D.      *Committee Formation*.  As of the date hereof, the United States Trustee for the

Southern District of New York (the "**U.S. Trustee**") has not yet appointed an official committee

of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code

(a "**Creditors' Committee**").

E.      *Notice*.  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and

(c)(2).  Proper, timely, adequate and sufficient notice of the DIP Motion has been provided in

accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and no other or

further notice of the DIP Motion or the entry of this Interim Order shall be required.

F.      *Debtors' Stipulations*.  After consultation with their attorneys and financial

advisors, and without prejudice to the rights of the Debtors' estates or any other party in interest

6

(but subject to the limitations thereon contained in paragraph 21 below), the Debtors admit, stipulate and agree that:

(i)    *Prepetition Credit Facility.*  Pursuant to that certain Sixth Amended and Restated Credit Agreement, originally dated as of July 17, 2006, and as amended and restated as of April 24, 2015 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition Credit Agreement**", and collectively with the Security Agreement (as defined in the Prepetition Credit Agreement, the "**Prepetition Credit Facility Security Agreement**") and the other Loan Documents (as defined in the Prepetition Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "**Prepetition Loan Documents**"), among (a) Windstream Services, LLC, as borrower (in such capacity, the "**Prepetition Borrower**"), (b) JPMorgan Chase Bank, N.A., as administrative agent, collateral agent and letter of credit issuing bank (in such capacities, the "**Prepetition Agent**"), and (c), the Tranche B-6 Lenders (as defined in the Prepetition Credit Agreement) party thereto and the Tranche B-7 Lenders (as defined in the Prepetition Credit Agreement) party thereto (collectively with the Tranche B-6 Lenders, the "**Prepetition Term Loan Lenders**") and the revolving lenders party thereto (the "**Prepetition Revolving Lenders**", together with the Prepetition Term Loan Lenders, the "**Prepetition Lenders**") (the Prepetition Lenders, collectively with the Prepetition Agent and all other holders of Prepetition Credit Facility Debt (as defined below), the "**Prepetition Credit Facility Secured Parties**"), the Prepetition Revolving Lenders provided revolving credit and other financial accommodations to, and issued letters of credit for the account of, the Prepetition Borrower pursuant to the Prepetition Loan Documents (the "**Prepetition Revolving Credit Facility**") and the Prepetition Term Loan Lenders

provided term loans to the Prepetition Borrower pursuant to the Prepetition Loan Documents (the "**Prepetition Term Loan Facility**", and together with the Prepetition Revolving Credit Facility, the "**Prepetition Credit Facilities**").  Pursuant to that certain Amended and Restated Guarantee Agreement,  originally dated as of July 17, 2006, and as amended and restated as of April 24, 2015 (as amended, restated, amended and restated, supplemented, waived, and/or otherwise modified from time to time), the subsidiary Debtors party thereto (the "**Prepetition Guarantors**") guaranteed on a joint and several basis the obligations of the Prepetition Borrower under the Prepetition Credit Agreement and the other Prepetition Loan Documents.

(ii)    *Prepetition Credit Facility Debt*.  As of the Petition Date, the Prepetition Borrower and the Prepetition Guarantors were justly and lawfully indebted and liable to the Prepetition Credit Facility Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $2.575 billion including (a) $802,000,000 in outstanding principal amount of Revolving Loans (as defined in the Prepetition Credit Agreement), plus $23,440,987 of outstanding letters of credit, (b) $1,180,549,993 in outstanding principal amount of Tranche B-6 Term Loan  (as defined in the Prepetition Credit Agreement) and (c) $568,375,253 in outstanding principal amount of Tranche B-7 Term Loan  (as defined in the Prepetition Credit Agreement) (collectively, together with accrued and unpaid interest, outstanding letters of credit and bankers' acceptances, any reimbursement obligations (contingent or otherwise) in respect of letters of credit and bankers' acceptances, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued,

8

accruing, due, owing, or chargeable in respect of any of the Prepetition Borrower's or the Prepetition Guarantors' obligations pursuant to, or secured by, the Prepetition Loan Documents, including all Facility Obligations (as defined in the Prepetition Credit Agreement), and all interest, fees, prepayment premiums, early termination fees, costs and other charges allowable under section 506(b) of the Bankruptcy Code, but less any original issue discount that is disallowed as unmatured interest pursuant to section 502(b)(2) of the Bankruptcy Code pursuant to a final, non-appealable order of the Bankruptcy Court, the "**Prepetition Credit Facility Debt**"), which Prepetition Credit Facility Debt has been guaranteed on a joint and several basis by all of the Prepetition Guarantors.

(iii)    *Prepetition Credit Facility Liens*.  As more fully set forth in the Prepetition Loan Documents, prior to the Petition Date, the Prepetition Borrower and the Prepetition Guarantors granted to the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, a first priority security interest in and continuing lien on (the "**Prepetition Credit Facility Liens**") substantially all of their assets and property, excluding any Excluded Assets (the "**Prepetition First Lien Collateral**").

(iv)    *Prepetition First Lien Secured Notes*.  Pursuant to that certain Indenture for certain 8.625% notes due 2025 dated as of November 6, 2017 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition First Lien Notes Indenture**", collectively and with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, and/or otherwise modified from time to time, the "**Prepetition First Lien Notes Documents**") by and among (a) Windstream Services, LLC and Windstream Finance Corp., as co-issuers (the "**Prepetition Secured Notes Issuers**"), (b) the Prepetition Guarantors party

thereto, as guarantors, (c) U.S. Bank, National Association, as trustee and notes collateral agent (in such capacities, together with its successors in such capacity, the "**Prepetition First Lien Notes Indenture Trustee**") and (d) the Holders (as defined in the Prepetition First Lien Notes Indenture, the "**Prepetition First Lien Noteholders**", collectively with the Prepetition First Lien Notes Indenture Trustee, the "**Prepetition First Lien Notes Secured Parties**"), the Prepetition Secured Notes Issuers incurred indebtedness to the Prepetition First Lien Noteholders of 8.625% Senior First Lien Notes Due 2025 (collectively, the "**Prepetition First Lien Notes**").

(v)     *Prepetition First Lien Secured Notes Obligations*.    Pursuant to the Prepetition First Lien Notes Indenture, the Prepetition First Lien Notes were originally issued with a face value of $600 million.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition First Lien Notes was $600 million (collectively, together with accrued and unpaid interest, indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Secured Notes Issuers' and the Prepetition Guarantors' obligations pursuant to the Prepetition First Lien Notes and the Prepetition First Lien Notes Documents, but less any original issue discount that is disallowed as unmatured interest pursuant to section 502(b)(2) of the Bankruptcy Code pursuant to a final, non-appealable order of the Bankruptcy Court, the "**Prepetition First Lien Notes Obligations**").

(vi)     *Prepetition First Lien Secured Notes Liens*.  As more fully set forth in the Prepetition First Lien Notes Documents, prior to the Petition Date, the Prepetition Secured Notes Issuers and the Prepetition Guarantors granted to the Prepetition First Lien Notes Indenture Trustee, for the benefit of itself and the Prepetition First Lien Noteholders, a first priority security interest

in and continuing lien on (the "**Prepetition First Lien Notes Liens**") on Prepetition First Lien Collateral.

(vii)    *Prepetition Midwest Notes*.  Pursuant to that certain Indenture for certain 6.75% notes due 2028 dated as of February 23, 1998 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition Midwest Notes Indenture**", collectively and with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition Midwest Notes Documents**") by and among (a) Windstream Holding of the Midwest, Inc. (f/k/a Aliant Communications, Inc.), as issuer (the "**Prepetition Midwest Notes Issuer**"), (b) U.S. Bank National Association, as trustee (in such capacity, together with its successors in such capacity, the "**Prepetition Midwest Notes Indenture Trustee**") and (c) the Holders, Holders of Securities and Securityholders (each as defined in the Prepetition Midwest Notes Indenture, the "**Prepetition Midwest Noteholders**", collectively with the Prepetition Midwest Notes Indenture Trustee, the "**Prepetition Midwest Notes Secured Parties**"), the Prepetition Midwest Notes Issuer incurred indebtedness to the Prepetition Midwest Noteholders of 6.75% Notes Due 2028 (collectively, the "**Prepetition Midwest Notes**").

(viii)    *Prepetition Midwest Notes Obligations*.  Pursuant to the Prepetition Midwest Notes Indenture, the Prepetition Midwest Notes were originally issued with a face value of $100 million.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Midwest Notes was $100 million (collectively, together with accrued and unpaid interest, indemnification obligations, fees, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or

11

chargeable in respect of any of the Prepetition Midwest Notes Issuer's obligations pursuant to the Prepetition Midwest Notes and the Prepetition Midwest Documents, but less any original issue discount that is disallowed as unmatured interest pursuant to section 502(b)(2) of the Bankruptcy Code pursuant to a final, non-appealable order of the Bankruptcy Court, the "**Prepetition Midwest Notes Obligations**").

(ix)    *Prepetition Midwest Notes Liens*.  As more fully set forth in the Prepetition Credit Facility Security Agreement, prior to the Petition Date, the Prepetition Midwest Notes Issuer and its "restricted subsidiaries" (as such term is defined in the Prepetition Midwest Notes Indenture) granted to the Prepetition Agent, for the benefit of the Prepetition Midwest Notes Secured Parties, a first priority security interest in and continuing lien on (the "**Prepetition Midwest Notes Liens**") on substantially all of their assets and property (the "**Prepetition Midwest Notes Collateral"**).

(x)    *Prepetition Second Lien Secured Notes*.  Pursuant to that certain Indenture for certain 10.5% notes due 2024 dated as of August 2, 2018 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition 2024 Second Lien Notes Indenture**", collectively and with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition 2024 Second Lien Notes Documents**") by and among (a) the Prepetition Secured Notes Issuers, as co-issuers, (b) the Prepetition Guarantors party thereto, as guarantors, (c) Wilmington Trust, National Association, as trustee and notes collateral agent (in such capacities, together with its successors in such capacity, the "**Prepetition 2024 Second Lien Notes Indenture Trustee**") and (d) the Holders (as defined in the 2024 Second Lien Notes Indenture, the "**Prepetition 2024 Second Lien**

Noteholders", collectively with the 2024 Second Lien Notes Indenture Trustee, the "**Prepetition 2024 Second Lien Notes Secured Parties**"), the Prepetition Secured Notes Issuers incurred indebtedness to the Prepetition 2024 Second Lien Noteholders of 10.5% Senior Second Lien Notes Due 2024 (collectively, the "**Prepetition 2024 Second Lien Notes**").  Pursuant to that certain Indenture for certain 9.0% notes due 2025 dated as of August 2, 2018 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition 2025 Second Lien Notes Indenture**", collectively and with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition 2025 Second Lien Notes Documents**", together with the Prepetition 2024 Second Lien Notes Documents, the "**Prepetition Second Lien Notes Documents**" (collectively with the Prepetition Loan Documents, the Prepetition First Lien Notes Documents and the Prepetition Midwest Notes Documents, the "**Prepetition Debt Documents**", and the obligations of any of the Debtors, as applicable, under the Prepetition Debt Documents, collectively, the "**Prepetition Debt**") by and among (a) the Prepetition Secured Notes Issuers, as co-issuers, (b) the Prepetition Guarantors party thereto, as guarantors, (c) Wilmington Trust, National Association, as trustee and notes collateral agent (in such capacities, together with its successors in such capacity, the "**Prepetition 2025 Second Lien Notes Indenture Trustee**")[7] and (d) the Holders (as defined in the 2025 Second Lien Notes Indenture, the "**Prepetition 2025 Second Lien Noteholders**" (together with the Prepetition 2024 Second Lien Noteholders, the "**Prepetition Second Lien Noteholders**"), collectively with the 2025 Second Lien Notes Indenture Trustee, the "**Prepetition**

---

[7] The Prepetition First Lien Notes Indenture Trustee, the Prepetition Midwest Notes Indenture Trustee, the Prepetition 2024 Second Lien Notes Indenture Trustee, Prepetition 2025 Second Lien Notes Indenture Trustee are collectively referred to as the "**Prepetition Notes Trustees**".

