Steven J. Reisman
Tami Kameda Sims (*pro hac vice pending*)
Shaya Rochester
Cindi M. Giglio
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, NY 10022
Telephone:     (212) 940-8800
Facsimile:     (212) 940-8776

*Proposed Conflicts Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WINDSTREAM HOLDINGS, INC., et al.,[1] | ) | Case No. 19-22312 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| WINDSTREAM HOLDINGS, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Adv. Pro. No. _____ |
| | ) | |
| vs. | ) | |
| | ) | |
| CHARTER COMMUNICATIONS, INC. and CHARTER COMMUNICATIONS OPERATING, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>COMPLAINT</u>**

---

[1] The last four digits of Debtor Windstream Holdings, Inc.'s tax identification number are 7717.  Due to the large number of debtor entities in these Chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://www.kccllc.net/windstream. The location of the Debtors' service address for purposes of these chapter 11 cases is: 4001 North Rodney Parham Road, Little Rock, Arkansas 72212.

Windstream Holdings, Inc. and its debtor affiliates as debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors" or "Windstream"), by and through their undersigned attorneys, allege for this Complaint and claims for relief against defendants Charter Communications, Inc. and Charter Communications Operating, LLC (collectively, "Charter") as follows:

## NATURE OF THE ACTION

1.      As was publicly disclosed by Windstream in its First Day filings in these Chapter 11 cases, Windstream did not arrive in Chapter 11 due to operational failures, and does not expect or plan to liquidate.  Instead, the Debtors have every expectation that their operations will continue uninterrupted and their approximately 11,600 employees will be able to continue to focus on providing best-in-class service to all of Windstream's valued customers.  The primary aim of these Chapter 11 cases is to serve as a foundation for a financial restructuring.

2.      Despite these facts, one of Windstream's direct competitors, Charter through its brand Spectrum, commenced a scare-tactic campaign to mislead, deceive, and confuse consumers regarding the reason, status, and consequences of Windstream's Chapter 11 cases. Charter disseminated false advertisements, directly targeting Windstream's strongest customer bases in Alabama, Georgia, Kentucky, Ohio, Nebraska, and North Carolina.  With a clear intent to deceive, Charter's advertisements were sent to Windstream's customers in a manner designed to make customers believe that the communication was from Windstream.  On the envelopes, Charter used Windstream's trademark and copied the same distinct color pattern from Windstream's current advertising campaign.  Charter deceitfully used this bait-and-switch tactic to lure Windstream customers into opening the advertisement.  Instead of a Windstream communication as consumers would have expected, the envelopes contained false and

2

misleading statements about Windstream's Chapter 11 cases.  The advertisements falsely implied that due to its bankruptcy, Windstream would not be able to continue services and was going to liquidate.  The advertisements urged customers to switch to Charter because Windstream was in imminent danger of going out of business.

3.      Charter is intentionally deceiving Windstream's customers.  The Chapter 11 filing has not disrupted the Debtors' operations nor created any "uncertainty" about Windstream's ability to continue serving its customers.  To the contrary, the Debtors have secured $1 billion of DIP financing and have every expectation that they will emerge from Chapter 11 as a going concern and as a strong and viable company for years to come.  Charter's tactics damage Windstream's efforts to emerge from Chapter 1 as a successful going concern, thereby threatening Windstream's ability to protect its customers, employees, creditors, and vendors. Charter's conduct is despicable and must be stopped immediately, before causing any further harm to the Debtors' restructuring efforts.  The only so-called "uncertainty" surrounding the Debtors' Chapter 11 cases is the result of Charter's *own* actions.  Specifically, at the same time that Charter sent false and deceptive advertisements to Windstream's customers, Charter intentionally disconnected service to some of Windstream's customers, ███████████████

████████████████████████████████████████

████████████████  Accordingly, to the extent there is any "uncertainty" created by the Debtors' Chapter 11 filing, it is entirely manufactured by Charter.

4.      The great irony to Charter's tactics, and which makes them particularly offensive, is that Charter is engaging in virtually the same bad acts for which Charter sought—and obtained—a TRO in its own Chapter 11 cases ten years ago.  Specifically, in 2009, Charter sought a TRO claiming that DirecTV, one of its biggest competitors, falsely stated and

deceptively implied that Charter's Chapter 11 bankruptcy filing would adversely affect Charter's

customers and cause it to cease operations.  As Charter itself recognized, this type of

manipulative campaign to distort the truth behind a Chapter 11 filing in order to cause consumer

confusion and deceit, violates multiple federal and state statutes, causes irreparable injury, and is

properly subject to immediate injunctive relief

5.      As set forth in detail below, Charter's false and misleading statements about

Windstream's products and services violate the Lanham Act and other similar state statutes,

entitling Windstream to both injunctive relief and monetary damages.



