**WHITE & CASE LLP**
Southeast Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Thomas E Lauria, Esq. (admitted *pro hac vice*)

1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113
J. Christopher Shore, Esq.
Harrison Denman, Esq.
Philip M. Abelson, Esq.
Julia M. Winters, Esq.

*Special Counsel to UMB Bank, N.A.
and U.S. Bank N.A.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>WINDSTREAM HOLDINGS, INC., *et al*,[1]<br><br>　　　　　　　　　　　　　Debtors. | Case No. 19-22312 (RDD)<br><br>(Jointly Administered) |

**LIMITED OBJECTION OF UMB BANK, NATIONAL ASSOCIATION AND
U.S. BANK NATIONAL ASSOCIATION, AS INDENTURE TRUSTEES,
TO DEBTORS' SECOND MOTION TO EXTEND THE DEBTORS' EXCLUSIVE
PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES
THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE**

---

[1] The last four digits of Debtor Windstream Holdings, Inc.'s tax identification number are 7717. A complete list of the debtor entities and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at http://www.kccllc.net/windstream. The location of the Debtors' service address for purposes of these chapter 11 cases is: 4001 North Rodney Parham Road, Little Rock, Arkansas 72212.

AMERICAS 101651233

UMB Bank, National Association, solely in its capacity as successor indenture trustee ("UMB Bank") under that certain indenture dated as of December 13, 2017 with Windstream Services, LLC ("Services") (as successor to Windstream Corporation) and Windstream Finance Corp. as co-issuers of 8.75% Senior Notes due 2024 and U.S. Bank National Association, solely in its capacities as indenture trustee ("U.S. Bank," and together with UMB Bank, the "Unsecured Notes Trustees") under (i) that certain indenture dated as of October 6, 2010 between it and Services as issuer of 7.75% Senior Notes due 2020, (ii) that certain indenture dated as of March 28, 2011 between it and Services as issuer of 7.75% Senior Notes due 2021, (iii) that certain indenture dated as of November 22, 2011 between it and Services as issuer of 7.50% Senior Notes due 2022, (iv) that certain indenture dated as of March 16, 2011 between it and Services as issuer of 7.50% Senior Notes due 2023, and (v) that certain indenture dated as of January 23, 2013 between it and Services as issuer of 6.375% Senior Notes due 2023, hereby file this objection to the *Debtors' Second Motion to Extend the Debtors' Exclusive Period to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [Docket No. 1281] (the "Motion")[1] and respectfully state as follows:

## OBJECTION

1.  The Debtors' request for a 247-day extension of their exclusive period to file a chapter 11 plan is inappropriate under the facts and circumstances of these chapter 11 cases. Since the petition date, the Debtors have been hemorrhaging cash. With funds borrowed monthly from Services, Windstream Holdings, Inc. ("Holdings") has been paying Uniti over $55 million per month under the "Master Lease," even though the Debtors believe the contractual arrangement with Uniti (the "Uniti Arrangement"), including the Master Lease, should be recharacterized as a

---

[1] Capitalized terms used and not otherwise defined herein shall have the meaning ascribed to them in the Motion.

financing (which would eliminate the need to make such payments). Moreover, if the Uniti Arrangement is viewed as a true lease, the monthly rental obligation is at least $22-25 million above market ($264-300 million annualized).

2. Rather than prosecuting the cases with the expected alacrity, the Debtors waited five months before seeking relief with respect to the Uniti Arrangement, which they have admitted is the linchpin for these cases, and they only agreed to the current litigation schedule under pressure from their creditors. As important, the Debtors have failed to make any meaningful progress toward a plan, largely because of their unwillingness to adopt an appropriate value-maximizing stance with respect to the Master Lease, whether as a consequence of conflicts of interest or poor judgment.

3. The Debtors' delay should not be rewarded with an 8-month extension of exclusivity. While the Unsecured Notes Trustees do not argue for an immediate termination of exclusivity at this time, such relief may be warranted in the near future, particularly given the Debtors' recent stipulation with Uniti (which conditionally extends out the Debtors' out-of-market payment obligations to Uniti). As such, for the reasons set forth herein, the Debtors need to be kept on a relatively short leash – an appropriate check-point on progress would be achieved with a 2-3 month exclusivity extension.

4. First, *all* of the Debtors' material stakeholders – the Ad Hoc Group of First Lien Lenders, the Ad Hoc Committee of Second Lien Noteholders, the Official Committee of Unsecured Creditors, and the Unsecured Notes Trustees – are united in opposing the Debtors' Motion and instead support a more limited extension. The statutory framework for extending exclusivity is premised on facilitating creditor consensus. See In re Mid-State Raceway, Inc., 323 B.R. 63, 68 (Bankr. N.D.N.Y. 2005) ("exclusivity is intended to promote an environment in which

… a consensual plan may be negotiated") (citing the legislative history of the Bankruptcy Reform Act of 1978). Here, universal creditor opposition informs that the lengthier period requested by the Debtors is excessive and should be curtailed.