**2025 Second Lien Notes Secured Parties**" (together with the Prepetition 2024 Second Lien Notes Secured Parties, the "**Prepetition Second Lien Notes Secured Parties**" and collectively with the Prepetition Credit Facility Secured Parties, the Prepetition First Lien Notes Secured Parties and the Prepetition Midwest Notes Secured Parties, the "**Prepetition Secured Parties**")), the Prepetition Secured Notes Issuers incurred indebtedness to the Prepetition 2025 Second Lien Noteholders of 9.0% Senior Second Lien Notes Due 2025 (collectively, the "**Prepetition 2025 Second Lien Notes**", and together with the Prepetition 2024 Second Lien Notes, the "**Prepetition Second Lien Notes**").

(xi)    *Prepetition Second Lien Secured Notes Obligations*.    Pursuant to the Prepetition 2024 Second Lien Notes Indenture, the Prepetition 2024 Second Lien Notes were originally issued with a face value of not less than $414,905,000.    As of the Petition Date, the aggregate principal amount outstanding under the Prepetition 2024 Second Lien Notes was not less than $414,905,000 (collectively, together with accrued and unpaid interest, indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Secured Notes Issuers' and the Prepetition Guarantors' obligations pursuant to the Prepetition 2024 Second Lien Notes and the Prepetition 2024 Second Lien Notes Documents, but less any original issue discount that is disallowed as unmatured interest pursuant to section 502(b)(2) of the Bankruptcy Code pursuant to a final, non-appealable order of the Bankruptcy Court, the "**Prepetition 2024 Second Lien Notes Obligations**").    Pursuant to the Prepetition 2025 Second Lien Notes Indenture, the Prepetition 2025 Second Lien Notes were originally issued with a face value of $801,964,000.00.    As of the Petition Date, the aggregate principal amount outstanding under the Prepetition 2025 Second Lien Notes was $801,964,000.00. (collectively,

together with accrued and unpaid interest, indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Secured Notes Issuers' and the Prepetition Guarantors' obligations pursuant to the Prepetition 2025 Second Lien Notes and the Prepetition 2025 Second Lien Notes Documents, but less any original issue discount that is disallowed as unmatured interest pursuant to section 502(b)(2) of the Bankruptcy Code pursuant to a final, non-appealable order of the Bankruptcy Court, the "**Prepetition 2025 Second Lien Notes Obligations**", together with the Prepetition 2024 Second Lien Notes Obligations, the "**Prepetition Second Lien Notes Obligations**").

(xii)    *Prepetition Second Lien Secured Notes Liens.*  As more fully set forth in the Prepetition 2024 Second Lien Notes Documents and Prepetition 2025 Second Lien Notes Documents, prior to the Petition Date, the Prepetition Secured Notes Issuers and the Prepetition Guarantor granted to the Prepetition 2024 Second Lien Notes Indenture Trustee, for the benefit of itself and the Prepetition 2024 Second Lien Noteholders and Prepetition 2025 Second Lien Notes Indenture Trustee, for the benefit of itself and the Prepetition 2025 Second Lien Noteholders, a second priority security interest in and continuing lien on (the "Prepetition Second Lien Notes Liens") on substantially all of their assets and property (the "Prepetition Second Lien Collateral", together with the Prepetition First Lien Collateral and Prepetition Midwest Notes Collateral, the "Prepetition Collateral").

(xiii)    *Intercreditor Agreements.* (i) That certain Intercreditor Agreement, dated as of August 2, 2018, among the Prepetition Agent, the Prepetition First Lien Notes Indenture Trustee, the Prepetition 2024 Second Lien Notes Indenture Trustee, the Prepetition 2025 Second Lien Notes Indenture Trustee, Services and the other prepetition obligors party thereto (as amended, amended

and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "**Junior Lien Intercreditor Agreement**"), (ii) that certain Intercreditor Agreement, dated as of November 6, 2017, among the Prepetition Agent, the Prepetition First Lien Notes Indenture Trustee, Services and the other prepetition obligors party thereto (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "**First Lien Pari Passu Intercreditor Agreement**") and (iii) that certain Intercreditor Agreement, dated as of August 2, 2018, among the Prepetition 2024 Second Lien Notes Indenture Trustee, the Prepetition 2025 Second Lien Notes Indenture Trustee, Services and the other prepetition obligors party thereto (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "**Second Lien Pari Passu Intercreditor Agreement**")[8] are, in each case, binding and enforceable against the prepetition obligors in accordance with their terms, and the prepetition obligors are not entitled to take any actions that would be contrary to the provisions thereof;

(xiv)   *Validity, Perfection and Priority of Prepetition Credit Facility Liens and Prepetition Credit Facility Debt.*   The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition Credit Facility Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition Credit Facility Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Credit Facility Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition First Lien Notes Liens on the Prepetition Collateral, which ranks equally in priority with the Prepetition Credit Facility Liens, (2) the

---

[8] The (i) Junior Lien Intercreditor Agreement, (ii) First Lien Pari Passu Intercreditor Agreement and (iii) Second Lien Pari Passu Intercreditor Agreement and are collectively referred to as the "**Intercreditor Agreements**".

Prepetition Midwest Notes Liens on the Prepetition Midwest Notes Collateral, which ranks equally in priority with the Prepetition Credit Facility Liens with respect to the Prepetition Midwest Notes Collateral and (3) certain liens senior by operation of law or otherwise permitted by the Prepetition Loan Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Credit Facility Liens as of the Petition Date, the "**Prepetition Credit Facility Permitted Prior Liens**"); (c) the Prepetition Credit Facility Debt constitutes legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Credit Facility Liens or Prepetition Credit Facility Debt exist, and no portion of the Prepetition Credit Facility Liens or Prepetition Credit Facility Debt is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Credit Facility Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the Prepetition Credit Facilities; and (f) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Credit Facility Debt, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Credit Facility Debt.  The Debtors further acknowledge and agree that prior to the Petition Date, an event of default had occurred and was continuing under the Prepetition Credit Facilities.

(xv)    *Validity, Perfection and Priority of Prepetition First Lien Notes Liens and Prepetition First Lien Notes Obligations*.   The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition First Lien Notes Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition First Lien Notes Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition First Lien Notes Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition Credit Facility Liens on the Prepetition Collateral, which ranks equally in priority with the Prepetition First Lien Notes Liens, (2) the Prepetition Midwest Notes Liens on the Prepetition Midwest Notes Collateral, which ranks equally in priority with the Prepetition First Lien Notes Liens with respect to the Prepetition Midwest Notes Collateral and (3) certain liens senior by operation of law or otherwise permitted by the Prepetition First Lien Notes Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition First Lien Notes Liens as of the Petition Date, the "**Prepetition First Lien Notes Permitted Prior Liens**", and, together with the Prepetition Credit Facility Permitted Prior Liens, the "**Permitted Prior Liens**")); (c) the Prepetition First Lien Notes Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition First Lien Notes Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition First Lien Notes Liens or Prepetition First Lien Notes Obligations exist, and no portion of the Prepetition First Lien Notes Liens or Prepetition First Lien Notes Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors

and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition First Lien Notes Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the Prepetition First Lien Notes; and (f) the Debtors waive, discharge, and release any right to challenge any of the Prepetition First Lien Notes Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition First Lien Notes Obligations.

(xvi)    *Validity, Perfection and Priority of Prepetition Midwest Notes Liens and Prepetition Midwest Notes Obligations.*  The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition Midwest Notes Liens on the Prepetition Midwest Notes Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition Midwest Notes Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Midwest Notes Liens were senior in priority over any and all other liens on the Prepetition Midwest Notes Collateral, subject only to (1) the Prepetition Credit Facility Liens and the Prepetition First Lien Notes Liens, which rank equally in priority with the Prepetition Midwest Notes Liens, and (2) certain liens, senior by operation of law or otherwise, permitted by the Prepetition Midwest Notes Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Midwest Notes Liens as of the Petition Date); (c) the Prepetition Midwest Notes Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Midwest Notes Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature to

any of the Prepetition Midwest Notes Liens or Prepetition Midwest Notes Obligations exist, and

no portion of the Prepetition Midwest Notes Liens or any Prepetition Midwest Notes Obligations

is subject to any challenge or defense, including, without limitation, avoidance, disallowance,

disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the

Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no

claims, objections, challenges, causes of action, and/or choses in action, including, without

limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law

equivalents or actions for recovery or disgorgement, against any of the Prepetition Midwest Notes

Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals,

officers, directors and employees arising out of, based upon or related to the Prepetition Midwest

Notes; and (f) the Debtors waive, discharge, and release any right to challenge any of the

Prepetition Midwest Notes Obligations, the priority of the Debtors' obligations thereunder, and

the validity, extent, and priority of the liens securing the Prepetition Midwest Notes Obligations.

(xvii)  *No Control*.  None of the Prepetition Secured Parties control the Debtors or

their properties or operations, have authority to determine the manner in which any Debtor's

operations are conducted or are control persons or insiders of the Debtors by virtue of any of the

actions taken with respect to, in connection with, related to or arising from the Prepetition Credit

Agreement, the Prepetition First Lien Notes Indenture, the Prepetition Midwest Notes Indenture,

the Prepetition 2024 Second Lien Notes Indenture and the Prepetition 2025 Second Lien Notes

Indenture.

(xviii)  *No Claims or Causes of Action*.  No claims or causes of action exist against,

or with respect to, the Prepetition Credit Facility Secured Parties, the Prepetition First Lien Notes

Secured Parties or the Prepetition Midwest Notes Secured Parties under any agreements by and among the Debtors and any such party that is in existence as of the Petition Date.

(xix)   *Release*.  Effective as of the date of entry of this Interim Order, the Debtors hereby absolutely and unconditionally release and forever discharge and acquit the Prepetition Credit Facility Secured Parties, the Prepetition First Lien Notes Secured Parties, the Prepetition Midwest Notes Secured Parties, the DIP Secured Parties, and each of the foregoing's respective Representatives (as defined herein), solely in their capacity as such (collectively, the "**Released Parties**"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date (collectively, the "**Released Claims**") of any kind, nature or description, whether matured or unmatured, known or unknown, foreseen or unforeseen, liquidated or unliquidated, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, arising out of or related to (as applicable) the Prepetition Debt Documents, the DIP Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the deal reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order.

(xx)   *Cash Collateral*.  All of the Debtors' cash, including any cash in deposit accounts (whether subject to control agreements or otherwise) constitutes "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "**Cash Collateral**").

G.    *Findings Regarding the DIP Financing and Use of Cash Collateral.*

(i)    Good and sufficient cause has been shown for the entry of this Interim Order.

(ii)    The DIP Loan Parties have an immediate and critical need to obtain the DIP

Financing and to use Prepetition Collateral (including Cash Collateral) in each case on an interim

basis, in order to permit, among other things, the orderly continuation of the operation of their

businesses, to maintain business relationships with vendors, suppliers and customers, to make

payroll, to make capital expenditures, and to satisfy other working capital and operational needs.

The access of the DIP Loan Parties to sufficient working capital and liquidity through the use of

Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness under the DIP

Documents and other financial accommodations provided under the DIP Documents are necessary

and vital to the preservation and maintenance of the going concern values of the DIP Loan Parties

and to a successful reorganization of the DIP Loan Parties.