6.      Through its actions, Charter has blatantly and willfully disregarded the

Bankruptcy Code's automatic stay in multiple ways.  First, Charter's systematic and widespread

campaign of sending false and deceptive advertisements to Windstream's customers impairs the

Debtors' goodwill, which constitutes property of the Debtors' estate.

Charter's attempt to collect

prepetition debt constitutes a clear-cut violation of the automatic stay.  For these reasons, as set

forth in more detail herein, Windstream is entitled to damages, including attorneys' fees.

7.      In sum, Charter has contravened numerous federal and state statutes,

, and violated the Bankruptcy Code's automatic stay.  The

Debtors respectfully request that the Court immediately enjoin Charter from engaging further in

such tactics to prevent irreparable injury to the Debtors and their estates, order Charter to pay

damages and attorneys' fees, and order such other relief as the Court deems appropriate.

## JURISDICTION AND VENUE

8.      The Bankruptcy Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York, dated February 1, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Bankruptcy Court in connection with this Adversary Proceeding to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES ARE DIRECT COMPETITORS

10.      Windstream is a FORTUNE 500 company organized under the laws of Delaware.

11.      Windstream is a leading provider of advanced network communications, technology, broadband, entertainment, and core transport solutions to consumer and business customers across the United States, with a national footprint spanning approximately 150,000 fiber miles.  Windstream offers broadband and entertainment solutions to consumers and small businesses, primarily in rural areas, in eighteen states.  Central to Windstream's growth is a focused operational strategy for each of its business segments with the overall objective of generating strong financial returns for its stakeholders.  Windstream's operational performance is on an upward trajectory—throughout 2018, Windstream added over 14,000 new broadband subscribers and improved strategic sales revenue.

12.      Defendant Charter is a publicly traded telecommunications company incorporated in the State of Delaware and headquartered in Connecticut.  Charter and its affiliates and

subsidiaries provide cable and internet services to residential and commercial customers in forty-one states.  Through its brand Spectrum, introduced in 2013, Charter has expanded its business to over twenty-eight million customers.

13.     Windstream and Charter compete directly with one another to provide telecommunications service to customers throughout the United States.  Charter is available in both urban and rural areas, including in every state Windstream is available.  Specifically, Charter has a strong presence, through coverage and customers, in some of Windstream's top states including Kentucky, Georgia, and North Carolina.  The two companies also have competing retail stores in several areas, including Lexington, KY, a key market for Windstream.

## BACKGROUND

**Windstream's Chapter 11 Filing Will Not Disrupt Its Operations Or Its Ability To Serve Its Customers**

14.     On February 25, 2019 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Chapter 11 filing was not the result of any failures in the Debtors' operations nor caused by concerns with the overall financial health of the Debtors' businesses.  Rather, the Chapter 11 filing was precipitated by an adverse decision issued by the United States District Court for the Southern District of New York, holding that Windstream had defaulted on an indenture with certain of Windstream's unsecured notes.  The Debtors will address and resolve the claims arising from this decision pursuant to a plan of reorganization under which Windstream expects to emerge from Chapter 11 as a going concern and as a strong and viable company for years to come.

15.     Indeed, in the months prior to the Chapter 11 filing, Windstream's operations and businesses experienced a particularly strong period of growth.  For example:

- Windstream ended the fourth quarter with three consecutive quarters of strategic sales in excess of total enterprise sales.
- The fourth quarter of 2018 represented the third consecutive quarter of consumer broadband growth, with Windstream adding over 14,000 subscribers in 2018.
- February 2019 represented the 12th consecutive month of consumer broadband growth.
- The growth was driven by both stronger sales and lower churn as Windstream benefited from recent investments in its network.
- Windstream has steadily increased the percentage of its footprint with access to higher-speed internet.
- For the foregoing reasons, the year prior to the Chapter 11 filing was a "transformational year," including consumer broadband subscriber growth.

16.    This strong operational momentum is not expected to be disrupted by the Chapter 11 filing.  The Bankruptcy Court has already granted the relief requested in all of the Debtors' "first day" motions, to help ensure that the Debtors' businesses will continue operating in the ordinary course and that the Debtors will be able to pay employees, maintain relationships with vendors and business partners and, most importantly, serve customers as usual without disruption.  Moreover, and in a testament to the strength of Windstream's business operations and reorganizational prospects, the Debtors were able to secure $1 billion in DIP financing within one week of the Petition Date.  This DIP financing will provide the Debtors with sufficient capital and liquidity to pay vendors, employees, business partners and other counterparties in the ordinary course throughout the pendency of the Chapter 11 cases.

17.    For the foregoing reasons, it is expected that the Chapter 11 filing will not disrupt the Debtors' operations nor Windstream's ability to continue serving its customers.  Contrary to the misleading advertisements published and mailed by Charter to Windstream's customers, the Debtors did not file for Chapter 11 to liquidate or downsize operations, and there has been no interruption to Windstream's operations or services.  Rather, Windstream filed for Chapter 11 simply to restructure the company's balance sheet.  This is not a matter of opinion, but of fact.