5. <u>Second</u>, the extension sought by the Debtors would impose significant costs on their estates and stakeholders. Holdings continues to pay postpetition "rent" (which is funded entirely by postpetition administrative loans from Services) under the Master Lease at the rate of approximately $55 million per month, even though the Debtors' own disclosures regarding, among other things, the fair market value of the leased assets at the time of the spin, the economic life of the leased assets, and the fair lease rate imply that such rent is approximately $22 to $25 million per month above the market rate for the leased property. <u>See</u> *Limited Objection of UMB Bank, National Association and U.S. Bank National Association, as Indenture Trustees, to Debtors' Motion to Stay Purported Application of the Deadline Under Section 365(d)(4) of the Bankruptcy Code to the Uniti Arrangement* [Docket No. 1219], ¶ 5. The continued payment of above-market amounts would be unnecessary if, as the Debtors allege in the adversary complaint, the Uniti Arrangement, including the Master Lease, is a financing rather than a true lease. Under such circumstances, Holdings would not need to provide treatment in respect of Uniti's debt claims until plan confirmation.

6. <u>Third</u>, once paid to Uniti, the funds advanced each month are likely forever lost to Services and its creditors regardless of whether the Court ultimately determines to recharacterize the Uniti Arrangement, including the Master Lease. The fact is that Holdings has no assets other than its ownership interest in Services and its claims against Uniti. If the Uniti Arrangement is recharacterized, Holdings would have a legal right to seek disgorgement from Uniti of all postpetition transfers – which at the rate of approximately $55 million per month would total

approximately $715 million from the Petition Date through the expected conclusion of the trial in the adversary proceeding. Such a recovery would be critically important to the creditors of Services because it would permit Holdings to repay the amounts it has borrowed from Services during these cases. However, because Uniti is a REIT, it dividends out substantially all of its cash on a quarterly basis, which leaves (a) Holdings with a claim against an entity with insufficient assets to disgorge its windfall, and (b) Services with an uncollectible intercompany priority claim against Holdings.

7. <u>Fourth</u>, any efforts by the Debtors in the future to extricate themselves from the current payment of above-market rent will encounter delays arising from the Debtors' recent stipulation with Uniti. <u>See</u> S*econd Stipulation and Agreed Order to Extend the Deadline Under Section 365(d)(4) of the Bankruptcy Code with Uniti* [Docket No. 1265] (the "<u>365(d)(4) Stipulation</u>"). Specifically, the 365(d)(4) Stipulation binds the Debtors to make payments under the Master Lease in the ordinary course as they come due during the extension period, even if the Debtors reject the Master Lease, unless and until the Debtors obtain an order from the Court permitting cessation of such payments. (<u>Id.</u> ¶¶ 4, 6) As such, even the Debtors' decision to reject the Master Lease would not by itself immediately turn off the current payment obligations. Instead, by requiring additional briefing and Court resolution, the 365(d)(4) Stipulation imposes additional hurdles that further cement the status quo monthly payments of over-market rent.

8. Clearly, then, each day that passes under the weight of the Master Lease prolongs the prejudice inflicted on Services and its creditors. The length of the Debtors' request – a full five months after the recharacterization trial – exacerbates that burden. At the same time, however, the Unsecured Notes Trustees support the Debtors' stated commitment to see the recharacterization litigation through to its conclusion on the current timeline. (Motion ¶ 19) As

the Debtors themselves note, determining the true nature of the Uniti Arrangement is the "gating item in these chapter 11 cases that must be resolved" in order for the Debtors to file a viable chapter 11 plan. (Id.) Trial on this issue is currently scheduled to begin on March 2, 2020. Thus, all parties will have more visibility into how this critical dispute will play out by early March, and a resolution may well be obtained by the end of March.

9. In the meantime, however, the Debtors should be negotiating with their creditor-stakeholders around consensual plans for either litigation outcome and should not wait until trial is concluded to begin crafting such reorganization plans. Giving the Debtors exclusivity for months beyond the trial provides them with *de facto* control over any settlement with Uniti and delays the Debtors' emergence from bankruptcy, creating the wrong dynamic.

10. As such, all things considered, an extension of exclusivity into March would seem to be workable. Importantly, such a limited extension would not prejudice the Debtors' ability to seek further extensions of exclusivity in the future. Likewise, the limited extension would not prejudice the ability of the Unsecured Notes Trustees and the other creditor constituencies to object to another extension request at that time, or to seek to shorten such extensions. Keeping these cases on a short exclusivity timetable represents an appropriate balance of the respective burdens and benefits for these cases at the present time of uncertainty. See In re Borders Grp., Inc., 460 B.R. 818, 821 (Bankr. S.D.N.Y. 2011) (quoting In re Ames Dep't. Stores, Inc., No. 90-B-11233, 1991 U.S. Dist. LEXIS 17074, at *6 (S.D.N.Y. Nov. 25, 1991) ("The decision of whether to extend the exclusivity periods under section 1121(d) involves a careful balancing of competing factors and a consideration of the interest of the many parties involved.").

## CONCLUSION

11. For the reasons set forth above, the Unsecured Notes Trustees respectfully request that the Court (i) limit any extension of the Filing Exclusivity Period to a date in March 2020 that

the Court determines to be appropriate, subject to the Debtors' right to seek a further extension and the stakeholders' rights to object or seek to shorten; and (ii) and grant such other relief as the Court deems just and proper.

Dated: December 16, 2019
      New York, New York

**WHITE & CASE LLP**

By:   /s/ J. Christopher Shore
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Thomas E Lauria, Esq. (admitted *pro hac vice*)

1221 Avenue of the Americas
New York, NY 10020-1095
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113
J. Christopher Shore, Esq.
Harrison Denman, Esq.
Philip M. Abelson, Esq.
Julia M. Winters, Esq.

*Special Counsel to UMB Bank, N.A.
and U.S. Bank N.A.*