(iii)    The DIP Loan Parties are unable to obtain financing on more favorable

terms from sources other than the DIP Lenders and are unable to obtain adequate unsecured credit

allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The DIP

Loan Parties are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2)

and 364(c)(3) of the Bankruptcy Code without the DIP Loan Parties granting to the DIP Secured

Parties, subject to the Carve Out, the DIP Liens and the DIP Superpriority Claims (as defined

herein) and, subject to the Carve Out, incurring the Adequate Protection Obligations, in each case,

under the terms and conditions set forth in this Interim Order and in the DIP Documents.

(iv)    Based on the DIP Motion, the Leone Declaration, the First Day Declaration,

and the record presented to the Court at the Interim Hearing, the terms of the DIP Financing and

the terms on which the DIP Loan Parties may continue to use the Prepetition Collateral (including

Cash Collateral) pursuant to this Interim Order and the DIP Documents are fair and reasonable, reflect the DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(v)    To the extent such consent is required, the Prepetition Secured Parties have consented, are deemed under the Intercreditor Agreements or other applicable Prepetition Debt Documents to have consented, or have not objected to the DIP Loan Parties' use of Cash Collateral and the other Prepetition Collateral, and the DIP Loan Parties' entry into the DIP Documents in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

(vi)    The DIP Financing and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the DIP Loan Parties, and the DIP Secured Parties, and all of the DIP Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Documents, including, without limitation:  all DIP Loans made to the DIP Loan Parties pursuant to the DIP Documents, any "**Obligations**" (as defined in the DIP Documents), and any "**Cash Management Agreements**" and "**Swap Agreements**" (each as defined in the DIP Documents), shall be deemed to have been extended by the DIP Agent and the DIP Lenders and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(vii)    The Prepetition Credit Facility Secured Parties have acted in good faith regarding the DIP Financing and the DIP Loan Parties' continued use of the Prepetition Collateral (including Cash Collateral) to fund the administration of the DIP Loan Parties' estates and continued operation of their businesses (including the incurrence and payment of the Adequate Protection Obligations and the granting of the Adequate Protection Liens (as defined herein)), in accordance with the terms hereof, and the Prepetition Credit Facility Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of section 363(m) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(viii)    The Prepetition Secured Parties are entitled to the adequate protection provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the DIP Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the DIP Loan Parties' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Collateral, including the Cash Collateral; *provided* that nothing in this Interim Order or the DIP Documents shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Interim Order and in the context of the DIP Financing authorized by this Interim Order to the extent such consent has been or will be given, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties, subject to any applicable provisions of the Intercreditor

24

Agreements, to seek new, different or additional adequate protection or assert the interests of any

of the Prepetition Secured Parties and the rights of any other party in interest to object to such

relief are hereby preserved.

(ix)    The Debtors have requested immediate entry of this Interim Order pursuant

to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Rules.  Absent granting the relief

set forth in this Interim Order, the DIP Loan Parties' estates will be immediately and irreparably

harmed.  Consummation of the DIP Financing and the use of Prepetition Collateral (including

Cash Collateral), in accordance with this Interim Order and the DIP Documents are therefore in

the best interests of the DIP Loan Parties' estates and consistent with the DIP Loan Parties'

exercise of their fiduciary duties.

H.    *Immediate Entry*.  Sufficient cause exists for immediate entry of this Interim Order

pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).

I.    *Permitted Prior Liens; Continuation of Prepetition Liens*.  Nothing herein shall

constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior,

enforceable, prior, perfected, or non-avoidable.  Moreover, nothing herein shall prejudice the rights

of any party-in-interest, including, but not limited to, the Debtors, the DIP Agent, the DIP Lenders,

the Prepetition Secured Parties, or a Creditors' Committee (if appointed), to challenge the validity,

priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior

Lien and/or security interests.  The right of a seller of goods to reclaim such goods under section

546(c) of the Bankruptcy Code is not a Permitted Prior Lien and is expressly subject to the DIP

Liens.  The liens and interests granted to the Prepetition Secured Parties (the "Prepetition Liens"),

and the DIP Liens that prime the Prepetition Liens, are continuing liens and the DIP Collateral is

and will continue to be encumbered by such liens in light of the integrated nature of the DIP Facilities, the DIP Documents, and the Prepetition Secured Documents.

J.      *Compliance with Local Rule 4001-2.*  The DIP Motion and this Interim Order comply with the requirements of Local Rule 4001-2.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      *Interim Financing Approved.*  The interim relief sought n the DIP Motion is granted, the interim financing described herein is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents and this Interim Order.  All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled.

2.      *Authorization of the DIP Financing and the DIP Documents.*

(a)      The DIP Loan Parties are hereby authorized to execute, deliver, enter into and, as applicable, perform all of their obligations in accordance with, and subject to the terms of this Interim Order and the DIP Documents and such other and further acts as may be necessary, appropriate or desirable in connection therewith.  The Borrower is hereby authorized to borrow money and obtain letters of credit pursuant to the DIP Term Sheet and the DIP Credit Agreement, and the DIP Guarantors are hereby authorized to guaranty the DIP Obligations, (a) in each case up to an aggregate principal or face amount equal to $100 million under the DIP Revolving Facility, subject in each case to any limitations on borrowing under the DIP Documents for the account of the Borrower, and subject to entry of the Final Order, an additional $400 million, in each case

subject to Revolving Facility Availability (as defined in the DIP Documents), in each case, which shall be used for all purposes permitted under the DIP Documents, subject to and in accordance with the budget (as the same may be modified from time to time consistent with the terms of the DIP Documents and subject to such variances as permitted therein, the "**Budget**")[9] including, without limitation, to provide working capital for the DIP Loan Parties and for general corporate purposes and to pay interest, fees, expenses and the Adequate Protection Payments (as defined herein), in each case, in accordance with this Interim Order and the DIP Documents, and (b) in each case up to an aggregate principal amount equal to $300 million under the DIP Term Loan Facility on an interim basis and, subject to entry of the Final Order, an additional $200 million under the DIP Term Loan Facility, subject to any limitations on borrowing under the DIP Documents, which shall be used for all purposes permitted under the DIP Documents, subject to and in accordance with the Budget, including, without limitation, to pay certain costs, fees and expenses related to the Chapter 11 Cases, to pay the Adequate Protection Payments, and to fund the working capital needs and for general corporate purposes during the Chapter 11 Cases, in each case, in accordance with this Interim Order and the DIP Documents, including the Budget.

(b)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments, certificates, and agreements and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees in connection with or that may be reasonably required, necessary, or desirable for the DIP Loan Parties' performance of their obligations under or related to the DIP Financing, including, without limitation:

---

[9] A copy of the initial Budget is attached hereto as **Schedule 1**.

(i)    the execution and delivery of, and performance under, each of the DIP Documents;

(ii)    the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the DIP Loan Parties and the DIP Agent may agree, it being understood that no further approval of this Court shall be required for any authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees and other expenses (including attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other obligations paid in connection therewith) that do not (A) shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder or (B) increase existing fees or add new fees thereunder(excluding, for the avoidance of doubt, any amendment, consent or waiver fee).

(iii)    the non-refundable payment to the DIP Agent or the DIP Lenders, as the case may be, of all reasonable and documented fees including, without limitation but only as applicable, any letter of credit fees (including issuance, fronting, and other related charges), unused facility fees, amendment fees, prepayment premiums, early termination fees, servicing fees,

audit fees, liquidator fees, structuring fees, administrative agent's or collateral agent's fees, upfront fees, closing fees, commitment fees, exit fees, backstop fees, agency fees, and/or reasonable professional fees (which fees shall be irrevocable, and shall be deemed to have been, approved upon entry of this Interim Order, whether or not such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of the indemnification obligations, in each case referred to in the DIP Documents (and in any separate letter agreements, including, without limitation, any Fee Letters, between any or all DIP Loan Parties, on the one hand, and any of the DIP Agent and/or DIP Lenders, on the other, in connection with the DIP Financing) and the costs and expenses as may be due from time to time, including, without limitation, reasonable and documented fees and expenses of the professionals retained by any of the DIP Agent or DIP Lenders (including Davis Polk & Wardwell LLP and such other advisors

as permitted under the DIP Documents), in each case, as provided for in the DIP Documents, without the need to file retention motions or fee applications or to provide notice to any party; *provided, however*, that nothing herein or in the DIP Documents shall limit the rights of any party-in-interest to seek payment of any fees and expenses in accordance with the Plan (as defined in the DIP Documents); and

(iv)    the performance of all other acts necessary, appropriate, or desirable under or in connection with the DIP Documents.

3.    *DIP Obligations*.  Upon execution and delivery of the DIP Documents, (i) the DIP Documents shall constitute valid, binding and non-avoidable obligations of the DIP Loan Parties, enforceable against each DIP Loan Party and their estates thereto in accordance with the terms of the DIP Documents and this Interim Order, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**").  Upon execution and delivery of the DIP Documents, the DIP Obligations will include all loans, letter of credit reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agent or any of the DIP Lenders, in each case, under, or secured by, the DIP Documents or this Interim Order, including all principal, accrued interest, costs, fees, expenses and other amounts under the DIP Documents.  Without limiting the foregoing, the DIP Obligations shall also include all Cash Management Obligations (as defined in the DIP Documents) and all obligations of any Debtor arising under any Cash

Management Agreements or Swap Agreements to the extent described in, or secured by, the DIP

Documents.  The Debtors shall be jointly and severally liable for the DIP Obligations.  The DIP

Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral

shall automatically cease on the Termination Declaration Date (as defined herein) or the

occurrence of any event or condition set forth in paragraph 20(b) of this Interim Order, except as

provided in paragraph 20 herein.  No obligation, payment, transfer, or grant of collateral security

hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens (as defined

herein), and including in connection with any adequate protection provided to the Prepetition

Secured Parties hereunder) shall be stayed, restrained, voidable, avoidable, or recoverable, under

the Bankruptcy Code or under any applicable law (including, without limitation, under sections

502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform

Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance

Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment,

offset, recharacterization, subordination (whether equitable, contractual, or otherwise),

counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any

applicable law or regulation by any person or entity.

4.      *[Reserved]*

5.      *[Reserved]*

6.      *Carve Out.*

(a)      *Carve Out.*  As used in this Interim Order, the "**Carve Out**" means the sum

of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States

Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory

rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up

to $50,000, which amount remains subject to entry of (and may be amended under) the Final Order, incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $20,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**"). For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

        (b)    *Fee Estimates.*  Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following the Closing Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "**Estimated Fees and Expenses**") incurred

during the preceding week by such Professional Person (through Saturday of such week, the "**Calculation Date**"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "**Weekly Statement**"); *provided* that within one business day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional statement (the "**Final Statement**") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date.  If any Professional Person fails to deliver a Weekly Statement within three calendar days after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Carve Out Accounts (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Budget for such period for such Professional Person; *provided* that such Professional Person shall be entitled to be paid any unpaid amount of Allowed Professional Fees in excess of Allowed Professional Fees included in the Budget for such period for such Professional Person from a reserve to be funded by the Debtors from all cash on hand as of such date and any available cash thereafter held by any Debtor pursuant to paragraph 6(c) below.  Solely as it relates to the Agents and the Lenders, any deemed draw and borrowing pursuant to paragraph 6(c)(i)(x) for amounts under paragraph 6(a)(iii) above shall be limited to the greater of (x) the sum of (I) the aggregate unpaid amount of Estimated Fees and Expenses included in such Weekly Statements timely received by the Debtors prior to the

Termination Declaration Date plus, without duplication, (II) the lesser of (1) the aggregate unpaid amount of Estimated Fees and Expenses included in the Final Statements timely received by the Debtors pertaining to the period through and including the Termination Declaration Date and (2) the Budgeted Cushion Amount (as defined below), and (y) the aggregate unpaid amount of Allowed Professional Fees included in the Budget for the period prior to the Termination Declaration Date (such amount, the "**DIP Professional Fee Carve Out Cap**"). For the avoidance of doubt, each Agent shall be entitled to maintain at all times a reserve (the "**Carve-Out Reserve**") in an amount (the "**Carve-Out Reserve Amount**") equal to the sum of (i) the greater of (x) the aggregate unpaid amount of Estimated Fees and Expenses included in all Weekly Statements timely received by the Debtors, and (y) the aggregate amount of Allowed Professional Fees contemplated to be unpaid in the Budget at the applicable time, plus (ii) the Post-Carve Out Trigger Notice Cap, plus (iii) the amounts contemplated under paragraphs 6(a)(i) and 6(a)(ii) above, plus (iv) an amount equal to the amount of Allowed Professional Fees set forth in the Budget for the then-current week occurring after the most recent Calculation Date and the two weeks succeeding such current week (such amount set forth in (iv), regardless of whether such reserve is maintained, the "**Budgeted Cushion Amount**"). Not later than 7:00 p.m. New York time on the fourth business day of each week starting with the first full calendar week following the Closing Date, the Debtors shall deliver to each Agent a report setting forth the Carve-Out Reserve Amount as of such time, and, in setting the Carve-Out Reserve, each Agent shall be entitled to rely upon such reports in accordance with the DIP Loan Documents. Prior to the delivery of the first report setting forth the Carve-Out Reserve Amount, the Agents shall calculate the Carve-Out Reserve Amount by reference to the Budget for subsection (i) of the Carve-Out Reserve Amount.