**Charter Launches A False And Misleading Advertising Campaign**

18.      Shortly after Windstream filed for Chapter 11 protection, Charter commenced a false and misleading advertising campaign designed to cause irreparable injury and damage to Windstream's reputation and business.  Charter targeted Windstream customers in Alabama, Georgia, Kentucky, Ohio, Nebraska, and North Carolina, which are several of Windstream's top performing states.

19.      Charter disseminated a direct mail campaign containing a letter advertisement to Windstream's customers.  On the envelopes for the advertisement, Charter intentionally utilized Windstream's trademark[2] and signature color pattern to mislead Windstream customers into believing that the advertisement came directly from Windstream.  Indeed, Charter's advertisement stated that it was "**Important Information Enclosed for Windstream Customers**."  The envelope contained a highly visible color strip that copied the same distinct and eye-catching color pattern of dark purple gradually blending to a bright pink that Windstream is using in a current, pervasive marketing campaign.  The envelope did not contain Charter's trademark, logos, or any other indicia that would otherwise suggest that the contents of the envelope were from Charter.  Set forth below is an image of the envelope that Windstream customers received from Charter:

---

[2] Windstream Services, LLC, who is among the debtors, owns several federal trademark registrations covering the word WINDSTREAM for various services, such as communication services that provide network access to multiple users.  See, e.g., U.S. Trademark Registration No. 3390047 (filed on March 10, 2006).

**CHARTER ENVELOPE**



20.    Windstream's current advertising campaign for Kinetic Internet has been running since September 2017 in all of Windstream's markets, including in Alabama, Georgia, Kentucky, Ohio, Nebraska, and North Carolina, where Charter's false advertisements were sent. Windstream's advertising campaign has consistently showcased the distinct and eye-catching color pattern of dark purple gradually blending to a bright pink for at least the past 12 months. Charter deliberately used Windstream's distinct color pattern on the envelopes to cause consumer confusion.

21.    Below are copies of Windstream advertisements and its webpage:





22.     The envelopes were thus designed with Windstream's mark and distinct color pattern to make Windstream's customers believe that the letters came from Windstream, and thus, more likely to open the letters.  The envelopes, however, were not from Windstream and did not contain legitimate information concerning Windstream's business.  Instead, they contained a Charter advertisement, which contained false and misleading statements about Windstream.  In particular, the advertisements state:

**Windstream Customers,**

**Don't Risk Losing Your Internet and TV Services.**

Windstream has filed for Chapter 11 bankruptcy, which means uncertainty.  Will they be able to provide the Internet and TV services you rely on in the future?  To ensure you are not left without vital Internet and TV services, switch to Spectrum.  With a network built for the future, Spectrum is here for the long haul . . . .

Goodbye, Windstream.

Hello, Spectrum.

. . .

Windstream's future is unknown, but Spectrum is here to stay—delivering internet and TV services you can count on. . . .[3]

23.      Charter's advertisements falsely state and imply that Windstream's bankruptcy means that Windstream will not be able to provide services.  It further falsely states that Windstream's bankruptcy necessarily means "uncertainty," even though Windstream's Chapter 11 filing has not disrupted its operations and there is no expectation that Windstream will be forced to liquidate or even downsize operations.  Indeed, the Bankruptcy Court has already granted relief to help ensure that Windstream's operations will continue in the ordinary course. Further, the use of the phrase "Goodbye, Windstream," falsely implies that Windstream is going out of business altogether, when there are no plans for liquidation or downsizing.  A true and accurate copy of Charter's advertisement is copied below.

---

[3] The advertising campaign states that the offers therein will last through April 25, 2019.

**CHARTER ADVERTISEMENT**




# Windstream Customers,
## Don't Risk Losing Your Internet and TV Services.

Windstream has filed for Chapter 11 bankruptcy, which means uncertainty. Will they be able to provide the Internet and TV services you rely on in the future? To ensure you are not left without vital Internet and TV services, switch to Spectrum. With a network built for the future, Spectrum is here for the long haul—with our best deal for Internet and TV services from **$59.98/month for 12 months.**\*

- **Fast speeds** up to **200 Mbps.**ᵉ Everyone at home can stream, game and download at the same time with no data caps.

- **Spectrum is the top performing Internet provider**, delivering more speed, more consistently.ᴵᴵ

- **FREE** modem; Windstream charges $5.99/month for an Internet modem.ᶦ

- **FREE HD**† with instant access to a huge selection of On Demand titles.

- Download the **Spectrum TV® App**§ to stream up to 50+ LIVE channels† including BET, OWN and VH1 on your devices, anywhere in your home and everywhere on-the-go.

Windstream has a 2-year contract. With Spectrum there are no contracts.
**Plus, we will buy you out of your current contract up to $500.**\*\*

BEST DEAL EVER!