(c)      *Carve Out Reserves.*

(i)     On the day on which a Carve Out Trigger Notice is given by any Agent to the Debtors with a copy to counsel to the Creditors' Committee, counsel to the Prepetition Agent, counsel to the Prepetition First Lien Notes Indenture Trustee, counsel to the First Lien Term Lender Ad Hoc Group, counsel to the Prepetition 2024 Second Lien Notes Indenture Trustee, counsel to the Prepetition 2025 Second Lien Notes Indenture Trustee, and counsel to the ad hoc committee (the "**Second Lien Ad Hoc Committee**") of certain Prepetition 2024 Second Lien Noteholders and Prepetition 2025 Second Lien Noteholders (the "**Termination Declaration Date**"), the Carve Out Trigger Notice shall (x) be deemed a draw request and notice of borrowing by the Debtors for loans to be made under the DIP Revolving Facility (each, a "**Revolving Loan**") (on a pro rata basis based on the then-outstanding commitments under the DIP Revolving Facility), in an amount equal to the sum of (1) the amounts set forth in paragraphs 6(a)(i) and 6(a)(ii) above, and (2) the lesser of (a) the then unpaid amounts of the Allowed Professional Fees (b) the DIP Professional Fee Carve Out Cap (any such amounts actually advanced shall constitute Revolving Loans) and (y) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the

sum of the amounts set forth in paragraphs 6(a)(i)–(iii) above. The Debtors shall deposit and hold such amounts in a segregated account at any Agent in trust to pay such then unpaid Allowed Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims.

(ii)    On the Termination Declaration Date, the Carve Out Trigger Notice shall also (x) be deemed a request by the Debtors for Revolving Loans under the DIP Revolving Facility (on a pro rata basis based on the then-outstanding commitments under the DIP Revolving Facility), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute Revolving Loans) and (y) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at any Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") prior to any and all other claims.

(iii)    On the first business day after an Agent gives such notice to such Revolving Lenders, notwithstanding anything in the DIP Loan Documents to the contrary, including with respect to the existence of a Default or Event of Default (each as defined in the DIP Loan Documents), the failure of the Debtors to satisfy any or all of the conditions precedent for Revolving Loans under the Revolving Facility, any termination of the commitments under the DIP Revolving Facility following an Event of Default (as defined in the DIP Loan Documents), or the occurrence of the Maturity Date, each Revolving Lender with an outstanding commitment under the DIP Revolving Facility (on a pro rata basis based on the then-outstanding commitments under the DIP Revolving Facility) shall make available to the Revolving Facility Agent such Revolving Lender's pro rata share with respect to such borrowing in accordance with the Revolving Facility; *provided* that in no event shall the Revolving Facility Agent or the Revolving Lenders be required to extend Revolving Loans pursuant to a deemed draw and borrowing pursuant to paragraphs 6(c)(i)(x) and 6(c)(ii)(x) in an aggregate amount exceeding the Carve-Out Reserve Amount.

(iv)    All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "**Pre-**

Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Agents for the benefit of the Lenders, unless the Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Existing Primed Secured Parties in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the paragraph (a) above (the "**Post-Carve Out Amounts**"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Agents for the benefit of the Lenders, unless the Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Existing Primed Secured Parties in accordance with their rights and priorities as of the Petition Date.

(v)     Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 6, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts

and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph (c), prior to making any payments to the Agents or the Existing Primed Secured Parties, as applicable. Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the Agents and the agents under the Existing Primed Secured Facilities shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid in accordance with the DIP Loan Documents and subparagraph (iv) above.  Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the DIP Loan Documents) or increase or reduce the Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees

due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facilities, or in any Existing Primed Secured Facilities, the Carve Out shall be senior to all liens and claims securing the DIP Facilities, the Adequate Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the Obligations or the obligations under the Existing Primed Secured Facilities.

(d)     *Payment of Allowed Professional Fees Prior to the Termination Declaration Date.*   Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)     *No Direct Obligation to Pay Allowed Professional Fees*.   None of the Agents, the Lenders, or the Existing Primed Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the Agents, the Lenders, or the Existing Primed Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)     *Payment of Carve Out on or After the Termination Declaration Date*.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-

40

for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the Obligations secured by the Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the Loan Documents, the Bankruptcy Code, and applicable law.

7.      *DIP Superpriority Claims*. Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the DIP Loan Parties (without the need to file any proof of claim) with priority over any and all claims against the DIP Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "**DIP Superpriority Claims**") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the DIP Loan Parties and all proceeds thereof (excluding claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or applicable state-law equivalents ("**Avoidance Actions**")) in accordance with the DIP Documents and this Interim Order, subject only to the liens on such property and the Carve Out. The Debtors intend to seek entry of the Final Order providing that the DIP Superpriority Claims shall also be payable from and have recourse to any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise

41

("**Avoidance Proceeds**").  The DIP Superpriority Claims shall be entitled to the full protection of

section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof

is vacated, reversed or modified, on appeal or otherwise.  The DIP Superpriority Claims shall be

*pari passu* in right of payment with one another and senior to the 507(b) Claims (as defined herein).

8.      *DIP Liens.*

(a)      *DIP Liens.*  As security for the DIP Obligations, effective and perfected

upon the date of this Interim Order and without the necessity of the execution, recordation or filing

by the DIP Loan Parties of mortgages, security agreements, control agreements, pledge agreements,

financing statements, notation of certificates of title for titled goods or other similar documents, or

the possession or control by the DIP Agent of, or over, any Collateral, security interests and liens

are hereby granted to the DIP Agent for its own benefit and the benefit of the DIP Lenders (all

property identified in clauses (i) through (iii) below being collectively referred to as the "**DIP

Collateral**"), subject only to the payment of the Carve Out (all such liens and security interests

granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this

Interim Order and the DIP Documents, the "**DIP Liens**"):

(i)      *Liens on Unencumbered Property.*  Pursuant to section 364(c)(2)

of the Bankruptcy Code, a valid, binding, continuing,

enforceable, fully perfected first priority senior security interest

in and lien upon all prepetition and postpetition property of the

DIP Loan Parties, whether existing on the Petition Date or

thereafter acquired, that, on or as of the Petition Date, is not

subject to a valid, perfected and non-avoidable lien, including,

without limitation, any and all unencumbered cash of the DIP

42

Loan Parties (whether maintained with the DIP Agent or otherwise) and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, of all the foregoing (the "**Unencumbered Property**"), in each case other than:  (i) the Excluded Assets, but including the proceeds of Excluded Assets that do not otherwise constitute Excluded Assets; and (ii) the Avoidance Actions; *provided* that the Debtors intend to seek entry of the Final Order granting DIP Liens on Avoidance Proceeds;

(ii)     *Liens Priming Certain Prepetition Secured Parties' Liens*. Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority priming security interest in and lien upon all prepetition and postpetition property of the DIP Loan Parties of the same nature,

scope and type as the Prepetition Collateral, regardless of where located, regardless whether or not any liens on such assets are voided, avoided, invalidated, lapsed or unperfected (the "**DIP Priming Liens**"), which shall prime all respects to the interests of the Prepetition Secured Parties arising from current and future liens of the Prepetition Secured Parties (including, without limitation, the Adequate Protection Liens granted to the Prepetition Secured Parties) (the "**Primed Liens**"). Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be (i) subject and junior to the Carve Out in all respects, (ii) senior in all respects to the Prepetition Liens and (iii) senior to the Adequate Protection Liens;

(iii)   *Liens Junior to Certain Other Liens*.   Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible pre- and postpetition property of each DIP Loan Party that is subject to either (x) valid, perfected and non-avoidable liens in existence at the time of the commencement of the Chapter 11 Cases (other than the Primed Liens) or (y) valid and non-avoidable liens (other than the Primed Liens) in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code, which

44

shall be (i) junior and subordinate to any valid, perfected and non-avoidable liens (other than the Primed Liens) in existence immediately prior to the Petition Date, and (ii) any such valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code; *provided* that nothing in the foregoing clauses (i) and (ii) shall limit the rights of the DIP Secured Parties under the DIP Documents to the extent such liens are not permitted thereunder; and

(iv)    *Liens Senior to Certain Other Liens.*  The DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the DIP Loan Parties and their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties, or (C) any intercompany or affiliate liens of the DIP Loan Parties or security interests of the DIP Loan Parties; or (ii) subordinated to or made *pari passu*

with any other lien or security interest under section 363 or 364

of the Bankruptcy Code granted after the date hereof.

9.      *Maintenance of Letters of Credit*.  To the extent permitted by the DIP Documents,

the DIP Loan Parties are authorized to renew letters of credit issued under the DIP Documents on

an uninterrupted basis and to take all actions reasonably appropriate with respect thereto on an

uninterrupted basis.  Without limitation to the foregoing, the DIP Loan Parties are authorized to

replace all outstanding Letters of Credit (as defined in the Prepetition Credit Agreement) with new

letters of credit issued under the DIP L/C Sub-Facility.

10.     *Protection of DIP Lenders' Rights*.

(a)      So long as there are any DIP Obligations outstanding or the DIP Lenders

have any outstanding Commitments (as defined in the DIP Documents) (the "**DIP Commitments**")

under the DIP Documents, the Prepetition Secured Parties shall: (i) have no right to and shall take

no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the

Prepetition Debt Documents or this Interim Order, or otherwise seek to exercise or enforce any

rights or remedies against such DIP Collateral or the Adequate Protection Liens; (ii) be deemed to

have consented to any transfer, disposition or sale of, or release of liens on, such DIP Collateral

(but not any proceeds of such transfer, disposition or sale to the extent remaining after payment in

cash in full of the DIP Obligations and termination of the DIP Commitments), to the extent such

transfer, disposition, sale or release is authorized under the DIP Documents; (iii) not file any

further financing statements, trademark filings, copyright filings, mortgages, notices of lien or

similar instruments, or otherwise take any action to perfect their security interests in such DIP

Collateral unless, solely as to this clause (iii), the DIP Agent or the DIP Lenders file financing

statements or other documents to perfect the liens granted pursuant to this Interim Order, or as may

be required by applicable state law to continue the perfection of valid and non-avoidable liens or security interests as of the Petition Date; and (iv) deliver or cause to be delivered, at the DIP Loan Parties' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agent or the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of such DIP Collateral subject to any sale or court-approved disposition.