## Goodbye, Windstream.
## Hello, Spectrum.

### Call 1-855-280-7152
or visit Spectrum.com/lifestyle
**Limited-time offer! Expires 04/25/19**

SPECTRUM INTERNET 200 Mbps
+ SPECTRUM LIFESTYLE TV

# $59⁹⁸
/mo. for 12 mos.\*

NO CONTRACT

O325-ALD-59    33513001-A01-00595136-001552

**CHARTER ADVERTISEMENT**



## Spectrum▶

# Now is the time to switch
## to Spectrum.

Windstream's future is unknown, but Spectrum is here to stay—delivering Internet and TV services you can count on. Enjoy super-reliable **200 Mbps**\* Internet speeds, plus a **FREE** modem and **FREE** Security Suite.

With Spectrum Lifestyle TV, watch LIVE TV, your favorite shows, sporting events and more in superior digital picture and sound quality. Get instant access to thousands of **FREE** On Demand movies, shows and Primetime favorites. Download the Spectrum TV® App® to stream LIVE TV and On Demand titles anywhere in your home and everywhere on-the-go.

Watch Do The Right Thing anytime on STARZ ENCORE Black

Tuesdays @ 9pm on BET

Goodbye, Windstream.
**Hello, Spectrum.**

## Call 1-855-280-7152
or visit Spectrum.com/lifestyle

**Limited-time offer! Expires 04/25/19**

SPECTRUM INTERNET 200 Mbps
+ SPECTRUM LIFESTYLE TV

# $59.98
/mo. for 12 mos.*

**NO CONTRACT**

BEST DEAL EVER!

Offer expires 04/25/19; valid to qualified residential customers who have not subscribed to any services within the previous 30 days and have no outstanding obligations to Charter. *Bundle price for Spectrum Lifestyle TV and Internet is $59.98/mo., from yr 1; standard rates apply after promotional period ends, additional services are extra. **Restrictions apply. For contract buyout qualifications, go to spectrum.com/buyout. ‡Channel and HD programming availability based on level of service and may vary by area. It is possible that some channels are not available in certain areas. §TV App account log-in may be required to stream some TV content online. Apps are free with corresponding level of service. Apps and live streams available in the U.S. only and subject to additional restrictions. ‡Services compared to Kinetic Internet 200 and DirecTV packages per windstream.com; 03/07/19. General Terms: TV: Install, other equipment, taxes, fees and surcharges extra (1xlcst. surcharge up to $11.99/mo.). INTERNET: ^Available Internet speeds may vary by address. Based on the 2016 FCC Broadband Report. Services subject to all applicable service terms and conditions, subject to change. Services not available in all areas. Restrictions apply. To reduce Charter direct mail, visit spectrum.com/dmoptout. Viacom Media Networks, a division of Viacom International Inc. Starz® and Starz Encore® and related channels and service marks are the property of Starz Entertainment, LLC. Visit starz.com for airdates/times. Do The Right Thing ©1989 Universal City Studios, Inc. All trademarks are the property of their respective owners. ©2019 Charter Communications.

0325-ALD-59    33513001-A01-00595136-001552        000020554

**Windstream's Customers Are Confused And Misled By Charter's Advertisements**

24.     Charter's advertising has caused consumer confusion and consumer deception among Windstream's customers.  On information and belief, Windstream customers were misled into opening the envelopes because they believed that the communications came from Windstream.  Upon opening the envelopes, customers were then confused and misled by the false statements contained in the advertisements.

25.     As one example, a Windstream customer called Windstream to say that she was disconnecting service because she had switched to Spectrum just as the letter from *Windstream* had instructed her to do:

> …. I got a letter in the mail saying that ya'll were going bankrupt and for me to go with Spectrum so I have gone to Spectrum and I have just called to have the services of Windstream disconnected.
> . . .
> I've got Spectrum over here so they go everything hooked up and so they told me not to call you until they got everything going like it's supposed to be but I got that letter in the mail *from Windstream* and told me to get with you guys – to get with Spectrum so that's what I did.
> . . .
> . . . I'm getting services disconnected with Windstream because of the letter that I got in the mail.
> . . .
> [Customer care associate] . . . We haven't gone bankrupt where you would need to leave our services.  So I definitely apologize for any misunderstanding with that.
> Yea, I got a very much misunderstanding on that.  I thought ya'll cause it said had gone uh…I got the letter right here and I thought ya'll were going bankrupt and ahh..get going out of service.
> . . .
> Oh, well I was just going there because it says hello I mean goodbye Windstream and uh..to got to Spectrum.
> . . .
> Oh lord, well I've been [Inaudible] on 'em honey.  I thought the letter was from you cause it *said Windstream Corporation*.
> . . .
> I thought that I had a certain time to discontinue your service.  You know.
> . . .

The way the letter was written honey I mean. . .

. . .

Because I mean uh I got the letter and I mean you know I've never got a letter like that.

. . .