(b)       To the extent any Prepetition Secured Party has possession of any Prepetition Collateral or DIP Collateral or has control with respect to any Prepetition Collateral or DIP Collateral, or has been noted as secured party on any certificate of title for a titled good constituting Prepetition Collateral or DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Lenders, and the Prepetition Agent and Prepetition Notes Trustees shall comply with the instructions of the DIP Agent with respect to the exercise of such control.

(c)       Any proceeds of Prepetition Collateral subject to the Primed Liens received by any Prepetition Secured Parties, whether in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral or otherwise received by any of the Prepetition Agent and Prepetition Notes Trustees, shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Agent for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements. The DIP Agent is hereby authorized to make any such endorsements as agent for each of the Prepetition Agent and Prepetition Notes Trustees or any such Prepetition Secured Parties. This authorization is coupled with an interest and is irrevocable. Notwithstanding the foregoing, the rights of setoff and first-priority security

interests of the financial institutions providing cash management services (solely to the extent related to cash management obligations and as governed by the cash management order entered in these Chapter 11 Cases) are preserved.

(d)    The automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to the extent necessary to permit the DIP Agent, acting at the direction of the Required DIP Lenders, and the DIP Lenders to enforce all of their rights under the DIP Documents and to (i) immediately upon the occurrence of an Event of Default, declare (A) the termination, reduction or restriction of any further Commitment to the extent any such Commitment remains and (B) all applicable DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the DIP Loan Parties; and (ii) upon the occurrence of an Event of Default and the giving by the DIP Agent of five (5) business days' prior written notice (which shall run concurrently with any notice required to be provided under the DIP Documents) (the "**Remedies Notice Period**") via email to counsel to the Debtors and the Creditors' Committee, counsel to the Prepetition First Lien Indenture Notes Trustee, counsel to the Prepetition Agent, counsel to the First Lien Term Lender Ad Hoc Group, counsel to the Prepetition 2024 Second Lien Notes Indenture Trustee, counsel to the Prepetition 2025 Second Lien Notes Indenture Trustee, and counsel to the Second Lien Ad Hoc Committee , and the office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") to (A) withdraw consent to the Debtors' continued use of Cash Collateral and (B) exercise all other rights and remedies provided for in the DIP Documents and under applicable law; *provided* that, during the Remedies Notice Period, the Debtors may request an expedited hearing before the Bankruptcy Court to determine whether an Event of Default has in fact occurred and/or seek nonconsensual use of Cash Collateral.  In no event shall the DIP Agent, the DIP

Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, with respect to the DIP Obligations or with respect to the Prepetition First Lien Debt or the Prepetition Collateral; *provided* that the DIP Agent and the DIP Lenders shall use commercially reasonable efforts to first use all DIP Collateral other than the assets held or owned by (i) the Prepetition Midwest Notes Issuer, (ii) Windstream Network Services of the Midwest, Inc. and/or (iii) each of the Prepetition Midwest Notes Issuer's Debtor subsidiaries that are not currently obligors under the Prepetition Credit Agreement or the Prepetition First Lien Notes, but are (or become) DIP Loan Parties, to repay the DIP Obligations prior to using such other DIP Collateral to repay the DIP Obligations.  Further, the Debtors intend to seek entry of the Final Order providing for a waiver of the "equities of the case" exception in section 552(b) of the Bankruptcy Code with respect to the secured claims of the Prepetition Secured Parties or to the Liens and security interests securing such claims.

(e)     No rights, protections or remedies of the DIP Agent or the DIP Lenders granted by the provisions of this Interim Order or the DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to the DIP Loan Parties' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the DIP Loan Parties' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the DIP Loan Parties' continued use of Cash Collateral or the provision of adequate protection to any party.

11.     *Limitation on Charging Expenses Against Collateral*.  Except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (including Cash

49

Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, acting at the direction of the Required Lenders (as defined in the DIP Documents, the "**Required DIP Lenders**"), and the Debtors intend to seek entry of the Final Order providing the same with respect to the Prepetition Agent, acting at the direction of the Required Lenders (as defined in the Prepetition Credit Agreement), and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Agent, the DIP Lenders or the Prepetition Secured Parties to any charge, lien, assessment or claim against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.

12.     *Payments Free and Clear.*  Any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders pursuant to the provisions of this Interim Order, the Final Order (if and when entered), any subsequent order of the Court or the DIP Documents shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code (subject to the entry of the Final Order approving the waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code), whether asserted or assessed by, through or on behalf of the Debtors, or 552(b) of the Bankruptcy Code, and solely in the case of payments made or proceeds remitted after the delivery of a Carve Out Trigger Notice, subject to the Carve Out in all respects.

13.     *Use of Cash Collateral*.  The DIP Loan Parties are hereby authorized, subject to the terms and conditions of this Interim Order, to use all Cash Collateral; *provided* that (a) the Prepetition Secured Parties are granted the adequate protection as hereinafter set forth and (b)

except on the terms and conditions of this Interim Order, the DIP Loan Parties shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court.

14.    *Disposition of DIP Collateral*.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral other than in the ordinary course of business without the prior written consent of the DIP Agent, except as otherwise provided for in the DIP Documents or otherwise ordered by the Court, and subject to the Intercreditor Agreements.

15.    *Adequate Protection of Prepetition Secured Parties*.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code (the "**Prepetition Adequate Protection Claim**").  In consideration of the foregoing, the Prepetition Agent and Prepetition Notes Trustees, for the benefit of the Prepetition Secured Parties, are hereby granted the following in the amount of such diminution (collectively, the "**Adequate Protection Obligations**"):

(a)    First Lien Adequate Protection Liens.  (i) The Prepetition Agent, for itself and for the benefit of the other Prepetition Credit Facility Secured Parties and (ii) the Prepetition First Lien Notes Indenture Trustee, for itself and for the benefit of the First Lien Noteholders, are each hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the Prepetition Credit Facility Secured Parties' Prepetition Adequate Protection Claims (in the case of the Prepetition Agent) and the First Lien

Notes Secured Parties' Prepetition Adequate Protection Claims (in the case of the Prepetition First

Lien Notes Indenture Trustee), a valid, perfected replacement security interest in and lien upon all

of the DIP Collateral and, solely as to the Prepetition Agent, any other assets on which the Midwest

Notes Adequate Protection Liens are granted, in each case subject and subordinate only to (A) the

DIP Liens and any liens to which the DIP Liens are junior and (B) the Carve Out (the "**First Lien**

**Adequate Protection Liens**").  The First Lien Adequate Protection Liens granted pursuant to this

paragraph in favor of the Prepetition Agent shall be *pari passu* with the First Lien Adequate

Protection Liens granted pursuant to this paragraph in favor of the Prepetition First Lien Notes

Indenture Trustee.

(b)      Second Lien Adequate Protection Liens.  (i) The Prepetition 2024 Second

Lien Notes Indenture Trustee, for itself and for the benefit of the Second Lien 2024 Noteholders

and (ii) the Prepetition 2025 Second Lien Notes Indenture Trustee, for itself and for the benefit of

the Second Lien 2025 Noteholders, are each hereby granted (effective and perfected upon the date

of this Interim Order and without the necessity of the execution of any mortgages, security

agreements, pledge agreements, financing statements or other agreements), in the amount of the

Second Lien 2024 Notes Secured Parties' Prepetition Adequate Protection Claims (in the case of

the Prepetition 2024 Second Lien Notes Indenture Trustee) and the Second Lien 2025 Notes

Secured Parties' Prepetition Adequate Protection Claims (in the case of the Prepetition 2025

Second Lien Notes Indenture Trustee), a valid, perfected replacement security interest in and lien

upon all of the DIP Collateral, in each case subject and subordinate to (A) the DIP Liens and any

liens to which the DIP Liens are junior, (B) the First Lien Adequate Protection Liens, (C) the

Prepetition Credit Facility Liens, (D) the First Lien Notes Liens and (E) the Carve Out (the

"**Second Lien Adequate Protection Liens**").  The Second Lien Adequate Protection Liens

granted pursuant to this paragraph in favor of the Prepetition 2024 Second Lien Notes Indenture Trustee shall be *pari passu* with the Second Lien Adequate Protection Liens granted pursuant to this paragraph in favor of the Prepetition 2025 Second Lien Notes Indenture Trustee.

(c)    <u>Midwest Notes Adequate Protection Liens.</u>  The Prepetition Midwest Notes Indenture Trustee, for itself and for the benefit of the Prepetition Midwest Noteholders, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution or filing of any mortgages, security agreements, pledge agreements, financing statements or other agreements or notices), in the amount of the Prepetition Midwest Noteholders' Prepetition Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon any and all assets (including, without limitation, any DIP Collateral) held or owned by (i) the Prepetition Midwest Notes Issuer, (ii) Windstream Network Services of the Midwest, Inc. and/or (iii) each of the Prepetition Midwest Notes Issuer's Debtor subsidiaries that are not currently obligors under the Prepetition Credit Agreement or the Prepetition First Lien Notes, but are (or become) DIP Loan Parties, subject and subordinate only to (A) the DIP Liens and any liens to which the DIP Liens are junior and (B) the Carve Out (the "**Midwest Notes Adequate Protection Liens**" and, together with the First Lien Adequate Protection Liens and Second Lien Adequate Protection Liens, the "**Adequate Protection Liens**")  The Midwest Notes Adequate Protection Liens granted pursuant to this paragraph shall be *pari passu* with the First Lien Adequate Protection Liens and shall be senior to the Second Lien Adequate Protection Liens.

(d)    <u>First Lien Section 507(b) Claims</u>.  (i) The Prepetition Agent, for itself and for the benefit of the other Prepetition Credit Facility Secured Parties (ii) the Prepetition First Lien Notes Indenture Trustee, for itself and for the benefit of the First Lien Noteholders, are each hereby granted, subject to the Carve Out, an allowed superpriority administrative expense claim as

provided for in section 507(b) of the Bankruptcy Code in the amount of the Prepetition Credit
Facility Secured Parties' Prepetition Adequate Protection Claims (in the case of the Prepetition
Agent) and the First Lien Notes Secured Parties' Prepetition Adequate Protection Claims (in the
case of the Prepetition First Lien Notes Indenture Trustee), in each case with, except as set forth
in this Interim Order, priority in payment over any and all administrative expenses of the kind
specified or ordered pursuant to any provision of the Bankruptcy Code (the "**First Lien 507(b)
Claims**"); which First Lien 507(b) Claims shall have recourse to and be payable from all of the
DIP Collateral.  The First Lien 507(b) Claims shall be subject and subordinate only to the Carve
Out and the DIP Superpriority Claims.  Except to the extent expressly set forth in this Interim
Order, the Final Order or the DIP Documents, the Prepetition Credit Facility Secured Parties or
Prepetition First Lien Notes Secured Parties shall not receive or retain any payments, property or
other amounts in respect of the First Lien 507(b) Claims unless and until the DIP Obligations
(other than contingent indemnification obligations as to which no claim has been asserted) have
indefeasibly been paid in cash in full and all DIP Commitments have been terminated.