From anyone and then I get a letter from you and I didn't know what and it was telling me and I was just doing what the letter and it say *from Windstream*.

26.     As another example, the following Windstream customer took to posting on social media to express his obvious distress of learning from Charter's advertisements that he would be losing services due to Windstream's bankruptcy:



27.     Additionally, as a direct result of Charter's false advertising, many of Windstream's customers called in or visited local stores, upset and concerned about the status of Windstream's services.  The following are just a few examples of Windstream customer care associates' contemporaneous notes of Windstream customers who called in on March 22, 2019, and March 27, 2019, because they were confused and concerned after receiving Charter's advertisements:[4]

[Redacted customer name, account information, and address]

LINCOLN, NE, United States, 68516
FLYER IN MAIL SAID SPECTRUM SAID THEY ARE LOSING THE WS
SERVICE THEY NEED TO CALL THEM

---

[4] When Windstream's customer care associates take customer calls, they make contemporaneous notes, taking down the customer's information and describing the customer's concerns.

. . .

Customer [Redacted] received a letter from Spectrum [redacted account information] stating that Windstream has filed for Bankruptcy and will soon be discontinuing service to his area in Morehead, KY. Account noted, customer reassured and thanked for the heads up

. . .

[Redacted customer name, account information, and address]
Tollesboro, KY 41189
Customer called in upset that spectrum called her and sent letter in mail saying we filed bankruptcy and they needed to switch over.

. . .

[Redacted customer name, account information, and address]
[Redacted name] CI[5] WNATED TO KNOW IF WE WERE CLOSING DUE TO CHAPTER 11 BANKRUPCY/ SAID THAT SHE RECEIVED A LETTER FROM SPECTRUM TELLING THEM THAT WE ARE [CLOSING]/ ADVISED IT WAS NOT TRUE AND GAVE INFO OF CHAPTER 11 TO BETTER UNDERSTAND/ ALSO WENT OVER SERVICES AND REMOVED SHIELD PRODUCT/ NO OTHER CHANGES

. . .

[Redacted customer name, account information, and address]
[Redacted name] called re Spectrum Letter re Windstream going away, has kinetic TV; she will mail letter to my attention; emailed info to [Redacted]

. . .

[Redacted customer name, account information, and address]
[Redacted name] ci to go over letter he received from spectrum and chapter 11/ advised we are not closing and no changes

. . .

[Redacted customer name, account information, and address]
[Redacted name] ci about receiving letter from Spectrum about Windstream going out of business/ sent email to [Redacted]/ reassured customer that she has no worries about her service going anywhere

. . .

[Redacted customer name, account information, and address]
[Redacted name] ci to adv she got letter from spectrum stating we were going out of business/ reassured her we are not/ upgraded to 50mg

28.    In addition to the foregoing, other Windstream customers called in to express

concerns or to ask questions as a direct result of receiving Charter's false advertisements.  In

---

[5] Windstream customer care associates often use short-hand in taking notes.  "CI" means "called in" and "adv" means "advised."

total, Windstream received at least 160 calls in the course of ten days.  Moreover, some customers who received the targeted advertising called Charter to inquire and were told by Charter that they "have a contract with Windstream to buy us out."  This is outright false.

29.     Windstream is informed and believes that the above-referenced advertisements were sent to Windstream's customers in Alabama, Georgia, Kentucky, Ohio, Nebraska, North Carolina, and elsewhere.

30.     As a direct result of Charter's advertising campaign, Windstream has been forced to expend substantial time, money, and resources to combat these false claims.  When distressed customers have called in, Windstream has offered upgrades, which many customers have taken. Windstream has also incurred costs and resources to educate its customer care associates on how to provide a comprehensive response to Charter's false claims, which includes an explanation of the true effects of the Chapter 11 proceedings.  In addition, as a direct result of Charter's advertising campaign, Windstream has undertaken an extensive mailing and advertising campaign, at significant cost and expense, to counter Charter's false and misleading advertising campaign.  Windstream's Legal department has also expended extensive time and effort in researching and responding to this matter.

**Charter Improperly Disconnected Service To Windstream Customers To Fabricate "Uncertain" Service**

31.     At the same time Charter engaged in its false advertising campaign, Charter undertook actions that created the false appearance that Windstream's services were, in fact, in a state of "uncertainty ███████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

32.    On or about March 14, 2019, Charter disconnected service to approximately 350

such Windstream customers, ████████████████████████████████████

████████████████████    When Windstream customers contacted Charter to have their services

reinstated, they were told by Charter that service was not being reinstated because of

Windstream's failure to pay certain amounts due to Charter.  Windstream, however, is not

currently authorized to make any payments to Charter on account of prepetition debt as a result

of the Chapter 11 filing.  Charter's attempt to thus collect prepetition is a willful violation of the

Bankruptcy Code's automatic stay and was a deliberate attempt to manufacture a problem with

Windstream's services.  Thus, the only "uncertainty" in Windstream's services since the Chapter