(e)  Second Lien Section 507(b) Claims.  Subject to section 6.01(c) of the Junior
Lien Intercreditor Agreement, (i) the Prepetition 2024 Second Lien Notes Indenture Trustee, for
itself and for the benefit of the Second Lien 2024 Noteholders and (ii) the Prepetition 2025 Second
Lien Notes Indenture Trustee, for itself and for the benefit of the Second Lien 2025 Noteholders,
are each hereby granted, subject to the Carve Out, an allowed superpriority administrative expense
claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Second Lien
2024 Notes Secured Parties' Prepetition Adequate Protection Claims (in the case of the Prepetition
2024 Second Lien Notes Indenture Trustee) and the Second Lien 2025 Notes Secured Parties'
Prepetition Adequate Protection Claims (in the case of the Prepetition 2025 Second Lien Notes

Indenture Trustee), in each case with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Second Lien 507(b) Claims**"); which Second Lien 507(b) Claims shall have recourse to and be payable from all of the DIP Collateral.  The Second Lien 507(b) Claims shall be subject and subordinate to the Carve Out, the DIP Superpriority Claims, the First Lien 507(b) Claims and the prepetition claims of the Prepetition First Lien Notes Secured Parties and the Prepetition Credit Facility Secured Parties.  Except to the extent expressly set forth in this Interim Order, the Final Order, the DIP Documents or the DIP Credit Agreement, the Prepetition Second Lien Notes Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Second Lien 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have indefeasibly been paid in cash in full and all DIP Commitments have been terminated.  For the avoidance of doubt, each of (i) the Prepetition 2024 Second Lien Notes Indenture Trustee (for itself and for the benefit of the Second Lien 2024 Noteholders) and (ii) the Prepetition 2025 Second Lien Notes Indenture Trustee (for itself and for the benefit of the Second Lien 2025 Noteholders) shall not assert their Second Lien 507(b) Claims until the Discharge of First-Priority Obligations (as defined in the Junior Lien Intercreditor Agreement) has occurred, in accordance with the Junior Lien Intercreditor Agreement.

(f)     Midwest Notes Section 507(b) Claims.  The Prepetition Midwest Notes Indenture Trustee, for itself and for the benefit of the Prepetition Midwest Noteholders, are hereby granted, subject to the Carve Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Prepetition Midwest Noteholders' Prepetition Adequate Protection Claims, with, except as set forth in this Interim

Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Midwest Notes 507(b) Claims**" and, together with the First Lien 507(b) Claims and Second Lien 507(b) Claims, the "**507(b) Claims**"), which Midwest Notes 507(b) Claims shall have recourse to and be payable (on a joint and several basis) from any and all assets (including, without limitation, any DIP Collateral) held or owned by (i) the Prepetition Midwest Notes Issuer, (ii) Windstream Network Services of the Midwest, Inc. and/or (iii) and each of the Prepetition Midwest Notes Issuer's Debtor subsidiaries that are not currently obligors under the Prepetition Credit Agreement or the Prepetition First Lien Notes, but are (or become) DIP Loan Parties.  The Midwest Notes 507(b) Claims shall be subject and subordinate only to the Carve Out and the DIP Superpriority Claims, *pari passu* to the First Lien 507(b) Claims, and senior to the Second Lien 507(b) Claims.  Except to the extent expressly set forth in this Interim Order, the Final Order or the DIP Documents, the Prepetition Midwest Noteholders shall not receive or retain any payments, property or other amounts in respect of the Midwest Notes 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have indefeasibly been paid in cash in full and all DIP Commitments have been terminated.

(g)    First Lien Secured Parties Cash Payments.    In each case subject to reallocation or recharacterization as payment of principal under sections 506(a) and (b) of the Bankruptcy Code, (i) the Prepetition Agent, for the benefit of the applicable Prepetition Credit Facility Secured Parties, shall receive current payment in cash on the last business day of each month in an amount equal to the sum of (A) all unpaid interest accruing on all outstanding principal, interest, fees and other amounts owing under the Prepetition Credit Agreement (as of the Petition Date) and (B) all outstanding and unpaid fees and interest owing pursuant to Section 2.11 of the

Prepetition Credit Agreement (in the case of Letter of Credit participation fees, for the avoidance of doubt, at the rates applicable after giving effect to Section 2.12(c)), in each case (x) whether accruing prior to, on or after the Petition Date, (y) accruing, on and after the Petition Date, at the applicable rate provided for under Section 2.12(c) of the Prepetition Credit Agreement in respect of all outstanding amounts and (z) no outstanding Borrowing may be converted or continued as a Eurodollar Borrowing (each as defined in the Prepetition Credit Agreement) at any time following the Petition Date; (ii) the Prepetition First Lien Notes Indenture Trustee, for the benefit of the applicable First Lien Notes Secured Parties, shall receive current payment in cash on the last business day of each month in an amount equal to the sum of (A) all unpaid fees owing to the Prepetition First Lien Notes Indenture Trustee under the First Lien Notes Indenture and (B) all interest accruing on the Notes (as defined in the First Lien Notes Indenture), whether accruing prior to, on or after the Petition Date, in each case at the non-default rate, and (iii) the Prepetition Midwest Notes Indenture Trustee, for the benefit of the applicable Prepetition Midwest Notes Secured Parties, shall receive current payment in cash on the last business day of each month in an amount equal to the sum of (A) all unpaid fees owing to the Prepetition Midwest Notes Indenture Trustee under the Prepetition Midwest Notes Indenture and (B) all interest at the non-default rate accruing on the Prepetition Midwest Notes, in each case whether accruing prior to, on or after the Petition Date,  (the payments in this paragraph 15(g), the "**Adequate Protection Payments**").

(h)    First Lien Secured Parties Fees and Expenses.  In each case subject to reallocation and recharacterization as payment of principal under sections 506(a) and (b) of the Bankruptcy Code, without duplication of amounts required to be paid pursuant to the DIP Documents, (i) upon entry of this Interim Order, the DIP Loan Parties shall pay in cash all

reasonable and documented out-of-pocket professional fees, expenses and disbursements payable

to the advisors to the Prepetition Agent (and, as set forth below, the Prepetition Credit Agreement

Lenders, the Prepetition First Lien Notes Indenture Trustee, the Prepetition Midwest Notes

Indenture Trustee, the Midwest Noteholder Group that accrued prior to the Petition Date, including

the fees and expenses of (A) Simpson Thacher & Bartlett LLP, plus any prior counsel to the

Prepetition Agent, as counsel for the Prepetition Agent, (B) a financial advisor for the Prepetition

Agent (and the Debtors are authorized to execute or acknowledge any related engagement letter),

(C) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the ad hoc group of Prepetition

Term Loan Lenders (the "**First Lien Term Lender Ad Hoc Group**"), (D) Evercore Group, L.L.S.,

as financial advisor to the First Lien Term Lender Ad Hoc Group, (E) counsel for the Prepetition

First Lien Notes Indenture Trustee, (F) Shearman & Sterling LLP, as counsel to certain holders of

Prepetition Midwest Notes (the "**Midwest Noteholder Group**"), (G) conflicts counsel for the

Midwest Noteholder Group, and (H) counsel to the Prepetition Midwest Notes Indenture Trustee,

((A) through (H), collectively, the "**First Lien Advisors**") and (ii) subject to reallocation or

recharacterization as payment of principal under sections 506(a) and (b) of the Bankruptcy Code,

the DIP Loan Parties shall pay in cash all reasonable and documented out-of-pocket professional

fees, expenses and disbursements payable to the advisors to the Prepetition Agent, the Prepetition

First Lien Notes Indenture Trustee, the Prepetition Midwest Notes Indenture Trustee, the Midwest

Noteholder Group and the First Lien Term Lender Ad Hoc Group that have accrued on or after the

Petition Date, including the fees and expenses of the First Lien Advisors.  The payment of the fees,

expenses and disbursements set forth in clause (ii) of the foregoing sentence shall be made within

ten (10) days (which time period may be extended by the applicable professional) after the receipt

by the Debtors, the U.S. Trustee and the Creditors' Committee, if appointed (the "**Review Period**")

of invoices therefor without the necessity of filing formal fee applications or compliance with the U.S. Trustee's fee guidelines. Such invoices provided to the Debtors, the U.S. Trustee and, as applicable, the Creditors' Committee, shall be summary copies, which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine. Any objections raised by the Debtors, the U.S. Trustee or a Creditors' Committee with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional so as to be actually received prior to the expiration of the Review Period. Following the Review Period, any such objection will be subject to resolution by the Court to the extent it remains unresolved. Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Debtors. Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Closing Date (as defined in the DIP Documents) all adequate protection fees and expenses incurred under this paragraph 15(h) on or prior to such date without the need for any applicable professional to first deliver a copy of its invoice or other supporting documentation. Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the DIP Agent and DIP Lenders in connection with or with respect to the DIP Facility in connection or with respect to these matters, are hereby approved in full and shall not be subject to avoidance, disgorgement or any similar form of recovery by the Debtors or any other person. The Debtors intend to seek entry of the Final Order approving in full any and all such fees, costs and expenses paid prior to the Petition Date by any of the Debtors to the Prepetition Secured Parties.

(i)     *Monitoring of Prepetition Collateral*.   The Prepetition Agents and Prepetition Notes Trustees shall be permitted to retain expert consultants and financial advisors at the expense of the Debtors, which consultants and advisors shall be given reasonable access for purposes of monitoring the business of the Debtors and the value of the applicable Prepetition Collateral.

(j)     *Financial Reporting*.   The Debtors shall continue to provide the Prepetition Agents, Prepetition Notes Trustees, and the First Lien Term Lender Ad Hoc Group (through its counsel)with financial and other reporting substantially in compliance with the Prepetition Debt Documents and any reporting described in this Interim Order or the other DIP Documents; *provided* that no audited financial statements shall be required and there shall be longer deadlines to be mutually agreed for certain reporting; *provided*, *further*, that the Prepetition Midwest Notes Indenture Trustee, the Second Lien Ad Hoc Committee, the Prepetition 2024 Second Lien Notes Indenture Trustee, the First Lien Term Lender Ad Hoc Group (through its counsel), and the Prepetition 2025 Second Lien Notes Indenture Trustee shall each be entitled to all financial reporting delivered to the Prepetition Agent and the Prepetition First Lien Notes Indenture Trustee pursuant to the applicable Prepetition Debt Documents.

(k)     Notwithstanding anything to the contrary herein, except as expressly provided for herein with respect to the Prepetition Midwest Notes or in the following proviso, no Prepetition Secured Party shall receive the benefit of any Adequate Protection Liens on the assets of, or 507(b) Claims against, any Debtor except to the extent such Debtor was a prepetition obligor with respect to the applicable Prepetition Secured Party; *provided* that the First Lien Adequate Protection Liens shall attach to the assets of, and the First Lien 507(b) Claims shall be against, any Debtor that is or becomes a DIP Loan Party but that was not an obligor under the Prepetition Credit

Facilities subject to the terms hereof; and provided, further, that the Adequate Protection Liens shall extend to and encumber any Collateral that is or becomes DIP Collateral.

16.    *Budget Maintenance*.  The initial Budget shall depict, on a weekly and line-item basis, for the first thirteen (13) week period from the Closing Date (A) (i) projected cash receipts, (ii) projected disbursements, including ordinary course operating expenses and bankruptcy-related expenses (including asset sales and any other fees and expenses relating to the DIP Documents), (iii) net cash flow, and (iv) DIP Facilities availability and total available liquidity, and (B) the other items set forth therein and such other information requested by the DIP Agent, and such initial Budget shall be approved by, and in form and substance reasonably satisfactory to, the DIP Agent in its sole discretion (it being acknowledged and agreed that the Budget attached hereto as **Schedule 1** is approved by and satisfactory to the DIP Agent).  The Budget shall be updated, modified or supplemented by the Debtors from time to time and upon the reasonable request of the DIP Agent (acting at the direction of the Required DIP Lenders), but in any event the Budget shall be updated by the Debtors not less than one time in each four (4) consecutive week period, and each such updated, modified or supplemented budget shall be deemed an approved Budget unless the DIP Agent acting in its reasonable discretion, objects by written notice delivered to the Debtors on or within five (5) business days after the receipt of such updated, modified or supplemented budget; *provided* that, in the event that the DIP Agent objects, the current approved Budget shall remain the approved Budget until the DIP Agent and the Debtors agree as to an updated, modified or supplemented Budget.  Each Budget delivered to the DIP Agent shall be accompanied by such supporting documentation as reasonably requested by the DIP Agent.  Each Budget shall be prepared in good faith based upon assumptions that the Debtors believe to be reasonable.  A copy of any Budget (or updated Budget) shall be delivered to counsel for a Creditors'

Committee (if appointed), counsel to the Prepetition Agent, counsel to the Prepetition First Lien

Notes Indenture Trustee, counsel to the First Lien Term Lender Ad Hoc Group, counsel to the

Midwest Noteholder Group, and the U.S. Trustee after it has been approved in accordance with

the DIP Documents.