11 Cases have been deceitfully caused by Charter in violation of the automatic stay.

**Charter Claims It Is Entitled To Mislead Customers About Windstream's Bankruptcy
Even Though It Previously Filed A Lawsuit Against DirectTV For Engaging In The Same
Type Of Advertising Campaign During Charter's Bankruptcy**

33.    Windstream sought to confer with Charter about these issues prior to filing the

Complaint.  On March 20, 2019, representatives of the parties convened a call to discuss certain

false and inaccurate statements made by Charter's employees and agents regarding

Windstream's bankruptcy.  On March 21, 2019, Windstream sent a follow-up letter enclosing a

copy of one of the false advertisements at issue and demanding that Charter immediately cease

and desist from all further use of the advertisements.  A true and correct copy of Windstream's

March 21, 2019, letter is attached hereto as **Exhibit B**.  When Charter did not respond in a

meaningful way, Windstream sent a follow-up letter on March 26, 2019.  A true and correct copy

of Windstream's March 26, 2019, letter is attached hereto as **Exhibit C**.

34.      On March 26, 2019, Charter responded to Windstream's letters, contending that its advertisements were not false or misleading, and that it was proper to describe Windstream's bankruptcy as creating an "uncertainty." According to Charter, a Chapter 11 bankruptcy filing "creates 'uncertainty' regarding Windstream's future until the bankruptcy is resolved." A true and correct copy of Charter's March 26, 2019, letter is attached hereto as **Exhibit D**.

35.      In 2009, however, when Charter was undergoing its own Chapter 11 bankruptcy, Charter took the ***exact opposite position***. Specifically, Charter denounced an advertising campaign targeting its own bankruptcy as uncertain, as a false, misleading, and deceitful campaign orchestrated to cause consumer confusion and irreparable harm.

36.      Indeed, on April 11, 2009, Charter filed a complaint in the Eastern District of Missouri entitled *Charter Communications Holding Company, LLC v. DirecTV, Inc.*, Case No. 4:09-cv-00730-RWS, seeking a temporary restraining order and preliminary injunction under the Lanham Act to enjoin DirecTV from engaging in a false and misleading advertising campaign that was virtually identical to the campaign in which Charter is currently engaged. Charter's complaint alleged that while it was in Chapter 11 bankruptcy, DirecTV launched a national advertising campaign specifically targeting Charter's customers and prospective customers "to exploit the fact that Charter filed for bankruptcy to create a misimpression among Charter's actual and potential customers that Charter is liquidating and that Charter's services will end or be substantially impaired." Charter further alleged that because its "relief . . . to continue business as usual [was] granted . . . DirecTV's ads [were] literally false, grossly misleading, cause consumer confusion, and are likely to deceive Charter's current and prospective customers." *Id.* at 3. Charter also claimed that because "DirecTVs direct mail ads [were]

enclosed in envelopes that do not readily identify DirecTV as the sender," this exacerbated the consumer confusion and deception. *Id.* at 10.

37.     Charter asserted causes of action against DirecTV for false advertising under the Lanham Act and various other state consumer fraud and deceptive business practice claims. A true and correct copy of Charter's complaint is attached hereto as **Exhibit E**. After Charter obtained an order temporarily restraining DirecTV from engaging in the advertising campaign, the matter was resolved via a settlement and DirecTV agreed to cease its advertising campaign.

38.     Moreover, Charter has filed at least two other lawsuits accusing competitors of false advertising. In *CC Michigan, LLC (d/b/a Charter Communications) v. SBC Communications, Inc.*, 4:02-cv-00031-RHB (W.D. Mich.), Charter accused its competitor of making false and misleading statements about its cable modem Internet service. In *Charter Communications, Inc. v. Central Wisconsin, Communications, LLC*, 3:15-cv-00615-jdp (W.D. Wisc.), Charter accused its competitor of making false statements that it offered higher internet speeds thereby enticing customers to choose it over Charter. And in *Charter Communications Holding Company, LLC v. Macrae*, 2:18-cv-00577-JFW-KS, Charter accused its competitors of trademark infringement because the competitors copied Charter's design mark and used it in their marketing campaign and products. Charter apparently recognizes the harm in making false statements and improperly using one's trademark when it comes to its competitors' conduct, but believes that it is above the law when it comes to its *own efforts* to unlawfully gain an unfair competitive advantage.

## Count I – Violation of the Lanham Act, 15 U.S.C. § 1125(a)

39.     Windstream incorporates by reference paragraphs 1 through 38 as though fully set forth herein.

40.     Charter has made and continues to make false and misleading statements about Windstream's products and services, in written and oral communications to Windstream's customers, in violation of 15 U.S.C. § 1125(a).

41.     Individually and collectively, the advertisements described above are false or misleading and deceive, confuse, or are likely to deceive or confuse a substantial segment of their intended audience in that they falsely portray Windstream's bankruptcy as having a detrimental effect on Windstream's customers, including, without limitation, by stating that there is "risk" that Windstream will no longer be providing service in the future.