17.    *Reservation of Rights of Prepetition Secured Parties*.  Under the circumstances and

given that the above-described adequate protection is consistent with the Bankruptcy Code,

including section 506(b) thereof, the Court finds that the adequate protection provided herein is

reasonable and sufficient to protect the interests of the Prepetition Secured Parties and any other

parties' holding interests that are secured by Primed Liens; *provided* that any of the Prepetition

Agent, or Prepetition Notes Trustees, acting on its own behalf or at the direction of the requisite

Prepetition Secured Parties may request further or different adequate protection, subject to and

consistent with the terms of the Intercreditor Agreements, and the Debtors or any other party in

interest may contest any such request.  In addition, the Prepetition 2024 Second Lien Notes

Indenture Trustee and the Prepetition 2025 Second Lien Notes Indenture Trustee reserve all rights

to assert claims for interest, if any, including default interest, and all other remedies provided under

the Prepetition 2024 Second Lien Notes Documents and the Prepetition 2024 Second Lien Notes

Documents, subject to the Intercreditor Agreements.

18.    *Consent and Consent Fee*.  As soon as reasonably practicable after entry of this

Interim Order, the Debtors are authorized to distribute to all Prepetition Lenders of record as of

such distribution date a request for formal consent (pursuant to documentation reasonably

satisfactory to the Debtors, the Prepetition Agent, and First Lien Term Lender Ad Hoc Group) to

the DIP Loan Parties' use of Cash Collateral and the other Prepetition Collateral, and the DIP Loan

Parties' entry into the DIP Documents in accordance with and subject to the terms and conditions

in this Interim Order, the Final Order and the DIP Documents, and each such Prepetition Lender

that affirmatively provides such formal consent within ten (10) days after the launch of such

consent shall earn and receive a consent fee in the amount of 0.75 percent of such Prepetition

Lender's outstanding principal amount of loans and Revolving Credit Exposure (as defined in

Prepetition Credit Agreement) under the Prepetition Credit Facilities; provided that, to the extent

the Debtors have not confirmed a chapter 11 plan or otherwise effectuated the Discharge of First-

Priority Obligations before the date that is 18 months after the Petition Date, each such Prepetition

Lender that affirmatively provides such formal consent within such ten (10) day period shall also

receive an additional consent fee in the amount of 0.50 percent of such Prepetition Lender's

outstanding principal amount of loans and Revolving Credit Exposure under the Prepetition Credit

Facilities; provided, that this additional consent fee shall be earned as of the date of entry of this

Interim Order.  All parties' rights are reserved (and shall not be prejudiced) to the extent the

Prepetition Lenders that so provide such consent do not constitute Required Lenders under and as

defined in the Prepetition Credit Agreement.

19.     *Perfection of DIP Liens and Adequate Protection Liens.*

(a)     Without in any way limiting the automatically effective perfection of the

DIP Liens granted pursuant to paragraph 8 hereof and the Adequate Protection Liens granted

pursuant to paragraph 12(a) and (b) hereof, the DIP Agent, the DIP Lenders and the Prepetition

Secured Parties are hereby authorized, but not required, to file or record (and to execute in the

name of the DIP Loan Parties, as their true and lawful attorneys, with full power of substitution,

to the maximum extent permitted by law) financing statements, trademark filings, copyright filings,

mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control

over cash or securities, or take any other action in order to validate and perfect the liens and security

interests granted to them hereunder.  Whether or not the DIP Agent, on behalf of the DIP Lenders or the Prepetition Secured Parties shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over any cash or securities, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order.  Upon the request of the DIP Agent or Prepetition Agent, each of the Prepetition Secured Parties and the DIP Loan Parties, without any further consent of any party, is authorized (in the case of the DIP Loan Parties) and directed (in the case of the Prepetition Secured Parties) to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)     A certified copy of this Interim Order may, in the discretion of the DIP Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Interim Order for filing and/or recording, as applicable.  The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agent to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

20.     *Preservation of Rights Granted Under this Interim Order.*

(a)     Other than the Carve Out and other claims and liens expressly granted by this Interim Order, no claim or lien having a priority superior to or *pari passu* with those granted

by this Interim Order to the DIP Agent and the DIP Lenders or the Prepetition Secured Parties shall be permitted while any of the DIP Obligations or the Adequate Protection Obligations remain outstanding, and, except as otherwise expressly provided in this Interim Order, the DIP Liens and the Adequate Protection Liens shall not be: (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the DIP Loan Parties' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the DIP Loan Parties.

(b)     The Debtors shall not seek, and it shall constitute an Event of Default and terminate the right of the DIP Loan Parties to use Cash Collateral if any of the DIP Loan Parties, without the prior written consent of the Required DIP Lenders and the Prepetition Agent seeks, proposes or supports (whether by way of motion or other pleadings filed with the Court or any other writing executed by any DIP Loan Party or by oral argument), or if there is entered or confirmed (in each case, as applicable), or if there occurs:

(i)     a failure of the Debtors to make any payment, including, for the avoidance of doubt any portion of the consent fee set forth in paragraph 18, under this Interim Order to any of the Prepetition Secured Parties when due;

(ii)    a failure of the Debtors to (x) observe or perform any of the material terms or provisions contained in this Interim Order or (y) comply with any covenant or agreement in this Interim Order in any material respect;

(iii)   any modifications, amendments, reversal or extensions of this Interim Order;

(iv)   an order converting to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases;

(v)   an order appointing a chapter 11 trustee in the Chapter 11 Cases;

(vi)   an order appointing an examiner with enlarged powers in the Chapter 11 Cases (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code);

(vii)   a plan of reorganization other than plan that provides for termination of the Commitments and payment in full in cash of the DIP Obligations being proposed by the Debtors or confirmation thereof;

(viii)   the sale of all or substantially all of the assets of the DIP Loan Parties (except to the extent permitted under the DIP Documents), which does not provide for the repayment in full in cash of all DIP Obligations (other than any contingent indemnification or expense reimbursement obligations for which no claim has been made);

(ix)   the occurrence of the Maturity Date under the DIP Credit Agreement (without giving effect to any amendment or modifications thereto) unless the Prepetition Agent affirmatively consents to the continued use of Cash Collateral at such time; or

(x)   the expiration of the Remedies Notice Period following the occurrence of any "Event of Default" as defined in the DIP Documents, unless such Event of Default has been cured or waived or the DIP Agent or the Required DIP Lenders have agreed in writing with the Debtors not to exercise any further remedies.

In the case of the occurrence of the Event of Default described in clause (l) of the defined "Events of Default" in the DIP Term Sheet, after giving effect to any grace, cure or similar period under the DIP Credit Agreement (without giving effect to any amendment or modifications thereto), the Prepetition Agent shall be entitled to move to terminate the DIP Loan Parties' rights to use Cash Collateral on five (5) business days' notice, subject to the Debtors' right to seek nonconsensual use of Cash Collateral. Any consent rights granted to the Prepetition Agent in this paragraph 20 shall be exercised subject to the terms of the Prepetition Credit Agreement. Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the

Bankruptcy Code or otherwise is at any time entered:  (i) the DIP Superpriority Claims, the 507(b)

Claims, the DIP Liens and the Adequate Protection Liens shall continue in full force and effect

and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and

Adequate Protection Obligations shall have been indefeasibly paid in full in cash (and that such

DIP Superpriority Claims, 507(b) Claims, DIP Liens and Adequate Protection Liens shall,

notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights

granted by this Interim Order shall not be affected; and (iii) this Court shall retain jurisdiction,

notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security

interests referred to in this paragraph and otherwise in this Interim Order.

(c)    If any or all of the provisions of this Interim Order are hereafter reversed,

modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect: (i) the

validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations

incurred prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agent

and Prepetition Notes Trustees, as applicable, of the effective date of such reversal, modification,

vacatur or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate

Protection Liens.  Notwithstanding any such reversal, modification, vacatur or stay of any use of

Cash Collateral, any DIP Obligations, DIP Liens, Adequate Protection Obligations or Adequate

Protection Liens incurred by the DIP Loan Parties to the DIP Agent, the DIP Lenders or the

Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the

DIP Agent or the Prepetition Agent and Prepetition Notes Trustees, as applicable, of the effective

date of such reversal, modification, vacatur or stay shall be governed in all respects by the original

provisions of this Interim Order, and the DIP Agent, the DIP Lenders and the Prepetition Secured

Parties shall be entitled to all the rights, remedies, privileges and benefits granted in sections

364(e) and 363(m) of the Bankruptcy Code, this Interim Order and the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

(d)      Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, the 507(b) Claims and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases or terminating the joint administration of these Chapter 11 Cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the DIP Loan Parties have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations; or (iv) any other act or omission.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Chapter 11 Cases, in any successor cases if these Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the Commitments have been terminated.

21.     *Effect of Stipulations on Third Parties.*  The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon the Debtors, but not their estates, in all circumstances and for all purposes.  The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases (including the Creditors' Committee, if any) and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless: (a) such committee or any other party in interest with requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in this paragraph 21) by no later than (i) (x) with respect to parties in interest with requisite standing other than the Creditors' Committee, 90 calendar days after entry of the Final Order and (y) with respect to the Creditors' Committee, 75 calendar days after the appointment of the Creditors' Committee, (ii) any such later date as has been agreed to, in writing, by the Prepetition Agent (with the consent of the Required Lenders (as defined in the Prepetition Credit Agreement), the DIP Agent, the Prepetition First Lien Indenture Notes Trustee, Prepetition Midwest Notes Indenture Trustee, and the First Lien Term Lender Ad Hoc Group, as applicable, and (iii) any such later date as has been ordered by the Court for cause upon a motion filed and served within any applicable period of time set forth in this paragraph (the time period established by the foregoing clauses (i), (ii), and (iii), the "**Challenge Period**"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Debt or the Prepetition Liens, or (B) otherwise asserting or prosecuting any action for

preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "**Challenges**") against the Prepetition Secured Parties or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each, a "**Representative**" and, collectively, the "**Representatives**") in connection with matters related to the Prepetition Debt Documents, the Prepetition Debt, the Prepetition Liens and the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred.  If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then: (a) the Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding on all parties in interest, including, without limitation, the Creditors' Committee (if any); (b) the obligations of the DIP Loan Parties under the Prepetition Debt Documents, including the Prepetition Debt, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, recoupment, offset or avoidance, for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s); (c) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense; and (d) the Prepetition Debt and the Prepetition Liens

on the Prepetition Collateral shall not be subject to any other or further claim or challenge by the

Creditors' Committee (if any), any non-statutory committees appointed or formed in the Chapter

11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates,

including, without limitation, any successor thereto (including, without limitation, any chapter 7

trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any

defenses, claims, causes of action, counterclaims and offsets by the Creditors' Committee (if any),

any non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party

acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any

successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or

examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code

or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out

of or relating to any of the Prepetition Debt Documents shall be deemed forever waived, released

and barred.  If any such Challenge is timely filed during the Challenge Period, the stipulations,

admissions, agreements and releases contained in this Interim Order shall nonetheless remain

binding and preclusive (as provided in the second sentence of this paragraph) on any statutory or

nonstatutory committee appointed or formed in the Chapter 11 Cases, including the Creditors'

Committee (if any), and on any other person or entity, except to the extent that such stipulations,

admissions, agreements and releases were expressly and successfully challenged in such Challenge

as set forth in a final, non-appealable order of a court of competent jurisdiction.  Nothing in this

Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including the

Creditors' Committee (if any) or any non-statutory committees appointed or formed in these

Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the

Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition

Debt Documents, the Prepetition Debt or the Prepetition Liens.