42.     Charter's use of false and misleading statements of fact, false and misleading descriptions of fact, or false and misleading representations of fact in its commercial advertisements deceive, or are likely to deceive, a substantial segment of their intended audience as to the nature, qualities, and characteristics of Charter's products and services.

43.     Charter's use of false and misleading statements of fact, false and misleading descriptions of fact, or false and misleading representations of fact in its commercial advertisements and promotions cause confusion, or are likely to cause confusion or mistake, as to a substantial segment of their intended audience as to the nature, qualities, and characteristics of Windstream's products and services.

44.     Charter's use of false and misleading statements of fact, false and misleading descriptions of fact, or false and misleading representations of fact in its commercial advertisements and promotions misrepresent the nature, characteristics, and qualities of Windstream's goods, services, or commercial activities.

45.     Charter's false and misleading statements in its commercial advertising and promotion have been disseminated to the public at large, which includes customers and potential customers of both Windstream and Charter.

46.     Windstream's customers have been actually deceived or confused by Charter's false and misleading statements.

47.     Charter's false and misleading statements were material in that they are likely to influence the purchasing decision of Windstream's current or prospective customers.

48.     Charter's false and misleading statements were, are, and continue to be made in interstate commerce.

49.     Charter's false and misleading statements were, are, and continue to be made in bad faith.  Charter intentionally set out to deceive the public with its advertisements including by using Windstream's mark and copying Windstream's distinct color pattern to lure customers into opening its advertisement containing false and misleading statements.

50.     Charter's false and misleading statements were, are, and continue to be made intentionally and willfully and with a reckless disregard for the rights of Windstream.

51.     Charter's false and misleading statements have resulted and will continue to result in actual or probable injury to Windstream.

52.     Charter's false and misleading statements have damaged and will continue to damage Windstream's business reputation and goodwill.

53.     Charter's false and misleading statements have and are likely to continue to injure Windstream by causing Windstream to lose subscribers and sales, resulting in monetary damages that are presently unknown to Windstream, in an amount to be determined at trial.

54.    Charter's false and misleading statements were, are, and continue to be disseminated knowingly and willfully by Charter.  Accordingly, Windstream is entitled to recover 1) Charter's profits, 2) monetary damages sustained by Windstream, 3) treble damages as provided under 15 U.S.C. § 1117(a), 4) costs as provided under 15 U.S.C. § 1117(a), and 5) attorneys' fees under 15 U.S.C. § 1117(a).

## Count II – Violation of Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. §§ 10-1-370, *et. seq.*

55.    Windstream incorporates by reference paragraphs 1 through 54 as though fully set forth herein.

56.    By engaging in the acts alleged above, Charter has engaged in deceptive trade practices in violation of O.C.G.A. §§ 10-1-370, *et. seq.* by, among other things:

a)    Using deceptive representations in connection with describing Windstream's  goods and services (10-1-372(a)(4));

b)    Representing that Windstream's goods and services have characteristics that they do not have (10-1-372(a)(5));

c)    Disparaging Windstream's goods and services by false or misleading representations of fact (10-1-372(a)(8)); and

d)    Engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding (10-1-372(a)(12)).

57.    These acts of Charter described above have been, and continue to be, knowing and willful.

58.    As a direct and proximate result of Charter's acts described above, Windstream has been irreparably harmed and damaged, and will continue to be irreparably harmed and damaged.  Windstream has no adequate remedy at law that will compensate it for the continuing and irreparable harm it will suffer if the wrongful conduct of Charter is not enjoined.

59.    Windstream is further entitled to costs and attorneys' fees pursuant to O.C.G.A. § 10-1-373(b).

## Count III – Violation of North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen Stat. § 75-1.1, *et. seq.*

60.    Windstream incorporates by reference paragraphs 1 through 59 as though fully set forth herein.

61.    The North Carolina Unfair and Deceptive Trade Practice Act provides that "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1(b).

62.    Charter's acts described herein constitute an unfair or deceptive act or practice, in or affecting commerce, and proximately caused injury to Windstream.

63.    Charter's acts described herein were willful.

64.    Windstream is entitled to damages, treble damages, and attorneys' fees pursuant to N.C. Gen. Stat. § 75-16 and § 75-16.1.

## Count IV – Violation of Nebraska Uniform and Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-302, *et. seq.*

65.    Windstream incorporates by reference paragraphs 1 through 64 as though fully set forth herein.

66.    By engaging in the acts alleged above, Charter has engaged in deceptive trade practices in violation of Neb. Rev. Stat. § 87-302 by, among other things:

    a)    Using deceptive representations in connections with goods and services (87-302(a)(4));

    b)    Representing that goods or services have characteristics that they do not have (87-302(a)(5)); and

    c)    Disparaging the goods, services, or business of Windstream by false or misleading representation of facts (87-302(a)(9)).