22.       *Limitation on Use of DIP Financing Proceeds and Collateral.*  Notwithstanding

any other provision of this Interim Order or any other order entered by the Court, no DIP Loans,

DIP Collateral, Prepetition Collateral (including Cash Collateral) or any portion of the Carve Out,

may be used directly or indirectly, (a) in connection with the investigation, threatened initiation or

prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against

any of the DIP Agent, the DIP Lenders, the First Lien Secured Parties or their respective

predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, in each case in

their respective capacity as such, or any action purporting to do the foregoing in respect of the DIP

Obligations, DIP Liens, DIP Superpriority Claims, Prepetition Credit Facility Debt, the Prepetition

First Lien Notes Obligations or the Midwest Notes Obligations (collectively, the "**First Lien**

**Obligations**"), the Prepetition Credit Facility Liens, the Prepetition First Lien Notes Liens, the

Midwest Notes Liens, and/or the Adequate Protection Obligations and Adequate Protection Liens

granted to the First Lien Secured Parties, as applicable, or (ii) challenging the amount, validity,

perfection, priority or enforceability of or asserting any defense, counterclaim or offset with

respect to the DIP Obligations, the First Lien Obligations and/or the liens, claims, rights, or

security interests securing or supporting the DIP Obligations granted under this Interim Order, the

Final Order, the DIP Documents or the Prepetition Debt Documents in respect of the First Lien

Obligations, including, in the case of each (i) and (ii), without limitation, for lender liability or

pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable

non-bankruptcy law or otherwise (provided that, notwithstanding anything to the contrary herein,

the Debtors and the Creditors' Committee (if appointed) may use the proceeds of the DIP Loans

and/or DIP Collateral or Prepetition Collateral (including Cash Collateral) to investigate but not to prosecute (A) the claims and liens of the Prepetition Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties up to an aggregate cap of no more than $50,000), (b) to prevent, hinder, or otherwise delay or interfere with the Prepetition Secured Parties', the DIP Agent's or the DIP Lenders', as applicable, enforcement or realization on the Prepetition Debt, Prepetition Collateral, DIP Obligations, DIP Collateral, and the liens, claims and rights granted to such parties under the Orders, each in accordance with the DIP Documents, the Prepetition Debt Documents or this Interim Order in contravention of the Debtors' stipulations set forth herein; (c) to seek to modify any of the rights and remedies granted to the Prepetition Secured Parties, the DIP Agent or the DIP Lenders under this Interim Order, the Prepetition Debt Documents or the DIP Documents, as applicable; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the Definitive Documentation) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, adequate protection liens and superpriority claims and liens granted to the Prepetition Secured Parties; or (e) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved or authorized by the Bankruptcy Court, agreed to in writing by the Required DIP Lenders, expressly permitted under this Interim Order or permitted under the DIP Documents (including the Budget), in each case unless all DIP Obligations, Prepetition Debt, adequate protection obligations, and claims granted to the DIP Agent, DIP Lenders or Prepetition Secured Parties under this Interim Order, have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit) or otherwise agreed to in writing by the Required DIP Lenders.

23.     *Loss or Damage to Collateral.*  Nothing in this Interim Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or any of the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts. So long as the DIP Agent and the DIP Lenders comply with their obligations under the DIP Documents and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Agent and the DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and (b) all risk of loss, damage or destruction of the DIP Collateral shall be borne by the DIP Loan Parties other than such loss, damage or destruction caused by the DIP Agent or the DIP Lenders.

24.     *Interim Order Governs.*  In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents (including, but not limited to, with respect to the Adequate Protection Payments) or any other order entered by this Court, the provisions of this Interim Order shall govern.  Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to any authorization contained in any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Interim Order and the DIP Documents, including, without limitation, the Approved Budget.

25.     *Binding Effect; Successors and Assigns.*  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agent, the DIP Lenders, the

Prepetition Secured Parties, the Creditors' Committee (if any), any other statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided* that the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

26.    *Limitation of Liability*.

(a)    In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Agent and the DIP Lenders shall not (i) be deemed to be in "control" of the operations of the Debtors; (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; and (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors, so long as the DIP Agent's and the DIP Lenders' actions do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a vessel or facility owned or operated by a Debtor, or otherwise cause liability to arise to the federal or state government or the status of "responsible person" or "managing agent" to exist under applicable law (as such terms or similar terms are used in the

United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any similar federal or state statute).

(b)        Nothing in this Interim Order, the Final Order, or the DIP Documents shall permit the Debtors to violate 28 U.S.C. § 959(b)

(c)        As to the United States, its agencies, departments, or agents, nothing in this Interim Order, the Final Order, or the DIP Documents shall discharge, release or otherwise preclude any valid right of setoff or recoupment that any such entity may have.

27.        *Master Proof of Claim*.  The Prepetition Agent, Prepetition Notes Trustees and/or any other Prepetition Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases or any successor case in order to assert claims on behalf of themselves or the Prepetition Secured Parties for payment of the Prepetition Debt arising under the Prepetition Debt Documents or the Midwest Notes Documents, including, without limitation, any principal, unpaid interest, fees, expenses and other amounts under the Prepetition Debt Documents.  The statements of claim in respect of the such indebtedness set forth in this Interim Order, together with any evidence accompanying the Motion and presented at the Interim Hearing, are deemed sufficient to and do constitute proofs of claim in respect of such debt and such secured status.  However, in order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, each of the Prepetition Agent, the Prepetition Notes Trustees and other Prepetition Midwest Notes Secured Parties is authorized to file in the Debtors' lead chapter 11 case *In re Windstream  Holdings, Inc.*, Case No. 19-22312 (RDD), a master proof of claim on behalf of its respective Prepetition Secured Parties on account of any and all of their respective claims arising under the applicable Prepetition Debt Documents and hereunder (each, a "**Master Proof of Claim**") against each of the Debtors.  Upon the filing of a Master Proof of Claim by any

of the Prepetition Agent and Prepetition Notes Trustees, such entity shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors (or, in the case of the Prepetition Midwest Notes Indenture Trustee or other Prepetition Midwest Notes Secured Parties, against each of the Prepetition Midwest Notes Issuer and its restricted subsidiaries) of any type or nature whatsoever with respect to the applicable Prepetition Debt Documents, and the claim of each applicable Prepetition Secured Party (and each of its respective successors and assigns), named in a Master Proof of Claim shall be treated as if such entity had filed a separate proof of claim in each of these Chapter 11 Cases (or, in the case of the Prepetition Midwest Notes Indenture Trustee, the Chapter 11 Cases of the Prepetition Midwest Notes Issuer and its restricted subsidiaries).  The Master Proofs of Claim shall not be required to identify whether any Prepetition Secured Party acquired its claim from another party and the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The provisions of this paragraph 27 and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the Prepetition Agent.

28.    *Insurance*.  To the extent that any of the Prepetition Agent or Prepetition Notes Trustees is listed as loss payee under the Borrowers' or Guarantors' insurance policies, the DIP Agent is also deemed to be the loss payee under such insurance policies and shall act in that

capacity and distribute any proceeds recovered or received in respect of any such insurance policies, first, to the payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted), and second, to the payment of the applicable Prepetition Debt.

29.     *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

30.     *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

31.     *Payments Held in Trust*.  Except as expressly permitted in this Interim Order or the DIP Documents, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order.

32.     *Miscellaneous*.   Upon request of any of the DIP Agent, Prepetition Agent, Prepetition First Lien Notes Indenture Trustee, Midwest Noteholder Group, and First Lien Term Lender Ad Hoc Group, the Debtors' advisors shall make themselves reasonably available (including for reasonable weekly telephone conferences) to discuss significant items and developments in the Chapter 11 Cases, including with respect to any material contracts, any material litigation, and any material operational or regulatory items.

33.     *Credit Bidding*.   (a) The DIP Agent shall have the right to credit bid, in accordance with the DIP Documents, up to the full amount of the DIP Obligations in any sale of the DIP Collateral, and (b) subject to the Intercreditor Agreements, the Prepetition Secured Parties shall have the right to credit bid up to the full amount of the Prepetition Debt in any sale of the DIP Collateral, in each case, as provided for in section 363(k) of the Bankruptcy Code and subject to any successful Challenge, without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363(k) or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

34.     *Bankruptcy Rules*.   The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

35.     *Necessary Action*.   The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Interim Order.

35A.    *Nunc Pro Tunc Approval*.   The Court granted the interim relief sought by the DIP Motion at the Interim Hearing, and the DIP Lenders and Debtors acted in reliance thereon prior to the entry of this Interim Order.   This Interim Order is effective *nunc pro tunc* to the Court's approval granted at the Interim Hearing.

36.    *Retention of Jurisdiction*.    The Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

37.    *Final Hearing*.    The Final Hearing is scheduled for April 16, 2019 at 10:00 a.m. before this Court.

38.    *Objections*.    Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon (a) the U.S. Trustee; (b) entities listed as holding the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Debtors, 4001 North Rodney Parham Road, Little Rock, Arkansas 72212 (Attn.: Office of the General Counsel); (d) counsel to the Debtors, Kirkland & Ellis LLP, 300 N. LaSalle Drive, Chicago, Illinois 60654 (Attn.: Brad Weiland and John R. Luze) and 601 Lexington Avenue, New York, New York 10022 (Attn.: Stephen E. Hessler, P.C.); (e) counsel to the DIP Agent, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (Attn.: Timothy Graulich, Natasha Tsiouris and Erik Jerrard); (f) counsel to the Prepetition Agent, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Attn.: Sandeep Qusba and Nicholas Baker); (g) counsel to the First Lien Term Lender Ad Hoc Group, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019 (Attn: Brian Hermann and Samuel Lovett); (h) counsel to U.S. Bank N.A., Maslon LLP, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, Minnesota 55402 (Attn: Clark T. Whitmore); (i) counsel to the Midwest Noteholder Group, Shearman & Sterling LLP, 599 Lexington Avenue, New York, New York 10022 (Attn. Joel Moss and Jordan Wishnew); (j) the Office of the United States Attorney for the Southern District of New York; (k) the state attorneys

general for states in which the Debtors' conduct business; (l) the Internal Revenue Service; (m) the Securities and Exchange Commission; (n) the Federal Communications Commission; and (o) any other party that has filed a request for notices with this Court, with a copy to the Court's chamber, in each case to allow actual receipt by the foregoing no later than April 1, 2019 at 4:00 p.m., prevailing Eastern Time and otherwise in conformity with the Court's order establishing notice and case management procedures.

39.    The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing, including, without limitation, notice that the Debtors will seek approval at the Final Hearing of a waiver of rights under sections 506(c) and 552(b) of the Bankruptcy Code) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court and to the Creditors' Committee after the same has been appointed, or such Creditors' Committee's counsel, if the same shall have been appointed.

Dated:    White Plains, New York
          March 1, 2019

                                        /s/Robert D. Drain
                                        THE HONORABLE ROBERT D. DRAIN
                                        UNITED STATES BANKRUPTCY JUDGE

## **Schedule 1**

### **Budget**