67.    Charter's acts described herein were willful.

68.    Windstream is entitled to injunctive relief, costs, and attorneys' fees pursuant to

Neb. Rev. Stat. § 87-303(a)-(c).

██████████████████████████

69.    Windstream incorporates by reference paragraphs 1 through 68 as though fully set

forth herein.

70.    ████████████████████████████████████████████████

███████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

█████

72.    █████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

73.    ████████████████████████████████████

██████████████████████████████████████████████████

██████████████

74.    █████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████



### Count VI – Violation Of Automatic Stay, 11 U.S.C. § 362

79.     Windstream incorporates by reference paragraphs 1 through 78 as though fully set forth herein.

80.     The automatic stay prohibits, among other things, acts to exercise control over the property of a debtor's estate and any act to collect, assess, or recover a claim against a debtor that arose before the petition date. *See* 11 U.S.C. §§ 362(a)(3), (6).



82.     Charter also violated the automatic stay and section 362(a)(2) of the Bankruptcy Code when it sent false and deceptive advertisements to Windstream's customers, thereby impairing Windstream's goodwill.

83.     Finally, Charter violated the automatic stay and section 362(a)(3) of the Bankruptcy Code when it disconnected customers' service in an attempt to collect its prepetition debts.

84.     Pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, Windstream is therefore entitled to a judgment that Charter has willfully violated the automatic stay, damages according to proof, and attorneys' fees.

### Count VII – Equitable Subordination, 11 U.S.C. § 510(c)

85.     Windstream incorporates by reference paragraphs 1 through 84 as though fully set forth herein.

86.     Windstream seeks the equitable subordination of all the claims of Charter Communications, Inc. and its subsidiaries and affiliates (collectively, the "Charter Claimants") against the Debtors to the claims of all other creditors pursuant to 11 U.S.C. § 510(c).  Equitable subordination is appropriate for violations under the automatic stay 11 U.S.C. § 362.  *See In re Fletcher Int'l, Ltd.*, No. 12-12796 (REG), 2014 WL 2619690 (Bankr. S.D.N.Y. June 11, 2014). Any and all claims asserted by the Charter Claimants against the Debtors should be equitably subordinated for purposes of distribution pursuant to 11 U.S.C. § 510(c), and the Charter Claimants should not be permitted to receive any distributions on any claims asserted or to be asserted by the Charter Claimants in these Chapter 11 cases until payment in full with interest is made to all non-defendant creditors of Windstream.

### PRAYER FOR RELIEF

Wherefore, Windstream respectfully prays for relief as follows:

1.     Preliminary and permanent injunctive relief enjoining Charter, its affiliates, officers, agents, employees, and all others in active concert or participation with them from: (a)

disseminating the advertisements described in the Complaint, and any other advertisements similar thereto; and (b) claiming, whether directly or by implication, in any advertisement, telephone campaign, email campaign, media campaign, or any other type of promotional communication (including as part of any "door to door" campaign), that Windstream's bankruptcy will impair or otherwise adversely impact Windstream's ability to continue to provide service to its customers;

2.      Preliminary and permanent injunctive relief requiring Charter, its affiliates, officers, agents, employees, and all others in active concert or participation with them to (a) provide Windstream a complete list of all customers to whom the advertisements were disseminated and/or who were otherwise contacted; and (b) disseminate corrective advertisements, approved by the Court, that inform customers of the falsity of Charter's prior statements.

3.      Equitable subordination and/or equitable disallowance of any and all claims asserted by the Charter Claimants against the Debtors;

4.      Damages according to proof, including but not limited to an amount no less than (a) Charter's profits, (b) Windstream's lost profits, and (c) Windstream's damages;

5.      Treble damages pursuant to 15 U.S.C. § 1117(a) and N.C. Gen. Stat. § 75-16;

6.      Punitive damages;

7.      Attorneys' fees pursuant to 15 U.S.C. § 1117(a), N.C. Ge. Stat. § 75-16, Neb. Rev. Stat. § 87-303(a)-(c), ███████████████, or as otherwise provided by law;

8.      Costs of suit;

9.      Pre-judgment and post-judgment interest as permitted by law; and

10.     Such other and further relief as the Court may deem just and proper.

Dated: April 5, 2019          */s/ Steven J. Reisman*
      New York, NY         Steven J. Reisman
                        Tami Kameda Sims (*pro hac vice pending*)
                        Shaya Rochester
                        Cindi M. Giglio
                        **KATTEN MUCHIN ROSENMAN LLP**
                        575 Madison Avenue
                        New York, NY 10022
                        Telephone: (212) 940-8800
                        Facsimile: (212) 940-8876
                        Email: sreisman@katten.com
                                tami.sims@kattenlaw.com
                                srochester@katten.com
                                cgiglio@katten.com

                        *Proposed Conflicts Counsel to the Debtors and Debtors in Possession*